**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
Lily Engleman on 02/14/2023

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3      LILY ENGLEMAN,              )
                                    )
 4           Plaintiff,            )
                                    )
 5      vs.                         )
                                    ) Civil Action File No.
 6      NATHAN ADKERSON,            ) 1:21-cv-01992-MLB
        MARYJANE MOSS, JOSE         )
 7      MORALES, et al.,            )
                                    )
 8           Defendants.           )
                                    )
 9                                  )
                                    )
10                                  )

11
                         - - -
12

13              Videotaped Deposition of

14                   LILY ENGLEMAN

15                (Taken by Defendants)

16                 Decatur, Georgia

17                February 14, 2023

18
        Reported by:   Lynne C. Fulwood
19
                       Certified Court Reporter
20

21

22

23

24

25
```

```
 1   STATE OF GEORGIA

 2   COUNTY OF COBB

 3   VIDEOTAPED DEPOSITION OF LILY ENGLEMAN

 4

 5             Pursuant to Article 8.B of the RULES AND

 6   REGULATIONS OF THE BOARD OF COURT REPORTING OF THE

 7   JUDICIAL COUNCIL OF GEORGIA, I make the following

 8   disclosure:

 9             I am a Georgia Certified Court Reporter.

10   I am here as a representative of Huseby Global

11   Litigation.

12             Huseby Global Litigation was contacted by

13   the offices of SATCHER & MCGOVERN, LLC, to provide

14   court reporting services for this deposition.  Huseby

15   Global Litigation will not be taking this deposition

16   by O.C.G.A. 15-14-37 (a) and (b).

17

18

19

20

21

22

23

24

25
```

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
Lily Engleman on 02/14/2023                                    Page 3

```
 1    ON BEHALF OF THE PLAINTIFF:

 2                  MARK BEGNAUD
                    Attorney-at-Law
 3                  Eshman Begnaud, LLC
                    315 West Ponce de Leon Avenue
 4                  Suite 775
                    Decatur, Georgia 30030
 5                  Mbegnaud@eshmanbegnaud.com

 6    ON BEHALF OF THE DEFENDANT, NATHAN ADKERSON:

 7                  ANNARITA L. MCGOVERN
                    Attorney-at-Law
 8                  Satcher & McGovern, LLC
                    288 South Main Street
 9                  Suite 100
                    Alpharetta, Georgia 30009
10                  Amcgovern@satchermcgovernlaw.com

11    ON BEHALF OF THE DEFENDANT, JOSE MORALES:

12                  ERIC BALLINGER - videoconference
                    Attorney-at-Law
13                  Royal Will
                    4799 Sugarloaf Parkway
14                  Building J
                    Lawrenceville, Georgia 30044
15                  Dwill@royallaw.net

16    ON BEHALF OF THE DEFENDANT, TOMEIKA JORDAN:

17                  DERRICK L. BINGHAM - videoconference
                    Attorney-at-Law
18                  Stites & Harbison, PLLC
                    303 Peachtree Street, N.E.
19                  Suite 2800
                    Atlanta, Georgia 30308
20                  Debingham@stites.com

21    ON BEHALF OF THE DEFENDANT, MARYJANE MOSS:

22                  NOAH GREEN - videoconference
                    Attorney-at-Law
23                  Appelbaum Henefeld & Green, P.C.
                    3017 Bolling Way, N.E.
24                  Suite 129
                    Atlanta, Georgia 30305
25                  Ng@aps-law.com
```

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
**Lily Engleman on 02/14/2023**                                    Page 4

```
 1    ON BEHALF OF THE DEFENDANTS WILLIAM CLAYTON NIX
      AND JOHN RICHEY:
 2
                  CHARLES E. COX, JR.
 3                Attorney-at-Law
                  Charles E. Cox, Jr., LLC
 4                Post Office Box 67
                  Macon, Georgia 31202-0067
 5                Charles@cecoxjr.com

 6    ON BEHALF OF THE DEFENDANT, JONATHAN ADAMS:

 7                ERIC O'BRIEN - videoconference
                  Attorney-at-Law
 8                Buckley Christopher, P.C.
                  2970 Clairmont Road, N.E.
 9                Suite 650
                  Atlanta, Georgia 30329
10                Tbuckley@bchlawpc.com

11    ON BEHALF OF THE DEFENDANT, MIKE RILEY:

12                CHARLES J. COLE
                  Attorney-at-Law
13                Mcrae Bertschi & Cole LLC
                  1872 Independence Square
14                Suite D
                  Dunwoody, Georgia 30338
15                Cjc@mcraebertschi.com

16

17

18

19

20

21

22

23

24

25
```

1

2                         - - -

3         Videotaped deposition of LILY

4    ENGLEMAN, taken by the Defendants, at 315

5    W. Ponce de Leon Avenue, Suite 800,

6    Decatur, Georgia 30030, on the 14th day of

7    February 2023, at 10:00 a.m., before Lynne

8    C. Fulwood, Certified Court Reporter.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
**Lily Engleman on 02/14/2023**                                          Page 6

```
 1                    INDEX TO EXHIBITS

 2    Exhibit 1        Videotape (retained by
                         Counsel)                    122
 3    Exhibit 2        JPay                           122

 4
                    INDEX TO EXAMINATION
 5
      Examination by Ms. McGovern                      8
 6
      Examination by Mr. Cole                         151
 7
      Examination by Mr. Cox                          156
 8
      Examination by Mr. Green                        163
 9
      Examination by Mr. O'Brien                      166
10
      Examination by Mr. Bingham                      173
11
      Examination by Mr. Ballinger                    176
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2                    - - -

 3         (Whereupon, the video camera was

 4    turned on.)

 5         THE VIDEOGRAPHER:  This is the

 6    beginning of Media 1, in the deposition of

 7    Lily Engleman, in the matter of Lily

 8    Engleman versus Nathan Adkerson, et al.

 9    Today's date is February 14th, 2023.  The

10    time is 10:21 a.m.

11         If the attorneys present would please

12    introduce themselves for the record, after

13    which the Court Reporter will swear in the

14    witness.

15         MR. BEGNAUD:  Representing Plaintiff

16    Lily Engleman, I'm Mark Begnaud.

17         MS. MCGOVERN:  Annarita McGovern for

18    Nathan Adkerson.

19         MR. COX:  Charles Cox for Mr. Nix and

20    Mr. Richey.

21         MR. COLE:  Chuck Cole for Mike Riley.

22         MR. BALLINGER:  Eric Ballinger filling

23    in for David Will representing Jose

24    Morales.

25         MR. GREEN:  Noah Green for Maryjane
```

```
 1        Moss.
 2              MR. BINGHAM:  Gary Bingham for Tomeika
 3        Jordan.
 4              MR. O'BRIEN:  And Eric O'Brien for
 5        Jonathan Adams.
 6                    LILY ENGLEMAN,
 7   having first been duly sworn, was deposed and
 8   examined as follows:
 9                    EXAMINATION
10   BY MS. MCGOVERN:
11        Q    Good morning, Ms. Engleman.
12        A    Good morning.
13        Q    My name is Annarita McGovern, and we just
14   met.
15             I wanted to touch base with you before we
16   begin to see if you'd been previously deposed before.
17        A    No.
18        Q    Okay.  Couple of basic ground rules.  We
19   obviously have a court reporter and a videographer.
20   We tend to nod and gesture, and I know I have a habit
21   of interrupting.  And if we can both try to speak one
22   at a time and not do any gestures so that we can have
23   a clean transcript.
24             If you need a break for any reason, let
25   me know.  I just ask that you answer the question on
```

```
 1   the table before taking the break.

 2              If you don't understand a question that I

 3   ask for any reason, please let me know, and I'll

 4   restate it.  Because if you answer, it will be taken

 5   down as if you understood and answered accordingly.

 6        A    Okay.

 7        Q    All that makes sense?

 8        A    Yeah.

 9        Q    Okay.

10              MS. MCGOVERN:  And I'm assuming we're

11         going to do the same stipulations and

12         reserve objections except as to form and

13         responsiveness?

14              MR. BEGNAUD:  Yes, ma'am.

15              MS. MCGOVERN:  Okay.

16   BY MS. MCGOVERN:

17        Q    Can you please state your full name for

18   the record?

19        A    Lily Eugenia Engleman.

20        Q    What is your date of birth?

21        A    September 5th, 1988.

22        Q    And what is your current address?

23        A    1445 Juneau Court, Tucker, Georgia 30084.

24   But I am moving on Saturday, so that won't be my

25   address for very long.
```

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023                              Page 10

```
 1        Q     Okay.  What's your new address on
 2   Saturday?
 3        A     I think it's 2985 First Avenue,
 4   Southwest, Atlanta, Georgia 30315.
 5        Q     Okay.  And is that a house, apartment --
 6        A     It's a house.
 7        Q     -- condo?
 8        A     It's a house.
 9        Q     Okay.  And buying or renting?
10        A     Yep.  I close on Thursday.
11        Q     Okay.  And your current address, is that
12   a house?
13        A     It's a house.
14        Q     And you own that?
15        A     A friend of mine owns it, and I've been
16   renting from her.
17        Q     Okay.  And how long have you been at your
18   current address?
19        A     We moved October of 2020.
20        Q     Okay.  All right.  And so where did you
21   live prior to 2020?
22        A     Before that, I lived in an apartment at
23   924 Brookhaven Way, Brookhaven, Georgia 30319.
24        Q     Okay.  And how many years have you lived
25   in the Atlanta area?
```

```
 1          A     Since 2015.
 2          Q     Okay.  And do you have family members
 3    that live in the -- in the Atlanta area generally?
 4          A     Yes.  So both of my parents live in
 5    Dahlonega.  I don't know if that counts as the
 6    Atlanta area, but they're in Dahlonega.  My sister --
 7    I have a younger sister who's kind of in, like,
 8    Kennesaw-Woodstock.  And I have an older brother
 9    who's in Peachtree Corners.
10          Q     And what are the names of your parents?
11          A     Dennis and Deborah Engleman.
12          Q     Sister, what's her name?
13          A     Mary Victoria Engleman.
14          Q     Okay.  And your brother, what's his name?
15          A     John Nicholas Engleman.
16          Q     And we say this for jury selection.  It's
17    not --
18          A     Yeah.
19          Q     -- to get into your personal business.
20                Any other family that you have including
21    cousins, aunts, uncles or anything in the Atlanta
22    area?
23          A     No.
24          Q     Okay.  You're not married?
25          A     No.
```

1       Q    And no children?

2       A    No.

3       Q    Okay.  Any prior legal actions you've

4  been involved with in your life as a plaintiff or as

5  a defendant?

6       A    No.

7       Q    Okay.  This is your first lawsuit?

8       A    Yes.

9       Q    Okay.  And I ask everyone this.  It's

10  not -- not to indicate anything.

11            Have you ever been arrested for any

12  reason?

13       A    No.

14       Q    Okay.  Nothing but any minor traffic

15  citations in your life?

16       A    Correct.

17       Q    Okay.  And tell me about -- oh, what was

18  your cell phone number at the time of the arrest and

19  the visit that we're here on today?

20       A    It's the same number that I've -- I still

21  have.  It's (706) 200-2062.

22       Q    Have you taken any -- first of all, do

23  you take any medications?

24       A    I take oral contraceptives.

25       Q    Okay.  And so have -- you haven't taken

1   any medications today that would impair your ability

2   to testify truthfully?

3        A    No.

4        Q    Okay.  And any other medical issues,

5   illness, lack of sleep or anything else that would

6   impair your ability to understand the questions and

7   answer them truthfully?

8        A    No.

9        Q    Okay.  And any -- what is your

10  educational background?  If you can kind of start

11  from high school and work me on up.

12       A    Okay.  So I graduated from high school,

13  Lumpkin County High School.  It's in Dahlonega.  That

14  was in 2006.  My senior year, I did joint enrollment

15  at North Georgia University, also in Dahlonega.  So I

16  was there my senior year of high school and my

17  freshman year of college.

18            After my freshman year of college, I

19  transferred to Georgia College and State University

20  in Milledgeville where I received my bachelor's of

21  arts degree.  I doubled majored in criminal justice

22  and English literature, and I minored in business

23  management.  I graduated from there in December of

24  2010.

25            And then I went back to school at Georgia

1  State University, fall of 2015, to get my master's in

2  social work, and I graduated in May of 2017.

3      **Q    Okay.  And were you working while you**

4  **were doing the Georgia State program or the --**

5      A    The social work program?

6      **Q    Yes.**

7      A    I was, yes.  So I -- I worked part time

8  at a restaurant, as a server at a restaurant.  I also

9  had a graduate research assistant position with a

10  professor at the school of social work.  So I did,

11  you know, research with her and kind of different

12  odds and ends.  And that paid for a lot of my tuition

13  plus gave me, like, a monthly stipend.

14      **Q    So -- and what restaurant were you**

15  **working part time at?**

16      A    The Wing Factory.

17      **Q    Okay.**

18      A    A sports bar in Buckhead.

19      **Q    Okay.  And were you taking classes full**

20  **time or part time?**

21      A    Full time.

22      **Q    Okay.  And any other educational work**

23  **after your MS- -- MSW from Georgia State?**

24      A    I mean, I have to do continuing

25  education.

1       Q     Sure.

2       A     But nothing like at a university, no.

3       Q     Okay.  Any other licenses or

4  certifications?

5       A     I have my -- I currently have my clinical

6  social work licensure that I just received in

7  January.  Prior to that, I had a lower level social

8  work licensure that I received right after

9  graduating.

10      Q     Explain the difference between the two

11 licensures.

12      A     Okay.  So the first one is a licensed

13 master social worker.  It's a licensure that you can

14 get once you get your master's degree in social work.

15 And beyond that, there aren't a lot of requirements.

16 You need, like, recommendation letters, whatever.

17 But you can immediately get it, and, you know,

18 it's -- it's a lower level licensure that does not

19 allow you to do clinical work, which is, you know,

20 like therapy, essentially.

21            And then a clinical social work

22 licensure, you can get after you have done supervised

23 clinical work for at least two years and you have

24 like 120 supervision hours and all of this kind of

25 stuff.  So usually, you know, you're not eligible to

1   get it until a few years after you get your master's

2   degree.  So I just received that in January.

3        **Q    In order to get that licensure, do you**

4   **have to take any tests or additional coursework?**

5        A    Yes.  Yes, there's tests for both of

6   them.

7        **Q    Okay.**

8        A    Uh-huh.

9        **Q    And then during what period of time did**

10  **you do your supervision for those subsequent license?**

11       A    I did my supervision when I was with the

12  capital defenders office.

13       **Q    Okay.**

14       A    And so a new director is mitigation

15  there.  She is a clinic social worker, and so she was

16  able to provide me with supervision.  There was

17  another clinical social worker on staff who I also

18  did supervision with.  And then, of course, when I --

19  my employment ended, I could not continue that with

20  them.

21            So about, I think, November of 2021, a

22  friend of mine connected me with a -- like a paid --

23  you can -- you can either get supervision through

24  your employment if they offer it for free, or you

25  can, you know, hire someone, essentially.  And there

1  are a lot of people, social workers, that kind of do

2  that as a side hustle.  So I did supervision for

3  about a year with her.  Her name is Jamie Bray.

4        **Q     Jamie Bray.**

5        **How do you spell that?  B-R- --**

6        A    B-R-A-Y.

7        **Q     And where is she in practice?**

8        A    I think she lives in Athens.  She's a

9  professor, social work professor at UGA, so I think

10  she works in Athens.

11        **Q     And so the supervision was received in**

12  **Athens?**

13        A    No.  So it was done over the phone.  So

14  we would have hourly phone sessions.  And then we

15  also did group supervision via Zoom.

16        **Q     Like Telehealth?**

17        A    Yeah, essentially so.  Uh-huh.

18        **Q     Okay.  And she would supervise you during**

19  **your telehealth?**

20        A    Well, I wasn't doing telehealth.  It was

21  like the group supervision would be me and maybe five

22  other supervisees.

23        **Q     Okay.**

24        A    So she had like, I don't know, 15

25  different people that she was supervising.  And we

1    would get together, you know, via Zoom and talk about

2    different cases that we were working, talk about

3    different, you know, issues that we were having.  You

4    know, I have a client that's presenting this way,

5    what do you-all think about that and -- yeah.

6        Q    Okay.  And so how many hours do you do

7    with Ms. Bray, approximately?

8        A    I -- I think when I left the capital

9    defenders office, I had to have 120 total.

10       Q    Right.

11       A    When I left the capital defenders office,

12   I had roughly half of that.  I think it was maybe

13   around 52 or 54.

14       Q    Okay.

15       A    So I did the remainder with Ms. Bray.

16       Q    Okay.  So about half?

17       A    Yeah.

18       Q    And then when did you receive the

19   subsequent licensure?

20       A    I think I took the test January 4th and

21   passed and then, you know, was immediately --

22       Q    Of this year, '23?

23       A    Yeah.  Yes, last month.

24       Q    Okay.  And you passed it, and you found

25   out and got the licensure when?

1        A    I mean, you find out that day --

2        Q    Okay.

3        A    -- that you passed.

4        Q    All right.  Okay.  So this happened.

5    Congratulations.

6        A    Yeah.

7        Q    Okay.  And so what does the new

8    certification allow you to do then?

9        A    I'm sorry, Mark.  The new certification

10   allows me to practice clinical social work.  So if I

11   wanted to open my own therapy business, I could do

12   that.  If I wanted to, you know, partner with another

13   therapist and kind of have a -- you know, a private

14   practice together, we could do that.

15            I don't want to do that.  I'm not

16   interested in being a private therapist.  I've never

17   been interested in that.  But I -- I want to have

18   just the highest level of credentials possible in my

19   field just for my own kind of sense of professional

20   credibility.  I wanted just the training and the

21   supervision that went along with getting that

22   licensure because it helps me do my job better, you

23   know, whatever my job is.

24            So it's -- being a clinical social worker

25   is kind of -- it's similar to being a licensed

1    psychologist, except a licensed psychologist can do

2    psychological testing that social workers can't --

3    will never be able to do.

4         Q    So you have a larger variety of options

5    available to you in your employment as a result of

6    the --

7         A    That's right.

8         Q    -- the (inaudible) license, right?

9         A    Yes.

10        Q    Than you did back in --

11        A    For sure.

12        Q    -- 2019 or '20?

13        A    Yes.

14        Q    Okay.  All right.  And so have you done

15   any other subsequent training or -- or licensure

16   work?

17        A    No.

18        Q    Okay.  Other than your continuing

19   education?

20        A    Right.

21        Q    All right.  And your license is in good

22   standing?

23        A    Yes.

24        Q    And your prior license is also in good

25   standing?

1      A    It doesn't -- it -- the clinical

2  licensure supercedes it, so it's --

3      Q    So it doesn't really matter?

4      A    It doesn't matter.  It's not in good

5  standing.

6      Q    Okay.  All right.  But you were never

7  suspended or had any ramifications on your license

8  previously?

9      A    Well, when I was arrested, I was not able

10  to renew.

11      Q    Okay.

12      A    You have to renew your licensure every

13  two years in Georgia.  And renewal year was -- it's

14  always on even years.  So it was like September of

15  2020.  And I went to renew, and there were -- you

16  have to indicate if you've been arrested within the

17  last year or, you know, anything like that.  And I

18  indicated that I had been arrested.

19            They wanted me to send in, you know, the

20  physician documents and all of that, which I didn't

21  have at that point.  You know, I'd been arrested, but

22  nothing has gone on with my criminal case whatsoever.

23  I was not even indicted yet.  And so I couldn't give

24  them anything.

25            And so the licensure -- it was placed in

1    this, like, not -- it wasn't, like, cancelled.  They

2    placed it in this, like, "cannot renew at the moment

3    type" status.  And it was like that for, I think -- I

4    think I finally was able to give them some

5    documentation that they accepted maybe in the spring

6    of 2021.  And then they did put it in active status

7    again.

8        Q    So how long were you in inactive status?

9        A    Maybe six months.

10       Q    Okay.

11       A    I think so.

12       Q    Okay.  And did you provide them any

13   supplemental information following your arrest,

14   whether it was just in a personal written narrative

15   or anything --

16       A    I gave them a --

17       Q    -- like that?

18       A    I gave them a letter.  I wrote them a

19   letter in the spring of 2021.  At that point, I had

20   been fired.  I lost my job.  You know, my licensure,

21   if you looked it up, it showed that it had not been

22   renewed.  That was a barrier to employment.  I wrote

23   them a letter explaining what had happened,

24   explaining why I didn't have any documentation.  And,

25   you know, showed them that once I did have

1   documentation, I would give it to them.  And they

2   said, Okay, you know, you haven't been convicted.

3   You know, we understand that.  We'll place this in

4   active status again, and then once you get

5   documentation, send it in.

6          Q    Okay.  All right.  And so in terms of

7   other types of training, you've never had any, like,

8   post training like correctional officers would have,

9   correct?

10         A    Oh, no.  No.

11         Q    Any legal training that you've ever had?

12  I mean, I know that you work with the --

13         A    Yeah.

14         Q    -- defenders office, so -- but any formal

15  -- let's start with any formal training classes,

16  courses, anything more along those lines.

17         A    In legal studies?

18         Q    Yes.

19         A    No.  I mean, I have a -- I mean, I attend

20  the same kinds of conferences that attorneys in my

21  office attend.  But there's not like -- I mean, I'm

22  not a lawyer.

23         Q    Right.

24         A    So no.

25         Q    Right.

1              So no -- no paralegal training, no --

2    A    No.

3    Q    -- formal legal training?

4    A    No.

5    Q    Just stuff that you would do through

6  work?

7    A    Yes.

8    Q    Okay.  And no weapons training?

9    A    No.

10    Q    Okay.  Tell me about your employment

11  history.  And I guess it would probably be easier if

12  we start where you're working now and work our way

13  back.

14    A    Okay.  So I currently work with the

15  federal defender program of the Northern District of

16  Georgia.  I've been there since January 18th of 2022.

17  So just about a year.

18    Q    Is that a similar position to what you

19  had with the state defender program?

20    A    It's very similar, yes.  I'm a mitigation

21  specialist.  The biggest difference is that I'm not

22  doing capital work.  It's non-capital cases, whereas,

23  of course, at the capital defenders office, was

24  solely capital work.

25    Q    And was that out of choice, or they

1  didn't have an opening, or how did that occur?

2        A    They don't do capital cases.  I mean,

3  they have -- they have a capital habeas unit.  It's

4  very, very small.  You know, it's -- they just need

5  one mitigation specialist that's fully staffed.

6  Yeah, so the trial unit doesn't do capital cases.

7        Q    Okay.  And are you appearing in most

8  courts in the Northern District of Georgia in terms

9  of your work?  Are you providing testimony?

10       A    I don't provide testimony, but yes, we're

11 in -- I do cases for all the judges, if that's what

12 you're asking.

13       Q    Yeah, that's what I was kind of getting

14 to.

15            Have you been before most of the judges

16 in the Northern District or been familiar or

17 submitted information on cases for --

18       A    Yeah.

19       Q    -- most of the judges?

20       A    Yes.  Yes.

21       Q    Any that you deal with more often than

22 not?

23       A    It's really just random.  So what happens

24 is if an attorney at my office has a case that they

25 think mitigation work would be very useful on, if

1    they have a case in which they have already kind of

2    identified or believe that their client has mental

3    health issues, maybe has substance abuse issues that

4    are, you know, relevant to the crime that happened.

5    Maybe they think their client has a long history of

6    trauma or something.  You know, maybe their client is

7    just kind of acting bizarrely and they don't know why

8    and they want someone with some training in that to

9    kind of help figure out what's going on, they'll ask

10   me to work on their case.

11            And there's one other full-time

12   mitigation specialist as well, so we kind of take

13   cases on a rotating basis.  If we're very full, you

14   know, we have very full caseloads, we'll tell

15   attorneys we can't really handle it right now, maybe

16   try to get a continuance, we can maybe look at it in

17   a couple of months or something.  So it's just very

18   random as to what attorney wants us and for what case

19   and what judge they happen to have.

20       **Q    Okay.  Who do you work directly for?**

21   **Who's your direct supervisor?**

22       A    Stephanie Kearns is the director of the

23   agency.

24       **Q    Her --**

25       A    K-E-A-R-N-S.

```
 1        Q      Thank you.

 2               And has that gone well?  No negative --

 3        A      Uh-huh.

 4        Q      -- issues with the -- with the job,

 5     negative feedback or anything like --

 6        A      It's been great.

 7        Q      Okay.

 8        A      It's been great.

 9        Q      All right.  And so prior to working at

10     the federal defenders office, where did you work?

11        A      Prior to that, I -- in May of 2021, I

12     opened my own LLC, like a mitigation advocacy, LLC.

13     That's still active.  I still have one case left over

14     from like a year ago that I -- is still kind of a

15     little bit active.  So the LLC is still active.

16               So I -- I mostly contracted with CJA

17     panel attorneys for that.  I did do some other things

18     as well.  But I had that from -- I opened that in

19     May 2021, if I remember correctly.  And then, you

20     know, was doing that until I got the full-time job at

21     the federal defenders office --

22        Q      What was --

23        A      -- in January 2022.

24        Q      What was the name of the LLC?

25        A      The Whole Story Mitigation Advocacy.
```

1        Q     And you operated as an LLC, but you were

2    the sole --

3        A     Yes.

4        Q     -- owner?

5              And so you received, like, 1099s from --

6        A     Yes.

7        Q     -- the state defender program or who --

8        A     From -- it's from the federal government.

9        Q     From the federal?

10       A     Yes, because I was -- I was working with

11   CJA panel attorneys, and so it was coming from the

12   federal government.  And then I -- I did do some

13   contract work with other full-time private mitigation

14   specialists who were doing capital cases who needed

15   additional help.  And I did a lot of work with a

16   forensic psychiatrist who does a lot of capital cases

17   who wanted help with record review and such like

18   that.  And yes, I received 1099s from them.

19       Q     All right.  And who is the forensic

20   psychiatrist you worked with?

21       A     Why am I blanking?  Shawn -- I'm blanking

22   on his last name.

23       Q     You would have a 1099 from him, though?

24       A     Yes.

25       Q     Okay.  And I don't think we've seen those

1   yet.  If you could provide 1099s, I don't think we've

2   seen the tax returns either for the relevant time

3   period.  You can follow up with that after the depo

4   too, so we can get it from that.

5        A    Sure.  Okay.

6        Q    And so any other major clients you have

7   through your LLC?

8        A    No, that was mostly it.  The CJA work and

9   I worked with a mitigation specialist out of Florida

10  a lot.  I worked with -- her name was Lisa Sullivan.

11  I worked with a psychiatrist a lot.  There was

12  another mitigation specialist here in Georgia that I

13  worked with some, but it was, like, very small

14  amount, like, I think I did one -- I worked on one

15  case briefly with her.

16       Q    Did you file a return for the LLC?

17       A    Uh-huh.

18       Q    Okay.  And --

19       A    I should say it out loud.  Yes.

20       Q    Okay.  And do you recall about what your

21  earnings were?

22       A    Not from the LLC itself.  I know that for

23  that year of 2021, I think I earned 37,000.  So prior

24  in the year, I was also working at the Wing Factory,

25  that restaurant.

1      Q      Right.

2             Before we get there, what was your hourly

3      rate that you charged, or did it vary for your LLC?

4      A      It was 75 -- 75 an hour for the CJA work.

5      The work I was doing with the psychiatrist and the

6      other mitigation specialist, I think, was 35 or 40 an

7      hour.

8      Q      And about how many hours over that

9      timeframe from May 2021 to getting -- you know, the

10     end of 2021 do you believe you worked?  Were you

11     working full time?

12     A      No.  It was definitely not --

13     Q      (Inaudible) hours a week?

14     A      It was definitely not full time.  I would

15     say on average -- I mean, it was not -- obviously, I

16     made 37,000.  It was hard living.  It was probably

17     ten to 15 hours a week.

18     Q      Ten to 15?

19     A      I would just guesstimate.

20     Q      Okay.  But you did file a return for your

21     LLC, The Whole Story.

22            And who prepared that return for you?

23     A      I did.

24     Q      You did your own return?

25     A      Uh-huh.

1      Q     Okay.  And the return would tell the

2   bottom line of what you earned from that business?

3      A     Yes.

4      Q     Okay.

5      A     Yeah, because I received a W-2 from the

6   restaurant, so you can just --

7      Q     Correct.

8      A     -- subtract it out.

9      Q     Right.

10     A     Yeah, see what it was.

11     Q     And if you haven't already, can you

12  please provide that --

13     A     Sure.

14     Q     -- return information --

15     A     Yeah.

16     Q     -- to your attorney and (inaudible)?

17     A     Yeah.

18     Q     Okay.  Thanks.

19           And so you were working part time at the

20  Wing Factory too, right?

21     A     Yes.

22     Q     And that I'm assuming less than minimum

23  plus tips, right?

24     A     Yes.

25     Q     Okay.  And what is less than minimum now?

1      A    It's 2.13.

2      Q    Okay.

3           MR. BEGNAUD:  Still?

4           THE WITNESS:  Yeah.  Georgia's been

5    2.13 for, I don't know, four years.

6  BY MS. MCGOVERN:

7      Q    Back when I did it, but no, you get your

8  tips on top, so, you know -- but --

9      A    Yeah.

10     Q    Yeah.  No.  I've been there, done that,

11  so --

12     A    I mean, it was also pandemic time, so --

13     Q    Okay.

14     A    You know, it's not -- it was not like

15  popping restaurant times all the time, you know.

16     Q    Sure.

17          So why did you choose to go back there?

18  I know you had an ongoing relationship with that

19  restaurant.

20     A    Yeah.  Yeah, yeah.  I've been -- I've

21  been back and forth a few times, which, you know,

22  it's the same general manager that's been there for a

23  very, very long time.  And I went back there this

24  latest time, you know, never expecting to ever work

25  in a restaurant again, but I went back there in

1   January of 2020, was when I had been arrested.  I was

2   still -- what is the word, on leave -- on

3   administrative leave --

4           Q    Uh-huh.

5           A    -- from the capital defenders office.  I

6   was -- I was very depressed.  I didn't have a whole

7   lot to do with my time and in the future felt very

8   scary.

9           So I thought, Let me see if I can just

10  work a couple of shifts a week at the restaurant.  It

11  will keep me occupied.  It will be healthy

12  emotionally, bring in a little bit of extra cash, you

13  know.  Who knows what's going to happen to me, and it

14  would probably be smart to get some extra money.

15          So I started there again, and I -- even

16  when I came back to the capital defenders office, I

17  continued working there twice a week, like Sunday and

18  Monday nights, I think.  It was just because at that

19  point, the extra money was -- it was nice, it was

20  helping me pay off some credit card debt.  And I just

21  still felt like I have no idea what's happening in my

22  life, and I want this security blanket.

23          So I continued there, and it was very

24  helpful because then when I suddenly was terminated,

25  you know, I went to my manager and was able to say,

 1   This happened to me.  Can you give me more shifts?
 2   And, you know, of course, he did.
 3       **Q    So many -- spent many years waiting**
 4   **tables including as a professional for extra money.**
 5   **There's a social element that --**
 6       A    Yeah.
 7       **Q    And this is a time during the pandemic --**
 8       A    Right.
 9       **Q    -- and things were very difficult.**
10       A    Right.
11       **Q    It was positive benefits to the kind of**
12   **social aspect of being in that kind of group.**
13       A    Yeah, I mean, you know, you're saying
14   there's enough that you're not able to think about,
15   you know, the fact that you're under a criminal
16   prosecution, yeah.  And it was a little bit of time
17   when I did kind of be busy and in a very different
18   environment and with people that were doing very
19   different things and -- and it was stress-relieving
20   to some extent.
21            You know, it was also as time wore on --
22   you know, especially once I'd been terminated, it was
23   a sense of I have a master's degree, I'm a licensed
24   social worker, and I'm working in a restaurant.  And
25   it was -- you know, as time went on, it was very --

1   it was depressing.

2          And so I worked really hard to try to

3   start the LLC business because I could not -- I

4   just -- it was -- you know, it -- it served its

5   purpose, the restaurant work served its purpose, and

6   then it was, like, I can't -- I can't continue.

7      **Q    Give me some timeframes in terms of when**

8   **you were on administrative leave -- and that was with**

9   **pay, right?**

10     A    Right.

11     **Q    So what was the timeframe of the**

12  **administrative leave?**

13     A    It started, I mean, the day I was

14  arrested.

15     **Q    Right.**

16     A    Until I think I came back -- it was right

17  before Valentine's Day, so I think it was like

18  February 11th, maybe, something like that, of 2020.

19     **Q    So 2020?**

20     A    Uh-huh.

21     **Q    Okay.  And so -- and that's when you**

22  **were -- you were terminated and there was no more**

23  **administrative leave --**

24     A    No, I was not terminated yet.

25     **Q    Okay.  All right.**

1          A     Yes.

2          **Q     You were on administrative leave?**

3          A     I was on administrative leave following

4     the arrest for three months, and then they brought me

5     back full time.

6          **Q     Okay.**

7          A     And I was back full time until -- I was

8     back full time at the capital defenders office until

9     November, mid-November of 2020, when I was taken out

10    of the capital defenders office -- that was following

11    the indictment -- taken out of the capital defenders

12    office, and I was transferred to an agency within the

13    Georgia Public Defense Council called office of

14    mental health advocate, a very small agency.  They

15    represent people who are insanity acquittals --

16    acquitees.  There's just like six people there, and

17    they just kind of transferred me there, I think,

18    because they didn't know where else to put me.  And

19    they thought, Well, a social worker could help out

20    this agency for a little bit.

21               So I was put there in mid-November, and,

22    you know, I was told, You'll just be here until the

23    criminal case wraps up, and after that point, you can

24    decide if you want to go back to the capital

25    defenders office or if you want to stay here.

 1                    But instead, on January 11th of 2021, I
 2      was pulled into a meeting and terminated.  So that
 3      was the timeframe of that.
 4            Q     What was the explanation for that?
 5            A     I was told that there was going -- and
 6      this came from Omotayo Alli, who is the director of
 7      the Georgia Public Defense Council.  She told me that
 8      she was implementing a new policy such that anybody
 9      in the agency, in the state agency, who's under
10      indictment would be terminated.  And I said, you
11      know, We talked two months ago when you moved me to
12      this other department, and that's not what you told
13      me then.  You said that I could stay at this
14      department until the criminal case wrapped up, and
15      then, you know, I could choose where I wanted to go.
16                    And she just pretty much said, you know,
17      Well, it's a new policy they came up with, and that's
18      just the way it is.
19            Q     Was it with a do not rehire status, or
20      was there a potential --
21                    (Interruption in proceedings.)
22                    THE COURT REPORTER:  Let's go off the
23         record.
24                    THE VIDEOGRAPHER:  The time is
25         10:51 a.m.  We're now off the record.

```
 1                (Whereupon, the video camera was
 2       turned off.)
 3                (Whereupon, a brief recess was taken.)
 4                (Whereupon, the video camera was
 5       turned on.)
 6                THE VIDEOGRAPHER:  The time is
 7       10:52 a.m.  We're back on the record.
 8   BY MS. MCGOVERN:
 9       Q     Okay.  So you're saying there was a new
10   policy brought on and there was going to be -- anyone
11   who had an indictment was going to be terminated.
12                And I was asking, was that with a do not
13   rehire status, or was there potential to be rehired
14   back?
15       A     I did not know at the time.  That was not
16   indicated on the paperwork that I received.
17       Q     Okay.  Do you know now?
18       A     Yes.
19       Q     What is it?
20       A     Once -- once the charges were eventually
21   dropped, I asked if I could be rehired back, and I
22   was told no.
23       Q     And were you given a reason why?
24       A     No.
25       Q     And who did you ask?
```

1          A     So I talked to Jerilyn Bell, who is --
2     was, at the time, and is the director of the capital
3     defenders office.  She told me she had already heard
4     that my charges had been dropped.  We had this
5     conversation a couple of days afterwards.  She heard
6     my charges had been dropped.  She'd already had a
7     conversation herself with Omotayo Alli about that and
8     Omotayo Alli kind of preemptively made the comment
9     that I wouldn't be hired back, kind of letting
10    Jerilyn Bell know to not even ask.
11         **Q     And do you have an understanding as to**
12    **why that was?**
13         A     I have no idea.
14         **Q     Did you submit a formal application for**
15    **the position again?**
16         A     No.
17         **Q     Did you have any further follow-up with**
18    **anyone regarding why they would not rehire you?**
19         A     No.  No.  I mean, that was -- it was a
20    very (inaudible) conversation with Jerilyn Brill.
21         **Q     Did you take any legal action or pursue**
22    **the possibility of legal action in regard to your not**
23    **getting your job back?**
24         A     No.
25         **Q     And why is that?**

1        A    I didn't -- I mean, at that point, I felt

2    incredibly betrayed, not so much by the capital

3    defenders office but by the larger Public Defense

4    Council headed by Omotayo Alli.  I felt like she had

5    lied to me.  I felt she had betrayed me.  I felt it

6    would be very unsafe for me to, you know, work under

7    her again.  I really, really loved my job there.  And

8    it was -- and it still is heartbreaking that I was

9    terminated.  And I would love to do capital work

10   again, and it may be something that I have luck at

11   revisiting when she's no longer the director.

12       **Q    Okay.  And specifically other than you**

13   **mentioned the policy about -- which was a change of**

14   **position, was there anything else about working with**

15   **her that created concern and a feeling of not being**

16   **safe?**

17       A    Well, she was very new.  She was -- she

18   was quite new.  She was appointed by Brian Kemp in

19   the summer of 2020.  So I did not have any

20   interactions with her until I was indicted, and then

21   she had to be told that an employee, you know, in the

22   agency was under indictment.  And she -- she had a

23   few conversations with me, like the conversation she

24   had when she told me she was going to transfer me to

25   the office of the mental health advocate.

1          And it just -- I don't know how to
2   describe it exactly, but she -- I just felt like I
3   couldn't trust her, like she would tell me things
4   like we know you didn't do this because they had seen
5   the discovery.  The legal counsel for GPDC had seen
6   the discovery, and it's obvious that there's not, you
7   know, anything here.  You know, she would look at me,
8   and she would -- you know, we know that you didn't do
9   this, and we're going to protect you.  And it's very
10  important to me to protect my agency's paycheck.  But
11  at the same time, she would tell me things like --
12  she -- she told me essentially that if I told anybody
13  outside of that room about that conversation that she
14  was having with me that my job would be in jeopardy.
15  She -- it was just a very, like, secretive air that
16  made me very uncomfortable.
17          She, herself, has a history as a public
18  defender.  She worked as a public defender for many
19  years, but she made comments about clients to me that
20  I thought were very inappropriate coming from someone
21  who worked in public defense.  And it -- it made me
22  question her -- her -- what is the word I'm looking
23  for?  Her actual, like, interest and motivation in
24  helping indigent clients, like she -- she would say
25  inappropriate things about them.  And it -- I -- I

1    just didn't get a really good feeling from her.

2             And so then, when two months later,

3    she -- you know, she terminated me all of a sudden,

4    you know, with this concept of like, oh, this is just

5    a brand-new policy, I've just come up with this

6    despite what I told you two months ago.  You know, I

7    just got the sense that she was not invested in

8    indigent defense.  I got the sense that she wasn't

9    really invested in her employees.  You know, it's an

10   appointed -- governor-appointed position.  And I got

11   the sense that it was -- she made decision in that --

12   in her position as director mostly based on, you

13   know, maintaining good status with the governor

14   potentially.

15       **Q    Is it fair to say that even if you hadn't**

16   **been terminated based on your concerns about working**

17   **with her, her honesty with you, her comments about**

18   **the people in the program, that you may have chosen**

19   **to move on regardless?**

20       A    No, not at all, because I had no

21   interaction with her prior to that.  I just wouldn't

22   have.  She's the director of this whole state agency.

23   You know, I was a -- I was an employee in one

24   department within that agency.  So throughout my

25   entire employment, I interacted with the director of

1  the capital defenders office, who I'd always had, you

2  know, great relations with.  Omotayo Alli had -- you

3  know, the director, not just her but prior directors

4  had -- you know, they weren't involved in, like, the

5  day-to-day management of the individual agencies.  I

6  never would have known her, I never would have had,

7  basically, conversations with her had I not been

8  under indictment.

9      Q    Okay.  But is it fair to say you weren't

10 happy with the direction she was going as the leader

11 of the agency?

12     A    Well, sure, but that's -- that's

13 government work.  I mean, that's -- you know, I

14 worked in child welfare before.  I wasn't happy, you

15 know, with the director of that agency either.  But

16 that's -- that's state government work.  You kind of

17 just -- you know that they're temporary.  You know

18 that if you care about what you're doing, you'll be

19 there longer than they are, hopefully, if they're all

20 government -- you know, governor appointed.

21     Q    How has your experience been with the

22 federal defender program since you've been there

23 since January?

24     A    It's been great.

25     Q    Issues politically with the people of any

1   of the same kind of concerns you just expressed?

2        A    No.  So the federal defender program here

3   in Atlanta is -- this was a little confusing for me

4   to understand when I first started working there.

5   Most federal defender programs are government

6   agencies.  They're agencies within the federal

7   government.  There are a handful throughout the

8   country that are actually nonprofit.  And the one

9   here for the Northern District of Georgia is actually

10  nonprofit.  So it's grant funded from the federal

11  government, but it has a board of directors, and it

12  operates very independently.  And I really like that.

13  After what happened with me with the Public Defense

14  Council, you know, the idea of working for another

15  government agency just kind of scared me a little bit

16  because, again, you have a director, potentially, who

17  is not really invested in the mission of the agency

18  that they are -- you know, that they're heading.

19            So I felt a lot more comfortable working

20  for an agency that was actually a nonprofit, has good

21  funding.  You know, we're not worried about funding

22  issues like other nonprofits may be, but it has a

23  board of directors.  There's not -- it's not like a

24  centralized power structure, so I like that.

25        Q    It would be fair to say you enjoy your

1    current job?

2         A    Yes.

3         Q    You intend to stay there for the future?

4         A    You know, foreseeable future?

5         Q    Yes.

6         A    Yeah.

7         Q    Okay.  And walking back because we kind

8    of jumped into the capital defender, tell me about

9    when you started -- so I've got a proper timeline --

10   when you started employment with the state capital

11   defender program.

12        A    I started there in August of 2017.  I

13   think it was August 2nd.

14        Q    And remind me, was that right after you

15   got your graduate degree?

16        A    Yes.  I graduated in May of 2017.

17        Q    So it was your first job in your

18   professional capacity as a social worker?

19        A    As a social worker.

20        Q    Okay.  All right.  Because I'm not going

21   to go back there.  (Inaudible) before.  So -- and

22   we've talked about the time period through when you

23   were terminated there.

24             And then what was your specific role and

25   title at the state capital defender program?

```
 1        A    I think on my paycheck, it says criminal
 2   investigator, but in the office, mitigation
 3   specialist/mitigation investigator.  It's used
 4   interchangeably.
 5        Q    And for laypeople, if you can walk
 6   through what a mitigation specialist does.
 7        A    Uh-huh.
 8             So for capital cases, a mitigation
 9   specialist investigates and comes up with themes and
10   theories for penalty phase -- for penalty phase of a
11   capital case because a capital case is kind of in two
12   different trials, so to speak.  You have the
13   guilt-innocence phase, and then you have a completely
14   separate trial, so to speak, for penalty phase in
15   which the jury is deciding whether the person should
16   have life or the death penalty.
17             And so the mitigation specialist is
18   someone who is trained, has to be -- has to be able
19   to identify, like, mental health issues and has to be
20   able to identify biopsychosocial issues going on with
21   the client.
22             So on a day to day, I would often go out
23   to a correctional facility to visit my clients.  I
24   would spend a lot of time with their families, their
25   neighbors, their teachers, their medical providers
```

1   interviewing them.  I would collect records.  I would

2   send out records requests myself and then get the

3   records back, and I would digest everything into the

4   case map.

5          And I would identify potential experts

6   that we felt were needed for the case.  You know, if

7   it was a client that I felt was intellectually

8   disabled, then we would look at hiring an expert that

9   could do IQ testing, for example.  There was a client

10  that we thought maybe had a brain injury.  We would

11  like, at hiring, a neuropsych to evaluate that.  That

12  was about the day to day.

13     **Q     Okay.  Were there any guidelines or**

14  **policies regarding like what should be done and**

15  **shouldn't be done in terms of gathering that**

16  **information in your role?**

17     A     There is, like, the uniform appeal which

18  kind of governs capital cases.  And there are --

19  like, there are details for what a mitigation

20  specialist is supposed to do.  And I think that --

21  I'm trying to think how to say this.  Within my

22  agency, there is a mitigation department.  So there's

23  a director of mitigation.  She had been working there

24  for, you know, 12 years or something, I think, at

25  that time.  And there were, within the agency, I

1  don't know, 11 or 12 mitigation specialists on --

2  that initially kind of reported to her.  She would

3  kind of supervise their work.  And there was these,

4  you know, built out best practices based on, you

5  know, just the agency lifetime and just knowing how

6  cases went, what cases were successful, what cases

7  weren't successful, lessons learned from past

8  experiences.

9        Q     Are those documented best practices?

10       A     Yeah.  They have documentation.  There

11 are -- the agency has, you know, how to collect

12 records, you know, how to -- kind of a starter guide

13 when you're training and you're new of how to conduct

14 mitigation interviews, how to, you know, make sure

15 that you're hitting these kind of things.  You know,

16 as like with any job, once you're -- once you're

17 there and you -- you learn the basics, you know, it's

18 a job that is significantly less about checking the

19 boxes and more about having a really strong

20 understanding of the case, the things in the case and

21 figuring out how to get the information that you

22 need.

23       Q     Who was the head of the mitigation

24 department?

25       A     Her name is Anupama, A-N-U-P-A-M-A,

1  Vishwamitra, V-I-S-H-W-A-M-I-T-R-A, I believe.

2      Q    And were you given, like, a handbook of

3  the best practices or something when you first

4  started?

5      A    Uh-huh, yeah.

6      Q    You still have that in your possession?

7      A    No, I don't think so.

8      Q    Okay.  And did you receive training

9  (inaudible)?

10     A    Yes.

11     Q    Did you get training?

12     A    Uh-huh.

13     Q    What did that entail?

14     A    So -- so Anu -- she goes by Anu.  She --

15  from what I remember, you know, the first, you know,

16  many weeks, she would bring me along with interviews,

17  she would bring me along with client visits.  It was

18  a lot of job shadowing.  It was a lot of -- like,

19  they got records in, and I would be inputting them

20  into case map.  You know, she would go through and

21  double-check, and you would talk about, you know,

22  what was -- you know, what I was doing well, what I

23  wasn't doing well.

24          Throughout my time there, like I said, I

25  started doing clinical supervision hours with her.

1   And so a lot of that kind of became, you know, we

2   would have set times where we would talk about cases.

3   I would talk about kind of what I was thinking about

4   cases, brainstorming sessions, ideas about, you know,

5   how to develop a case more.  That was always a

6   regular thing there both with her and with the team

7   in general because, you know, it's a

8   multidisciplinary team.

9       **Q     So it was interactive and had on-the-job**

10  **training as well as your supervision.**

11          **But were there ever any, like,**

12  **classroom-type settings or testing on various aspects**

13  **of doing your job?**

14      A    I mean, there were conferences.  Like, I

15  went to, you know, different capital conferences.  I

16  think that they did -- I think that that agency did a

17  good job about training in that -- in that way.  I

18  remember they hosted one time a training on fetal

19  alcohol syndrome.

20          We -- there's a national capital defense

21  community that is fairly tight.  People are connected

22  via different LISTSERVs, and there are some

23  agencies -- there's one in Florida particularly that

24  does -- they used to do weekly, I think now it's

25  maybe monthly, Zoom trainings on a variety of topics

1    for capital mitigation work.  So it could be maybe

2    best practices for working with a client who's a

3    veteran, you know, how to read Department of Defense

4    veteran records.

5             It could be a class training on, you

6    know, intellectual disability, is a huge thing in the

7    capital world, because it -- you have a client who is

8    intellectually disabled, and they're not eligible for

9    the death penalty, so significant training on how to

10   identify -- identify symptoms of that in a client and

11   then also how to interview family members for what's

12   called "adaptive functioning" in your client, how to

13   identify the experts, you know.

14            So there's -- there is a lot of training

15   I felt both internal and a lot of training kind of

16   external to the agency that we were encouraged to

17   participate in.

18      **Q    Was there any training on dealing with**

19   **security risks and security issues within the prison**

20   **context when dealing with --**

21      A    Uh-huh.

22      **Q    -- the accused?**

23      A    Yeah.  I mean, we would have -- and we

24   held a monthly mitigation meeting.  It would be an

25   all-day meeting.  It was a time to kind of brainstorm

1  cases with all the mitigation specialists together.

2  So the ones in different parts of the state would

3  travel into Atlanta.  We would brainstorm cases.  We

4  would talk about concerns that -- you know, issues we

5  were having with cases.  And she would usually have a

6  guest speaker that would kind of train us on

7  different topics.

8            So, for example, I remember someone

9  involved in law enforcement, I think, that came in

10 one time to talk to us about different kinds of

11 illicit drugs.  And we had someone come in to talk to

12 us about kind of assessing different sexuality in

13 clients because a lot of male clients, especially,

14 are uncomfortable, you know, talking about their

15 sexuality.  And there was a sex therapist and LGBT

16 sex therapist.  And he talked to us about, you know,

17 kind of how to -- how to interview a client who may

18 be closeted, for example.

19            So she would have different trainings

20 like this on a monthly basis at our meetings.  And we

21 would often talk about safety issues both in the

22 field.  You know, you're going on -- knocking on

23 random people's doors who don't know you.  Safety

24 issues with that was a big topic.

25            In terms of correctional facilities, you

1  know, I don't -- I don't remember a whole lot of

2  discussion about security issues in correctional

3  facilities because it wasn't -- you know, they had

4  correctional officers there who were dealing with

5  that.  That wasn't something we had to be concerned

6  with ourselves.  It was when you had to be out in the

7  field, you know, walking into someone's home.

8       We had a few -- there were a few people

9  who had clients in the same facility, you know, and

10  we might kind of talk about, you know, issues with

11  scheduling visits or, you know, I'm going to go see

12  my guy on this day, so don't go see your guy on that

13  day because they can't both accommodate us kind of

14  deal.  It would be discussions like that, mostly.

15  **Q    So there was no training for you in terms**

16  **of safety in a personal risk going into security**

17  **facilities especially as a woman?**

18       A    I don't -- I don't think any of us felt

19  like there was much of a risk.  So there wasn't -- I

20  mean, I don't know what that discussion would have

21  looked like.

22  **Q    There was no guidance given on how to**

23  **dress, how to interact when dealing with male inmates**

24  **in a closed door high max prison environment?**

25       A    Well, there is a lot of -- there was a

1    lot of training on how to deal with interviewing

2    different kinds of clients.  There is a lot of

3    training on how to -- you know, everybody's different

4    and people have different ways that they're

5    comfortable interacting with other people.  And we

6    had to be able to build relationships with people and

7    get information out of them.

8              And so there was a lot of training on how

9    to do that with different kinds of individuals.  You

10   know, someone who is, like, profoundly impaired, you

11   know, you need to slow your -- you know, maybe talk a

12   little bit slower.  You need to be mindful about the

13   sentence structure that you're using.  You need to

14   check in with them regularly to make sure that they

15   can understand what you're saying, you know, that

16   you're not using big run -- on sentences.

17             So there's a lot of training for that.

18   How to assess your client's cognitive abilities and

19   how to meet them where they're at in order to be able

20   to get the information out of them that you

21   ultimately need.  That's -- that's what most of it

22   was.

23        Q    Okay.  And what I'm getting at is kind of

24   a little different.  For example, when I started

25   going into prisons and dealing with inmates on

1  one-on-ones, as a young woman, I was very

2  specifically instructed on cut the makeup, nothing

3  low cut, close-toed shoes.

4       A    Yeah.

5       Q    Pants, if preferable.  To be on guard

6  especially men that are not seeing women on a

7  customary basis.

8            So did you not receive any kind of

9  training along those lines?

10      A    I mean, there would be discussions

11 about -- I think it's common sense to never wear

12 open-toed shoes in a correctional facility.  You

13 don't know what's on the floor.  It's gross.  And

14 prior to this position, I had interned with the

15 Southern Center for Human Rights for a year, and I

16 interned with the Fulton County public defense office

17 for a year.  So with both of those positions, I was

18 going into correctional facilities.  And that was

19 probably when I received my first kind of, you know,

20 always wear close-toed shoes because you never know

21 when someone's throwing something on the floor kind

22 of deal.

23            With the capital defenders office, we

24 all -- attorneys, investigators, mitigation

25 specialists, we all dressed pretty casually.  We had

1    a lot of discussion about things like wanting to make

2    sure that there was not, like, a power dynamic

3    barrier with a client.  So, you know, I would -- I

4    would often -- especially when going into a

5    correctional facility or if I knew I was going to be

6    hitting up someone's trailer in the backwoods of

7    Georgia, I would be wearing jeans, sneakers and a

8    top.  You know, I did not want to look super

9    professional.  I did not want to look like someone

10   that they needed to be scared of.  I didn't want to

11   look like there was going to be -- you know, I was

12   going to be sitting there and be like, Tell me, blah,

13   blah, blah, blah, blah.

14           So I tried to create, like, a casual

15   environment.  And we did that with all of our

16   clients, I think.  The focus was, you know, how to

17   present in a way that is engaging, casual engaging,

18   that reduces barriers to interaction with whatever

19   client you're dealing with.  How to -- how to be able

20   to talk with clients so that they feel comfortable

21   with you, that they feel like there is, you know,

22   just a positive interaction so that they're going to

23   tell you the information that you need to get.

24       Q   And you weren't advised about any self

25   protective measures for yourself?

1      A    I mean, I'm trying to think about the

2   facilities that I went to when I worked there.  Most

3   of them were, like, small town county jails.  You

4   know, and security measures there vary pretty widely.

5   You know, most of the facilities I went to would

6   have, like, an officer right outside the door.  You

7   know, I would be in my room with my client.  Usually,

8   there would be, like, you know, a door with, like,

9   the top half was, like, a window.  And there would be

10  an officer kind of sitting outside the whole time.

11  That's how it was at (inaudible) where Ricky was.

12         So, you know, there's always an officer

13  there who I can indicate, I'm sorry, you know, if

14  something's going on.  You know, I always felt safe,

15  and I also felt like all my clients knew I was there

16  to help them.  They all knew that we -- you know, the

17  defense team at large, we were there to help.  And I

18  never -- I never felt unsafe with any of my clients.

19  I never have.  I never felt unsafe with any of them.

20      Q    Now, you talk about your prior experience

21  in prisons that were in a small town or obviously not

22  capital offense scenarios.

23         Are you aware that Jackson SMU is the

24  only high max --

25      A    Uh-huh.

1        Q      -- level --

2        A      Yeah.

3        Q      -- prison in the state, right?

4        A      Yes.

5        Q      Was that -- when you visited Ricky

6   Dubose, was that the first time you'd been in a high

7   max in Georgia before?

8        A      For work purposes, I took a -- I took a

9   class as part of my criminal justice studies, you

10  know, back in undergrad that was, like, exploring the

11  prison world.  And it was, like, a summer class.  And

12  for the whole summer, we went and toured different

13  facilities.  I believe we went to something, like, 15

14  correctional facilities.

15          So in that class, I remember going to

16  Georgia Diagnostic, which is the main campus there.

17       Q      Right.

18       A      SMU is like a separate building.

19       Q      It is.

20       A      Yeah.

21          So I had not been to SMU before.  I had

22  been to Georgia Diagnostic.  I toured death row.  You

23  know, I had been to a lot of facilities in the state

24  just because of that class.

25       Q      But not to the high max SMU --

1       A     Yeah.  Correct.

2       Q     And admittedly, that has higher risk

3    inmates with more serious crimes?

4       A     Yeah, I think so.

5             MR. BEGNAUD:  Object to the form.

6    BY MS. MCGOVERN:

7       Q     People in high max generally are put

8    there for a reason.

9             Is that your understanding?

10      A     Yes.

11      Q     And you said you had an officer outside.

12   That was outside a door when you were --

13      A     Uh-huh.

14      Q     -- meeting with Ricky, that there was an

15   officer posted outside the door?

16      A     Yes.

17      Q     And were you locked in?

18      A     Yeah.  I'm pretty sure they locked us in.

19      Q     So you're in a room with Ricky alone, and

20   the officer is outside that needs a key to access,

21   correct?

22      A     To be honest, I don't remember --

23      Q     That's okay.

24      A     -- perfectly.  I think so.

25      Q     Okay.

1        A      But I don't remember --

2        **Q      Sure.**

3        A      -- perfectly.

4        **Q      And have you ever, in your coursework or**

5   **in your professional capacity, those studies of**

6   **injuries and harm to correctional officers, other**

7   **inmates and visitors done by inmates in a**

8   **correctional setting?**

9        A      In my studies, no.

10       **Q      In any capacity, have you become aware of**

11  **inmate violence against others while in a**

12  **correctional setting?**

13       A      For sure.  For sure.  I know that

14  correctional settings are not safe places for

15  inmates, yes, and for officers.  You know, I -- yeah,

16  I'm obviously -- I'm obviously aware of that.

17       **Q      And for women going into the prison,**

18  **correct?**

19       A      I don't know that.  I don't know any -- I

20  don't -- I don't know anything about -- I've never

21  read any news, I've never seen data about women

22  visitors or women defense teams particularly having

23  security issues or safety issues.  I've never read

24  anything like that.

25       **Q      Did you have any -- any inmates that you**

1    dealt with in your career who have made inappropriate

2    comments, been flirtatious or anything along those

3    lines, in the course of your discussions?

4         A    Yes.  Yeah, I think that most women

5    working in the criminal justice field absolutely have

6    gotten that from clients.  I think a lot of -- a lot

7    of clients have not lived lives where they have

8    learned the most appropriate social behaviors.  And

9    yeah, a lot of times have not lived lives where they

10   have learned appropriate social behaviors.

11            And they have made inappropriate

12   comments.  People made inappropriate comments.  They

13   still do.  I think that that's probably always going

14   to happen.  You know, we had -- we had training.

15   This is one of the things that we talked a lot about

16   in those mitigation meetings, was how to -- how to

17   have conversations with clients when that happens,

18   you know, which was always to -- people do that

19   because they haven't been taught correctly, you know,

20   how to interact with people in a professional manner.

21   Sometimes some of our clients probably had never

22   really interacted with people in a professional

23   manner before.

24            And so we were trained to really explain

25   to them that's inappropriate.  I am a member of your

1  defense team.  It's not appropriate to have language

2  like that.  You know, these are the boundaries.  I'm

3  here to help you.  I want to get to know a lot about

4  you, but this is a hard boundary.  You know, and

5  that's a conversation that I have to have with

6  clients, and I expect I will always have that

7  conversation with clients because, you know, that's

8  just -- that's a lot of people in the criminal

9  justice system.  They -- they can -- they can make

10  inappropriate comment.

11      **Q    Some of the people in the criminal**

12  **justice system actually have crimes against women**

13  **which put them there as well, correct?**

14      A    Yes.

15      **Q    So it may be more than just not knowing**

16  **boundaries?**

17      A    Well, I think when they are -- I mean, I

18  would call that potentially not knowing boundaries.

19  But, you know, when they're interacting that way with

20  a professional person that is part of their defense

21  team, I mean, I think it's very much not knowing

22  boundaries.

23      **Q    Even if you're dealing hypothetically**

24  **with a rapist, you're saying they don't -- just don't**

25  **understand boundaries?**

```
 1        A    I mean, I've never -- I've never had --
 2   I've been in that situation.
 3        Q    Okay.
 4        A    So I don't know.
 5        Q    Okay.
 6        A    I've never had -- I've never had a client
 7   who has been charged with -- I've been defending a
 8   client who is charged with rape.
 9        Q    Okay.
10             MR. BEGNAUD:  And mind if we take a
11        break at some point?
12             MS. MCGOVERN:  Yeah, let me just
13        finish up --
14             MR. BEGNAUD:  Yeah.
15             MS. MCGOVERN:  -- just a little bit.
16        I'm -- I need lunch too.
17   BY MS. MCGOVERN:
18        Q    So -- and what was -- what was the worst
19   comment that's been made to you in the context of
20   doing your work that was inappropriate?
21        A    Oh, gosh.  I -- oh, okay.  I thought this
22   was a funny story.  I don't know if you-all will
23   think this is a funny story.  This was a capital
24   client of mine -- I want to be careful to be very
25   vague because of I don't want to identify -- who had
```

1   autism, and I think that that had a lot to do with

2   the way he communicated.  I think he was very -- felt

3   very defensive about his social life because I was

4   trying to really explore his -- what I believe to be

5   his autism and was kind of really asking him, you

6   know, lots of questions about his social life and

7   interactions with other people and done -- you know,

8   done a lot of talking to him about friendships,

9   dating history, this and that.

10            And at one meeting, he said something to

11   me like -- he said something to me like, You remember

12   before, you were asking me why so-and-so is -- like,

13   this girl that he had taken to the high school prom

14   who was, like, his girlfriend in high school.  He was

15   like, Remember you were asking me why we broke up,

16   and I said we just kind of stopped talking.

17            Well, the real reason why we broke up is

18   because that night after prom, we were trying to have

19   sex for the first time, and I was -- I couldn't get

20   it in.  And she was really embarrassed.  And then she

21   never wanted to talk to me again.

22            And when he told me this story at the

23   time, I was like, Okay, what is he trying to say with

24   this story?  I think he feels embarrassed about

25   his -- everything I've been uncovering about his

1   social life.  He wants me to think that he's

2   sizeable.  He is wanting to turn this story about

3   this girl -- you know, things aren't going well with

4   this girl kind of around in a way that makes him kind

5   of look a little more superior than it had in the

6   past.  And at the time, I -- I was just like, Oh,

7   okay, and moved on.

8             The story came out of nowhere.  We'd been

9   talking about some other topics.  He brought this

10  story up, and I moved back to that original topic.

11  And then I went back to the office.  And this was

12  something that we discussed at one of the mitigation

13  meetings, was just what happened here, you know, how

14  to kind of deal with that, yeah.

15       **Q   Oh, I guess I didn't see how that was a**

16  **funny story.**

17       A    I think it was just -- I think, for me,

18  at the time, it was -- it was -- I think because it

19  came out of nowhere.  Like, it was we were talking

20  about something else, and he was like, Oh, oh, I got

21  it.  There's something I really wanted to tell you.

22  I really wanted to tell you this.

23             I'm like, Okay, what?

24             And then he tells me this story.

25             And I'm like, That doesn't have anything

1  to do with what we were talking about.  Like, why is

2  this what you're kind of fixated on right now in your

3  head?  Yeah.

4       **Q    Okay.  But in terms of any flirtation**

5  **with you, inappropriate comments with you, those**

6  **occurred as well during the course of your work?**

7       A    Honestly, I think I have gotten actually

8  way more flirtatious comments from family members

9  than I have from clients.

10      **Q    But have you received them from the**

11 **clients?**

12      A    Yeah, probably.  Yeah, probably have.

13      **Q    Did you receive them from Dubose?**

14      A    No.  No.

15           MS. MCGOVERN:  Why don't we go ahead

16      and take a break right now and then jump

17      back into --

18           MR. BEGNAUD:  Sounds good.

19           THE VIDEOGRAPHER:  The time is

20      11:28 a.m.  We're now off the record.

21           (Whereupon, the video camera was

22      turned off.)

23           (Whereupon, a brief recess was taken.)

24           (Whereupon, the video camera was

25      turned on.)

```
 1              THE VIDEOGRAPHER:  The time is

 2       11:43 a.m.  We're back on the record.

 3   BY MS. MCGOVERN:

 4       Q    We talked a little bit about your

 5   experience with the Jackson SMP [sic].

 6              And so as my understanding, Ricky Dubose

 7   was the first time you were actually in SMP?

 8       A    SMU.

 9       Q    Why did I say that?  I'm sorry, I'm

10   getting tired already.

11              SMU at Jackson, correct?

12       A    Yes.

13       Q    Okay.  And were you provided with any

14   information going in either through the facility or

15   from your workplace about entering the high max

16   prison to go visit Dubose?

17       A    The -- I mean, the first several times I

18   saw him, I went with other members of the team who

19   had already been seeing him for a while.  So, you

20   know, they showed me what to do, this is where you

21   go, this is where you park, this is how you go

22   through security.  You know, it was -- it was a few

23   visits before I was going by myself.  And that was

24   true of any case I had.  You know, for any new

25   client, new facility, I pretty much always went at
```

1   least the first time, you know, if not a few times,

2   with another member of the team.

3        Q    And when you went through, you just

4   checked in and signed in and went through a scanner?

5        A    So at SMU, from my memory -- it's been a

6   few years since I've been there, but from my memory,

7   you know, you come in through the gate, and then

8   there's, like, a standalone security office that you

9   go through.  You go through a metal detector, all of

10  your -- you know, your things, your case notebook.  I

11  would only just bring in my case notebook and a pen.

12  And, you know, I wouldn't bring in, like, my whole

13  file or anything like that.  And I don't remember

14  ever having needed to bring in, like, a computer.

15           So it was always just my case notebook.

16  They would flip through that.  They would -- they

17  would look at -- you know, just kind of flip through

18  to make sure nothing was in there.  You would have to

19  kind of, like, turn your pockets inside out to show

20  that there's nothing in your pocket.  If we were

21  wearing pants, which, you know, I always wore pants,

22  you'd have to kind of, like, roll them up, pull them

23  up and show -- you know, you'd have to take your

24  shoes off too to go through the metal detector.  But

25  roll your pants up, show that there's nothing, I

1  don't know, stuck in your pant leg or something,

2  stuck in your socks.  You know, they would pat you

3  down if needed.  And then you would exit the security

4  box when you were cleared, and you would go on

5  through to the main facility.

6        Q    You go through the sally port and then

7  go --

8        A    Yes.

9        Q    -- onto the facility?  Okay.

10            And you were aware that Dubose had been

11 obviously a prior flight risk based on --

12       A    Yes.

13       Q    -- his prior conviction, correct?  And I

14 just need a verbal -- a clear verbal yes for the --

15       A    Yeah.

16       Q    Okay.  And were you aware that he had had

17 previous disciplinary reports, several of them for

18 contraband?

19       A    Yes.

20       Q    You were?

21       A    Yes.

22       Q    Okay.  And how did you become aware of

23 that?

24       A    Because I was a member of his defense

25 team.  I had every record ever generated on him.

1      Q    So every time he got a disciplinary

2   report, you would receive a copy of that?

3      A    Yes.

4      Q    Okay.  And so you would have knowledge

5   that he was involved with -- with some type of

6   contraband or another?

7      A    In his correctional career, yes, I knew

8   about all the disciplinary infractions that he got

9   through his correctional career.

10      Q    Including at Jackson?

11      A    Yes.

12      Q    Okay.  So you know that there had been an

13   issue with that?

14      A    Yes.

15      Q    Was it ever discussed with him?

16      A    Yes.

17          MR. BEGNAUD:  And objection as far

18      as -- and just for the record just so I can

19      do this for the record.

20          THE WITNESS:  Yeah, yeah, yeah, I

21      don't want to -- yeah.

22          MR. BEGNAUD:  Just for the record,

23      obviously, Mr. Dubose, who has passed away,

24      has rights and, you know, was your -- the

25      defense team's client, and so there is

1          attorney/client privilege associated with

2          any communications between Ms. Engleman and

3          Mr. Dubose.  And so, you know, we'll just

4          be aware of that in the deposition.

5                    THE WITNESS:  Okay.

6                    MS. MCGOVERN:  That's fine.

7     BY MS. MCGOVERN:

**8          Q    Was it your understanding that he had**

**9     been -- strike that.  Just strike that.**

**10                   So how did you initially become involved**

**11    in the Dubose case?**

12         A    So like I said, I started working there

13    in August of 2017.  The situation with Ricky in which

14    he, you know, escaped, there was the -- the

15    correctional officers were murdered on the prison.

16    But that had happened in June, two months prior.

17                   He was represented -- so the capital

18    defenders office has, like, multiple branches

19    throughout the state just to kind of help facilitate

20    representing people throughout the state.  I worked

21    at the Atlanta branch.  There were branches in

22    Athens, Macon, Tifton and Brunswick.

23                   The Macon branch was representing Ricky.

24    They had a mitigation specialist who was already on

25    the case representing Ricky, but she was going on

1   maternity leave.  And so they needed someone to kind

2   of fill in while she was going to be gone.  And since

3   I was new to the office, meaning I didn't already

4   have a full caseload, they thought that I -- and I

5   knew the director of mitigation was also kind of

6   pulled in to help.

7               So she was pulled in to help, and it was

8   kind of like, Lily is going to help with this as well

9   while the other mitigation person is on maternity

10  leave.  And so that's how I initially got started in

11  the case.

12       Q    And how long were you working on the case

13  file in advance of -- with Ricky in advance of his

14  penalty phase?

15       A    I don't understand the question.

16       Q    How long were you working on the

17  mitigation aspect of the file?  How many months,

18  weeks?

19       A    Before he went to trial?

20       Q    Uh-huh.

21       A    Is that the question?  He -- so he went

22  to trial after I was fired.  So I worked on his case

23  the entire time I was at the capital defenders

24  office.

25       Q    Okay.

1      A     Yeah.

2      Q     All right.  So I'm trying to gauge from

3   when this person had maternity leave.

4            And how long have you been there when

5   that happened?

6      A     I was immediate -- when I started working

7   there, there was several cases I was immediately put

8   on.  His was one of the ones I was immediately put

9   on.

10     Q     All right.  And so you were tasked with

11  a -- working on the penalty -- death penalty phase of

12  his case in the sentencing, not the underlying

13  defense.  Is that accurate?

14     A     That's correct.  It's a team effort.  You

15  know, it's a team effort, and, of course, you know,

16  it's not like you work in silos.

17     Q     Sure.

18     A     It all kind of blends together to some

19  extent.  But for a capital case, you have a

20  mitigation specialist, mitigation investigator that

21  primarily focuses on the penalty phase, and you have

22  a fact investigator that focuses more on the actual,

23  you know, offense.

24     Q     Was there any dispute in your mind that

25  he had, in fact, previously escaped from prison?

```
 1        A     No.
 2        Q     Was there any dispute in your mind that
 3   he had been involved in the murder of two
 4   correctional officers?
 5        A     No.
 6        Q     Okay.  So you did know that going in --
 7        A     Yes.
 8        Q     -- and you were looking at mitigating a
 9   death penalty --
10        A     Yes.
11        Q     -- sentence?
12        A     That was what all my cases were.
13        Q     Okay.
14        A     Mitigating (inaudible).
15        Q     All right.  Did it cause concern for you
16   being in close quarters with an individual who had
17   previously escaped and who had murdered actual
18   correctional officers?
19        A     No.
20        Q     And why not?
21        A     I felt very secure in the facility.  I
22   felt like they had good security.  Ricky was
23   handcuffed and in the leg chains, I don't know
24   exactly what they're called, the ankle cuffs, every
25   visit I had with him to my memory.  He was under very
```

1    strict scrutiny there.  We -- I knew that anywhere he
2    went, he had like three officers with him at all
3    times, you know.
4              And beyond that, like I said before, I --
5    I felt safe with all of my clients, and they'd all --
6    they were all alleged to have killed people.  That
7    was all of their -- you know, they're all facing the
8    death penalty.  And you get that in Georgia, you
9    know, in this country because you're alleged to have
10   killed people.  And that was obviously -- I knew
11   that.  I worked there.  I knew that all of my clients
12   were going to be alleged murderers, you know.  You
13   don't -- you don't agree to have a job like that
14   unless you're personally comfortable dealing with
15   people who are alleged have to done those kinds of
16   offenses and unless you have a -- I think a personal
17   sense of your own, you know, I'm -- I can handle
18   whatever situation comes my way, and I feel equipped,
19   and, you know, I just always felt that way.
20             And with that facility in particular, I
21   felt very secure.  I thought that they did -- you
22   know, there was always an officer right outside the
23   door.  And -- and I went there regularly, and I got
24   to know the officers.  And I felt -- you know, I
25   felt -- I felt safe there.

1        Q     Was there anything specific in regard to

2    the facility that made you feel you said safer in

3    that facility?

4        A     I mean, it's the most secure facility

5    I've ever been to.  Like, there's so many sally ports

6    you have to go through.  Ricky was always handcuffed

7    and, you know, the feet things, you know.  Some of my

8    clients weren't, and I felt safe with those clients

9    too, but yeah.

10       Q     Okay.  With someone who had previously

11   escaped from prison, would you agree that security

12   and ensuring that didn't happen again needed to be a

13   high priority for -- for Jackson SMU?

14       A     Sure.

15       Q     And would you agree that security is a

16   paramount importance in a high max prison setting?

17       A     Sure.

18       Q     Now, were you aware that there were

19   cameras located throughout the facility when you

20   would see -- see your client at -- at Jackson?

21       A     Yes.  I mean, you go through the sally

22   ports.  You go through that security, standalone

23   security place.  You know, of course, there are

24   cameras everywhere.  When I would come into the main

25   facility I would come in.  There is, like, a lobby

1  that I would wait in.  There were cameras there.  And

2  then when they were -- when they had him set up for

3  the visit, they would -- you know, an officer would

4  come and get me.  They would walk me through another

5  sally port.  We would take a left, go down this

6  hallway, and the visitation room was down there.

7  And, you know, of course, there are cameras all up

8  on -- you know, walking down to the visitation room.

9       **Q    Were you aware that there was a camera in**

10  **the visitation room?**

11      A    I was aware that there was a camera.  I

12  had no idea it was on.

13      **Q    And it was certainly not recording**

14  **anything verbally that was --**

15      A    Now I know --

16      **Q    -- being discussed?**

17      A    Now I know that.  Now I know that.

18      **Q    That's your understanding, correct?**

19      A    Yes.  I mean, at the time, I assumed that

20  it would not be on at all for a legal visit.

21      **Q    And I understand you're not an actual**

22  **attorney, but to your understanding of**

23  **attorney/client privilege, you understand that's only**

24  **referred to communications between a client and**

25  **someone on their legal team?**

1            MR. BEGNAUD:  Object to the form.

2            You can answer.

3      A    Okay.  Yes, but I -- I think most people

4  in my -- on my defense team, including myself and

5  every defense person who I've really spoken to you

6  about this, you know, body language is communication,

7  writing is communication.  I would bring my notebook

8  for every visit and write in it.  That's

9  communication.  You know, the way that you're

10  interacting with -- we're communicating right now.

11  Even if we weren't talking, we're communicating.  So,

12  you know, I -- I have always thought communication

13  meant a fairly, you know, broad meaning of

14  communication.

15  BY MS. MCGOVERN:

16      **Q    But you don't have an understanding**

17  **other -- of the Georgia bar or any other legal**

18  **standards that indicate that anything beyond the**

19  **verbal communications between an attorney and a**

20  **client are protected by attorney/client privilege,**

21  **are you?**

22            MR. BEGNAUD:  Object to the form.

23            You can answer.

24  BY MS. MCGOVERN:

25      **Q    I'm not asking for a legal opinion.  I'm**

1   just saying you're not aware of any authority that

2   states that anything beyond verbal communications is

3   protected by attorney/client --

4       A    No.

5       Q    -- privilege?

6       A    I don't -- I'm not an attorney, so I just

7   don't know stuff like that.

8       Q    So this is just something you've heard

9   around and you surmise, but you don't have any -- any

10  actual support for that position, correct?

11      A    I have always been told in any law office

12  I've worked at, which is now four, that my

13  interactions with my client were privileged.

14      Q    But you do not have any authority that

15  supports the position anything beyond verbal

16  communications is protected?

17      A    No.

18      Q    Verbal and written communications is

19  protected, correct?

20      A    Yes, that's correct.

21      Q    Okay.  And in terms of you saw the

22  camera, you didn't ask anyone if it was on, you

23  didn't make any inquiry, correct?

24      A    No.

25      Q    And do you have an understanding why

1   there would be a need for cameras to be on Ricky

2   Dubose wherever he was located to some degree to

3   protect both the staff, the visitors and the facility

4   from any adverse event happening, correct?  You

5   understand there would be a reasonable justification

6   to have a camera --

7        A    Absolutely, except for a legal visit for

8   sure.  And there were always cameras on him, you

9   know.  I knew that.  But I don't -- I don't think

10  that it's appropriate for there to be a camera on a

11  legal visit.

12       Q    But you -- you can't assert anything that

13  would legally support that that was not appropriate

14  or authorized?

15       A    No.

16       Q    And you were locked in a room with a man

17  who had, to your understanding, escaped and killed

18  two correctional officers and at the time that you

19  had a concern that there might be a camera

20  monitoring?

21       A    Could you rephrase that?

22       Q    You were locked in the room with Ricky

23  Dubose?

24       A    Yes.

25       Q    Okay.  And have you considered that the

1   camera may have been for your personal safety?

2               MR. BEGNAUD:  Object to the form.

3               Go ahead.

4   BY MS. MCGOVERN:

5         Q    I just asked if you considered that.

6         A    No, I don't -- I don't --

7         Q    You haven't --

8         A    I have not considered that.

9         Q    Okay.  And you do not have any training

10  in POST certification, security issues within the

11  prison, context or any other professional training in

12  terms of how to manage security in a facility such as

13  Jackson, correct?

14        A    Yes, that's correct.

15        Q    Okay.  You're aware that my client,

16  Nathan Adkerson, did not work at Jackson SMU.  He was

17  independently employed by OPS, correct?

18        A    Yes.  Yes, I know that.

19        Q    And were you aware that Jackson SMU

20  had -- was involved -- and their warden in setting up

21  surveillance cameras and other security measures

22  within that particular prison?

23              MR. BEGNAUD:  Object to the form.  I

24        didn't track that.

25              THE WITNESS:  Me either, sorry.

1              MS. MCGOVERN:  (Inaudible) complex.

2     BY MS. MCGOVERN:

3         Q    So you don't have any knowledge or

4     information that demonstrates that OPS oversaw

5     security measures at Jackson SMU, do you?

6         A    No, I'd never heard of OPS --

7         Q    Okay.

8         A    -- really before this.

9         Q    And would it be your general assumption

10    that each prison facility or DOC in general would be

11    in charge of those security measures?

12        A    I honestly have no idea.

13        Q    You don't know (inaudible).

14        A    I've never thought of it -- about it

15    before.

16        Q    Sure.

17             You basically can't give testimony one

18    way or the other on that?

19        A    Right.

20        Q    Okay.

21        A    I have no idea.

22        Q    That's fine.

23             And you don't have any specific knowledge

24    that Nathan Adkerson was in any way involved in

25    putting any cameras in, running cameras or anything

1   else on the visits you had with Ricky Dubose?

2        A    No, I don't have knowledge.

3        Q    Okay.  And what I'm asking you about

4   today is your personal knowledge.

5        A    Right.

6        Q    You don't have any knowledge or

7   information on how OPS became involved in this

8   investigation of Ricky Dubose and his interactions

9   with you, do you?  And I don't want to know what you

10  talked about with your attorneys.

11       A    Well, I mean, I know -- I've seen the

12  discovery in my criminal case.

13       Q    Okay.

14       A    So it's all in there.

15       Q    Okay.

16       A    Is that what you're referring to?

17       Q    Sure.

18       A    Okay.  Yes.

19       Q    Okay.  And what is your understanding?

20       A    My understanding is that sometime in

21  mid-September of 2019, maybe the 13th or something

22  like that, that there was a shakedown and contraband

23  was found in Ricky's cell.  And they found stuff that

24  I honestly don't fully remember, but that prompted

25  them to want to review the video of my latest visit

1    with him, which was on September 6th.

2        Q    Okay.  And do you -- did you know or have

3    any recollection that Warden Morales and his

4    assistant located a letter indicating that someone by

5    the name of L was going to be bringing contraband

6    into the prison?

7        A    I --

8             MR. BEGNAUD:  Object to the form.  I

9        think it's a mischaracterization of the

10       letter.

11            MS. MCGOVERN:  I was just asking if

12       she knew that or not.

13            MR. BEGNAUD:  You can answer.

14       A    Okay.  I've seen that in the discovery.

15   BY MS. MCGOVERN:

16       Q    Okay.  And you don't personally have any

17   knowledge of anyone else with the initial L who was

18   conducting visits with Ricky Dubose during that time

19   period, do you?

20       A    No.  The only people doing visits with

21   him were his defense team.

22       Q    Right.

23            You don't have any personal knowledge

24   of -- well, strike that.  All right.

25            So the visit on September 6th, 2019, I

1    think you had -- was this your first visit with Ricky

2    Dubose or this was -- was later on?

3         A    I --

4         Q    The subject visit that was recorded on

5    September 6th, 2019, had you already had prior visits

6    with Ricky?

7         A    I had been visiting with him for

8    two years.

9         Q    Okay.  All right.  And so you were

10   familiar with the setting --

11        A    Yes.

12        Q    -- and that there had it was a camera in

13   the room?

14        A    Yes.

15        Q    And the dynamic of that visit, how it was

16   set up, was it very different from your prior visits?

17        A    No, it was very much the same.

18        Q    Okay.  All right.  And I'm going to try

19   to pull this up on my --

20             MS. MCGOVERN:  I don't know how best

21        you want to do this with Zoom, folks,

22        anyone.  I can read out where we are.  On

23        the video.  I'm not going to go through the

24        whole thing.

25             MR. GREEN:  (Inaudible) share the

1        screen?

2               MS. MCGOVERN:  I have no idea if I can

3        share the screen.  This isn't my computer,

4        so I don't think I can show the witness.

5        I'll tell you the point markers, but I have

6        no idea how I can do that.

7               MR. BEGNAUD:  Let's go off the record.

8               THE COURT REPORTER:  Go off the

9        record, please.

10              THE VIDEOGRAPHER:  The time is

11       12:02 p.m.  We're now off the record.

12              (Whereupon, the video camera was

13       turned off.)

14              (Whereupon, a brief recess was taken.)

15              (Whereupon, the video camera was

16       turned on.)

17              THE VIDEOGRAPHER:  The time is

18       12:04 p.m.  We're back on the record.

19   BY MS. MCGOVERN:

20       Q    We're going back on.

21            We are playing the video from the visit

22   from September 6th, 2009 [sic].  I am at time marker

23   3:47:30.  And I'm going to hit play, and I'm going to

24   stop it periodically.

25              (A video was played during the

1          deposition.)

2     BY MS. MCGOVERN:

3          Q    We see Mr. Dubose looking down here.

4               Do you have a recollection of what

5     you-all may have been discussing at this point this

6     time?  We're at 3:47:51.

7                    MR. BEGNAUD:  Obviously without --

8                    THE WITNESS:  Yeah.

9                    MR. BEGNAUD:  -- telling us

10         (inaudible).

11                   THE WITNESS:  (Inaudible).

12                   MS. MCGOVERN:  I'm not (inaudible).

13         A    I -- I under- -- I have a memory of kind

14    of the trajectory of this hour and a half long visit.

15    I mean, I can't say exactly what we were talking

16    about at that time.  But I do have a memory of kind

17    of, you know, the visit in general.

18    BY MS. MCGOVERN:

19         Q    Okay.  And I've stopped it at 3:47:58 for

20    a second.  And we have -- Mr. Dubose is sort of

21    positioned, so his back is squarely against the

22    camera.  So it kind of obliterates the view of the

23    front of his body.  Is that accurate?

24         A    Yes.

25         Q    Okay.  I'm going to stop it.  We're at

1    3:48:05.

2         A    Uh-huh.

3         Q    And you -- you are bending your head to

4    look under the table.

5              What is occurring at that point in time?

6    I'm not asking for communications.  I'm asking for,

7    why are you putting your head under the table at that

8    point?

9              MR. BEGNAUD:  First, I object to the

10        (inaudible).

11   BY MS. MCGOVERN:

12        Q    Adjacent to the table at that point?

13        A    I don't think I know how to answer that

14   question without --

15        Q    I'm not asking for communications.

16   Why -- why were you --

17        A    We were -- we were looking at the tattoos

18   on his feet.

19        Q    Okay.  Because my understanding of this,

20   if we can go back, is that he still has his socks and

21   shoes on.  We can go back to reiterate that.

22        A    I mean, I don't -- there's that one shoe

23   right there that I can see.  But we -- we were --

24   what I remember about this visit is that the

25   beginning started off very heavy.  And if you watch

1  the entire visit, you'll see that.  The beginning, it

2  was a very heavy visit.  Ricky was not doing well

3  emotionally, and we talked about that for quite a

4  long time at the beginning of the visit.

5              I remember being concerned because I had

6  gone in with an agenda.  You know, I had certain

7  things I needed to talk to my clients about when I

8  would visit them.  And I knew that what I needed to

9  talk to him about was also pretty heavy.  So I was a

10  little bit concerned to, like, show up.  And he

11  was -- he was not doing well because I didn't want to

12  put him into, like, a worse place.

13              And I remember being very mindful in this

14  visit of, like, how do I control how this goes.  And

15  so we kind of discussed what he wanted to discuss,

16  you know, during the first part.  And then I tried to

17  kind of, like, bring him up mood-wise.  We started

18  talking about his tattoos.  He has a lot, you know.

19  He has a lot of them.

20              And I had learned from previous visits

21  that getting him to talk about his tattoos was a way

22  that he could kind of boost his mood because he had

23  stories that went along with them.  You know, he had

24  some, like, cartoon character ones that he liked to

25  talk about.  And so it was very strategic attempt on

1   my part to get him to get his mind off of what we had

2   been discussing and kind of have a breather where he

3   could kind of, you know, have his mood boosted, talk

4   about something a little bit more light-hearted so

5   that then I could go into what I needed to talk to

6   him about, which you see if you continue watching the

7   video.  Kind of as it gets closer to the end, you'll

8   see it gets more serious again.

9            I remember walking away from this video

10  thinking like, Good job, Lily.  You handled that well

11  as a social worker, really read that well.  And so it

12  was, again, kind of shocking when I got arrested

13  because of this visit.  You know, I remember we --

14  you know, we were talking about tattoos on his head.

15  We were talking about tattoos on different parts of

16  his body.  You know, I don't remember exactly what

17  all areas we kind of talked about.  But it was -- it

18  was a conversation that went on for a while.

19       **Q    Well, yeah, obviously, we're more than**

20  **halfway --**

21       A    Uh-huh.

22       **Q    -- through at this point.  But he clearly**

23  **has tattoos all over his arms --**

24       A    Yes.

25       **Q    -- all over his body.**

1       A     Yes.

2       Q     But he doesn't -- let me just get the

3   whole --

4       A     Okay.

5       Q     She'll get mad at us for talking over

6   each other.

7             But he didn't show you anything on his

8   arms, hands, neck, anything local during the course

9   of this.  And we can replay it, but that's not -- you

10  didn't choose to go into anything readily visible in

11  terms of tattoos?

12      A     I -- I don't remember.  I remember asking

13  him, What tattoos did you get that hurt the most,

14  like what was the most painful, you know, tattoo that

15  you got.  I think that that's why he started showing

16  me the ones on his feet, if I remember correctly.

17      Q     Okay.  And so he obviously came into the

18  room with his socks and his state-issued like --

19      A     Slide.

20      Q     -- slide shoes, right?

21            Okay.  And so I've backed it up a little

22  to play it because he's taken no action as of yet to

23  remove them.  So, you know, I'm not trying to

24  mislead, but he's still got the socks and the shoes

25  on.  This was earlier in your conversation at

1    3:45:35.  Now you're smiling at 3:45, so clearly,

2    whatever has lighten up --

3         A    Uh-huh.

4         Q    -- has lightened up a little.  The

5    heaviness has lifted?

6         A    I -- I assume so.

7         Q    Okay.  And this is prior to anything with

8    the -- with the showing the tattoos on the feet.  And

9    now he seems to be looking up towards the camera

10   there.

11             Do you know what that might have been

12   about?

13        A    He was just twisting his neck.  He'd been

14   sitting in the position for a while.

15        Q    You're smiling again.  So it seems like

16   you've gotten through some of the heaviness and it's

17   in a lighter place.

18             Does that seem fair?

19        A    Yes, I would assume so.

20        Q    And now it almost looks like you're

21   laughing here at 3:47.

22        A    Uh-huh.

23        Q    You don't recall what -- okay.  Now he

24   bends over.  He bends over the table, 3:47:11.  And

25   you don't recall what caused you to laugh right

1   before then?

2        A    I don't remember.

3        Q    So he -- Nichols has -- I'm sorry, Dubose

4   has his bed under the table, and he's leaning over,

5   looking up at you, and you're laughing.

6        A    Uh-huh.

7        Q    Do you know what that's regarding at all?

8        A    No.

9        Q    And he's taken no action that I can see

10  to remove socks or shoes as of yet, correct?  You

11  haven't seen anything different, have you?

12       A    I mean, his body is in the way.  Not that

13  I can tell with his body in the way.

14       Q    It doesn't look like his arms are moving

15  to remove anything at that juncture yet, does it?

16       A    No.

17       Q    At 3:47:58, he's leaning over again and

18  not all the way under the table, just leaning on the

19  table, correct?  And then here at 3:48 --

20       A    Uh-huh.

21       Q    So he had just leaned over, but there did

22  not appear to be any action by his arms to remove

23  socks and shoes at that point in time when you --

24  when you looked down.  Your head is not totally under

25  the table, but it's adjacent to the table at 3:48:05.

1              So why did you put your head under there
2     while he had the shoes and sock on?
3              MR. BEGNAUD:  Object to the form.
4              You can answer.
5         A    Okay.  I mean, I don't know.  We looked
6     under the table a lot.  Like, this happened for other
7     visits.  We would look at his shoes.  He's a big shoe
8     guy.  He wanted to always notice my shoes.  Sometimes
9     he would come in with Nikes.  We would talk about his
10    Nikes.  I don't know.  I don't remember.  This is
11    three and a half years ago.  But it was not unusual
12    for me to look under the table for all of my clients
13    and talk about, you know, shoes, talk about different
14    things.  That was not remotely unusual.
15    BY MS. MCGOVERN:
16        Q    Well, let me go back.
17             He was wearing Nikes --
18        A    Not this time.
19        Q    -- while he was in high max?
20        A    Yeah.
21        Q    So he was allowed to have -- are you
22    aware that would have been contraband for him to have
23    Nikes?
24        A    He had them.  He would walk around in
25    them.

1       Q    Okay.  You don't know how he came to get

2   those?

3       A    I don't know.

4       Q    You're aware that would not be standard

5   issue?

6       A    That was -- that was always my

7   impression, but he -- he had them, he wore them, he

8   walked around in them.

9       Q    Okay.  And then you said he would like to

10  look at your shoes?

11      A    He was a big shoe guy.  And there were --

12  I specifically remember a pair of Adidas that I had

13  that he -- they were -- they were pretty (inaudible)

14  Adidas, and I would wear them sometimes because, like

15  I said, I always wanted to dress fairly casually.

16  And I -- I do remember him commenting -- you know,

17  he'd be like, Oh, I like those shoes.  And then if I

18  wore them again a few months later, he'd be like, Oh,

19  you're wearing those Adidas that I like, you know,

20  things like that.

21      Q    So you testified previously you had --

22  you'd been provided with information --

23      A    Uh-huh.

24      Q    -- about his prior instances of

25  contraband.  You were well aware of his disciplinary

 1    reports.  You were aware that he previously escaped.

 2    You were aware these issues have come to light in

 3    terms of other contraband issues, and yet you felt it

 4    was regular and customary to put a head under the

 5    table in a high max prison during a visit?

 6          A    Yes.

 7               MR. BEGNAUD:  Object to the form.

 8    BY MS. MCGOVERN:

 9          Q    Okay.  I need your answer, though,

10    because I don't think the Court Reporter got it.

11          A    Yes.

12          Q    Did you have any understanding why that

13    might be concerning to security and people within the

14    high max prison environment?

15               MR. BEGNAUD:  Object to the form.

16               You can answer.

17          A    Okay.  I don't think it's any of their

18    business.  I don't.  I think that I'm there as a

19    member of his defense team, and I need to have the

20    interactions with my client that I need to have to

21    get the information from him that I need to have the

22    best defense case for him that we can build.  And

23    it's, frankly, I don't think any of the prison

24    people's concern what -- how a defense team is

25    conducting their business with their client.

1   BY MS. MCGOVERN:

2        Q    So if individuals are blocking cameras

3   with the back and going under the table where they

4   can't be seen and you have an inmate with frequent

5   contraband issues, it's none of the prison's business

6   whether or not contraband can be passed to an inmate

7   that's previously escaped?

8        A    Well, I knew I wasn't giving him

9   contraband.  So no, that was not something I ever --

10       Q    How are they --

11       A    -- thought about.

12       Q    How are they going to know that, that

13  you're not doing that?

14       A    Because I had --

15            MR. BEGNAUD:  Object to the form.

16       A    I had no idea the camera was on.  Had no

17  idea the camera was on.  Ricky was handcuffed.  He

18  was in leg irons.  And there was an officer sitting

19  outside.  So I knew I wasn't giving him anything.  I

20  knew no one in the team was giving him anything.

21  That was never a concern.  What was a concern was

22  coming here and making sure that we were able to, you

23  know, have the best defense that we could have and

24  have the interactions with our clients that we needed

25  to have.

1    BY MS. MCGOVERN:

2        Q    The concern for the prison was to make

3    sure that Ricky Dubose didn't get contraband, harm

4    someone or escape, correct?

5            MR. BEGNAUD:  Object to the form.

6        A    Yes.

7    BY MS. MCGOVERN:

8        Q    And they didn't know you personally, know

9    what you were up to or not.  They had to go on based

10   on their protocols and procedures to ensure there was

11   no contraband, correct?

12           MR. BEGNAUD:  Object to the form.

13           Ms. McGovern, do you mind giving my

14       client a little more space?  Thank you.

15       A    That is the prison's concern.  Our

16   concern as the defense team is to have -- went off

17   again.  Our concern as the defense team, which I'm

18   sure you know as an attorney yourself, is to be able

19   to have the conversations you need to have with your

20   client, the interactions you need to have with your

21   client.  I'm -- I'm not there to be thinking about

22   what the prison officials are thinking about.  I'm

23   there to do my job.

24           MS. MCGOVERN:  Okay.  I'm going to

25       move to strike as nonresponsive.

1    BY MS. MCGOVERN:

2          Q    I'm going to try to go about this at a

3    different angle.

4                You had your job to do, right?

5          A    Uh-huh.

6          Q    And the correctional officers and the

7    warden and the security at this high max prison had

8    their job to do --

9                MR. BEGNAUD:  Object to the form.

10   BY MS. MCGOVERN:

11         Q    -- correct?

12               MS. MCGOVERN:  What's the basis for

13        that objection?

14               MR. BEGNAUD:  It's all argumentative.

15        I mean --

16               MS. MCGOVERN:  It's not.  It's not.

17               MR. BEGNAUD:  We can agree to

18        disagree.

19               MS. MCGOVERN:  Okay.

20         A    Yes, that's correct.

21   BY MS. MCGOVERN:

22         Q    Okay.  And you don't have a knowledge or

23   understanding of what goes into that job, correct?

24         A    No, I don't.

25         Q    Okay.  And you've already agreed, I

1  believe, that those are legitimate concerns in a high

2  max prison with someone who's escaped to be concerned

3  about security risks?

4      A    Yes.

5      Q    And with someone who's previously had

6  issues with contraband with individuals going to a

7  table where they can't be observed by the officer

8  outside the room or anyone else, it's fair to say

9  that no one knows what can happen under that table

10  except for you?

11      A    That's correct, because it's no one

12  else's business what happens in a legal team meeting.

13  Like a legal meeting with a client, it's no one

14  else's business.

15      Q    Are you aware that, historically, there

16  have been cases of defense teams -- I'm not even

17  saying yours -- providing contraband to inmates?

18  This is something that does, at time, occur?

19      A    It does, at time, occur, but, you know --

20  yes, that does, at time, occur.

21      Q    And the risk if something like that

22  happens can result in harm to people working in the

23  prison, people outside the prison or other inmates.

24  If contraband gets in there can be a danger to

25  others.  Isn't that fair?

```
 1        A    Yes.
 2        Q    And those risks can include and have
 3   included with Mr. Dubose before injury and death to
 4   others including correctional officers, correct?
 5        A    With contraband?  I'm confused.
 6             Could you please restate that?
 7        Q    The contraband can include many things
 8   including shanks and items that can be made into
 9   shanks.  There's a lot of different kinds of
10   contraband.
11             Isn't it fair to say with the risk of
12   contraband getting to someone like Ricky Dubose,
13   there is a risk of serious injury or death to
14   individuals, including the individuals that have to
15   work inside that prison every day?
16        A    Sure.
17             MR. BEGNAUD:  Object to the form.
18   BY MS. MCGOVERN:
19        Q    And that's a significant concern for the
20   individuals at the prison that they might be injured
21   or harmed in the course of their work --
22        A    Sure.
23        Q    -- on a daily basis in a high max prison,
24   correct?
25        A    Yes.
```

1        Q    And I'm sure, sitting here today, you

2   would not be someone who would want someone within a

3   high max prison that works there every day to be at

4   risk of injury or death?

5        A    Of course not.

6        Q    Okay.  And, in fact, as a result of

7   Mr. Dubose, two correctional officers had already

8   died --

9        A    Yes.

10       Q    -- correct?

11       A    Yes.

12            MS. MCGOVERN:  I'm trying to show the

13       video is the only thing.  Let me get

14       through the video, and I can totally scoot

15       out of the way.

16   BY MS. MCGOVERN:

17       Q    Do you know anything about the family

18   members that were related to the individuals that

19   died?

20       A    I know a little bit.

21       Q    They suffered greatly, didn't they?

22       A    Yes.

23       Q    We're at 3:48:05.  And you are at this

24   point looking under the table.  Continuing to look

25   under the table.  And then your head's back up at

1    3:48:19.  Then your head went back down about

2    3:48:21.  You're still looking under the table, and

3    your head's back up 3:48:30.

4              Now, during that time period, are you

5    able to tell me what you were looking at?

6         A    I don't know.  I don't remember.

7         Q    Okay.  And I haven't -- and tell me if

8    I've missed it.  I haven't noticed him doing anything

9    with shoes or socks to remove his socks as of yet.

10             Did I miss something there or --

11        A    I don't feel like I can see that.  I feel

12   like I just see a little bit of his foot on the left.

13   I can't see the other foot.  I don't -- I don't feel

14   like I can make a statement based on how you can't

15   see anything to do with his feet, really.

16        Q    I haven't seen any arm movement that

17   looked like it was removing a sock on the right-hand

18   side, have you?

19             MR. BEGNAUD:  Object to the form.

20             MS. MCGOVERN:  Well, we're going

21        through the video, so she can give me her

22        impressions of the video.

23        A    I don't know.  I don't think so, but I

24   don't know.  I don't think it's very clear.

25   BY MS. MCGOVERN:

1        Q     Yeah, if -- if you do tell me.

2        A     Okay.

3        Q     And we'll stop and replay it.

4              On the left, it looks like you can still

5    see that there's a sock and a shoe on that left foot.

6              Am I correct in that?

7        A     That's what it looks like, yes.

8        Q     Yeah.

9              So it wouldn't be on the left foot that

10   you would be looking at any tattoos, right?

11       A     Yes, I would agree with that.

12       Q     Okay.  And at 3:48:36, I think your head

13   went adjacent, look under the table again.  You don't

14   know what that's about?  And then again at 3:48:45,

15   and then you're back up at 3:48:50.  Do you recall

16   what that was about?

17       A     Not specifically, no.

18       Q     No, okay.

19       A     Uh-huh.

20       Q     That's pretty clear.

21             He picks up a sock foot at 3:49:04, and

22   it looks like he's removing his sock.

23             Do you see that?  And I can go back if

24   you want me to play it again.  Do you want me to go

25   back a minute?

```
 1        A     Sure.
 2        Q     Try not to go back too much.  Stop.
 3              MR. BEGNAUD:  Use the ten-second-back
 4     thing.
 5              MS. MCGOVERN:  Use that?
 6              THE WITNESS:  No, no, but to the left
 7     of the pause line.
 8              MR. BEGNAUD:  There's a ten on it.
 9              MS. MCGOVERN:  Okay.  I messed that
10     up, sorry.
11              Which one?
12              THE WITNESS:  It's the --
13              MS. MCGOVERN:  Oh, ten.
14              MR. BEGNAUD:  Ten, yeah.  Supposed to
15     roll back ten seconds.
16              MS. MCGOVERN:  You think that's good,
17     or should I do one more?
18              THE WITNESS:  Do one more.
19     BY MS. MCGOVERN:
20        Q     Okay.  We went back at 3:49:02.
21              Okay.  And there is his left sock on it,
22     looks to me, and he is taking it off.
23              Does that look like that to you, and your
24     head goes down?
25        A     Yes.  Yes, maybe -- yes, maybe it's...
```

1     Q    Okay.  And then 3:49:23, he appears to be
2  rolling his sock up?
3     A    Uh-huh.  Yeah, he's putting his socks
4  back on.
5     Q    And then his left foot at 3:49:30, he's
6  taking that sock off?
7     A    Uh-huh.
8     Q    And your head is pretty much under the
9  table completely at that point and one arm is under
10  the table?
11     A    Well, it's on my chest.
12          MR. BEGNAUD:  I disagree.
13     A    My arm is on my chest.
14  BY MS. MCGOVERN:
15     Q    Well, it's certainly not visible.  Your
16  arm is below the surface level of the table, correct?
17     A    That's correct, because my body was.
18     Q    Right.
19          Your whole body and head were, at that
20  point --
21     A    Yes.
22     Q    -- under the table.
23          And that's not visible to the officer
24  outside or to the camera what's happening, correct?
25     A    Yes.

1       Q    So security has no way to verify what's

2  happening at that point because it's not visible on

3  here, right?

4       A    Yes.  That's correct.

5       Q    Okay.  And so go back to 3:49:46, and

6  then he is rolling up his sock on his left-hand side,

7  correct?

8       A    Uh-huh, yes.

9       Q    And he would -- seemed to be taking a

10  minute to do that.

11            And so what is your recollection of what

12  was going on during those frames we show with him

13  taking off each sock and then rolling them back up

14  his foot?

15       A    I mean, I don't remember the complete ins

16  and outs of this conversation three and a half years

17  ago, but I remember that we were talking about

18  tattoos.  We were talking about tattoos on his feet.

19  That's -- that is the general sense of my

20  recollection of this.

21       Q    And instead of him lifting his foot up to

22  show you or doing something that would have been line

23  of sight, why -- why was it done under the table with

24  you leaning with your arm and head below the surface

25  of the table?

```
 1        A     His -- he was in ankle irons, so he
 2   couldn't -- I mean, he would have had to have, like,
 3   you know --
 4        Q     He could have lifted both feet up?
 5        A     That would have taken significantly more
 6   effort and not -- not a natural movement compared to
 7   just looking under the table.
 8        Q     That may be all I need to -- well, at
 9   3:50, he is doing something with his sock again, it
10   looks like.
11        A     Uh-huh.
12        Q     Do you recall what he was doing there?
13   It's somewhat blocked by the camera.
14        A     I don't know.
15        Q     Now he raises his left arm, and it's just
16   showing at 3:50, it's clear he has a whole lot of
17   different tattoos on arms and hands.  But he didn't
18   choose to show you those tattoos during the course of
19   the interview.  It was just the ones on his feet?
20        A     I don't remember.  I don't remember.
21        Q     How many tattoos did he have on his feet?
22        A     I don't remember.
23        Q     And why was that germane to your case?
24        A     Again, what I remember what -- the
25   question I remember asking him that prompted talking
```

```
 1   about his feet was me asking about, you know, what
 2   tattoo had he gotten that, like, hurt the most.
 3       Q    Okay.  I can scoot away now because we're
 4   on the video.
 5            All right.  Is there anything else that
 6   reviewing that video brings to mind in regards to
 7   looking at his feet, the socks and so on and so
 8   forth, other than what we went through?  Did I miss
 9   anything?
10       A    No.
11       Q    Okay.  And you never considered during
12   the course of that visit that it might not be a good
13   idea in a high max prison to put your head under the
14   table and have a convicted murderer take off articles
15   of clothing to show you his feet?
16       A    No, I -- that was not unusual for any of
17   my clients.  That was very standard.
18       Q    But -- never mind.
19            Okay.  Now, there was a subsequent voice
20   recording that's been produced in this case.  I don't
21   know if you've heard it or not by Ricky Dubose
22   indicating that it was necessary to get some -- some
23   information to lawyers who were going to get him some
24   stuff that was taken in code.
25            Have you ever listened to any audio
```

1   recordings of Ricky Dubose in relation to this

2   particular investigation of the interactions that

3   you-all had?  If you don't know anything about it,

4   it's fine.

5       A    I -- I don't know.  I've listened to,

6   like, a very short amount of an audio recording that

7   I think Nathan Adkerson did with Ricky --

8       Q    Right.

9       A    -- about -- my understanding is Ricky had

10  gone to Warden Morales and had said that he had

11  information as to, like, a contraband drop, and he

12  wanted to tell Warden Morales about this.  In

13  exchange, he was hoping to get a visitation approved

14  with his girlfriend.

15          To be honest, I know that there's an

16  audio recording.  I think I listened to, like, seven

17  minutes of it, and it's very hard to hear Ricky.  And

18  I was just like, This is why I have an attorney to do

19  this for me.  It was just very hard to hear him, and

20  I didn't listen to all of it.

21      Q    I might need a Wi-Fi here to get to this.

22  The conference doesn't require a -- okay -- security

23  key?  Well, guys, I'm going to take a break.  I had

24  it pulled up yesterday.  I'm going to come back to

25  that.

1           But you're not recalling a video -- or

2    I'm sorry, an audio recording Ricky Dubose made

3    himself on a telephone?

4           A    Oh, no.

5           Q    Yeah, okay.

6                So as part of your investigation, you

7    went to see Ricky's family, and you went out of state

8    a couple of times, right?

9           A    Yes.

10          Q    Tell me about that.

11          A    I'm sorry.  I made multiple trips to

12   Texas.  He had family in Texas.  I also had two other

13   cases at the time in which there were family members

14   in Texas.  So I would go to Texas.  For a while, I

15   was going to Texas somewhat regularly and kind of,

16   like, doing work on all the cases.

17               He had family in North Carolina.  I went

18   to North Carolina once.  His sister was in Alaska,

19   and the lead attorney on the case and I went to

20   Alaska once to see her.

21          Q    Who funded the trip to Alaska?

22          A    It was all funded by the capital

23   defenders office.

24          Q    So what did you learn in the course of

25   those meetings?  Oh, well, I'm not trying to get into

1    any attorney/client privilege there.  I mean, were

2    there mitigation issues --

3         A    Yes.

4         Q    -- that weren't privileged that --

5         A    I can say in kind of general.

6         Q    Yeah, yeah.

7         A    When talking with -- when meeting with

8    family, you know -- you know, I'm exploring kind of

9    cognitive deficits, exploring -- like I said,

10   intellectual functioning is always something that

11   we're exploring in every capital case, and that was

12   something that we explored a lot with -- with Ricky.

13   So it was a lot of conversations with family members

14   about how -- how well he could -- he could function,

15   communication skills, you know, we talked to family

16   about -- a lot of clients have histories of abuse and

17   neglect and growing up in poverty and, you know,

18   talking to family collaterals can be extremely

19   important to uncovering information about that.

20        Q    How much time did you spend with, say,

21   his mother?

22        A    Hardly any.  None.

23        Q    Hardly any or none?

24        A    I -- I showed up -- so at one point, I

25   knew (inaudible), who, as I said, is the director of

1    mitigation who worked on this case as well.  She and

2    Amber Pittman, who's a lead attorney, met with

3    Ricky's mother.  And for various reasons, Ricky's mom

4    did not want to engage with us as a defense team for

5    many years.  So I would attempt to contact her.  I

6    would attempt to call her or, you know, knock on her

7    door, and, you know, she would tell me that she

8    didn't want to speak with me.  So I had very little

9    contact with her.

10        Q    Okay.  So you're aware that after the --

11   after the arrest and when the media published that

12   there were a variety of Facebook posts --

13        A    Uh-huh.

14        Q    -- that went up including -- I assume

15   you're aware there were Facebook posts by family

16   members that --

17        A    Uh-huh.

18        Q    -- had comments about they thought you

19   were in love with him.

20             Do you have any understanding as to why

21   they would make such comments based on what

22   interactions you did or did not have with them?

23        A    I can give you my guess.

24        Q    Sure.  Of course.

25        A    You know, I don't know for sure what they

1  were thinking.  The young woman who made that

2  comment, if I remember correctly, she was Ricky's

3  cousin.  She lived in Texas.  And when she was --

4  when she was younger, she had lived in Georgia and

5  had lived near the Dubose family in Georgia when

6  Ricky was very young.  And so, you know, I spent a

7  lot of time on this case really wanting to talk to

8  cousins, aunts, uncles, other people because his

9  mother was not a source of information.  So I spent a

10  lot of time looking elsewhere.  And his father was

11  also not a very strong source of information for

12  various reasons.  So I spent a lot of time with more

13  extended relatives.

14          I remember going out to Texas -- and I

15  was persistent.  I was very persistent.  That is --

16  that is part of the job.  And we were -- we were

17  trained, and, you know, if people tell you no, you

18  come back around later and you try again.

19          I went to Texas once for a trip.  Like I

20  said, I was doing work on multiple cases on that

21  trip.  I wanted to speak with this cousin

22  particularly because I had this sense that she seemed

23  a little bit more stable than some of the other

24  family members.  I knew that she was around Ricky

25  when he was young, and I was hoping that she could

 1  give me some information as to what the home life was
 2  like.
 3           And I remember she had agreed to an
 4  appointment with me.  We had set, like, a time and
 5  place, and, you know, everything was good, and then
 6  she just kind of ghosted me.  And, you know, I was --
 7  she would -- just kind of stopped responding to my
 8  calls and my texts, and, you know, I would try to
 9  say, Okay, see you tomorrow, and there was just
10  nothing.
11           So I was like, All right, well, I'll just
12  try again another day.  And the next time I went out
13  to Texas, you know, a couple of months later, perhaps
14  I attempted to meet with her again.  And we did meet.
15  You know, I had to really be persistent, but we -- I
16  remember we met at a -- like, a public park.  And we
17  had -- you know, she was -- she was open, and she
18  was -- she was -- you know, it was a good interview.
19           My experience with a lot of criminal
20  defendants and especially capital defendants is that
21  their families are very defensive.  Their families
22  really feel like their person has -- you know, their
23  family member, the -- you know, my client has often
24  been very demonized in the news rightfully so
25  potentially.  You know, they, themselves, have

1  potentially had backlash themselves in their

2  community about, you know, being a family member to

3  this person.  And so they can be -- they can be very

4  defensive.  And I try to make it very clear from the

5  get-go, I'm on your -- you know, your brother, your

6  husband, your father, your sister, your mother,

7  whoever my client is, I'm on their side.  I'm helping

8  them.  I understand that they're facing these

9  allegations.  You know, I don't -- I don't think that

10 they're a horrible person the way that they've been

11 shown, perhaps.  And, you know, you have great

12 memories of them.  I want to hear those memories, and

13 I believe in those memories.  You know, someone can

14 have killed people and yet also be a loving brother.

15         And so I always try to make that very

16 clear with them people, like you have positive

17 memories of this person, I believe that.  I believe

18 that.  And I want to hear these memories.  I'm not

19 here to attack your loved one.  I'm not here to

20 disparage them.

21         So my impression with his cousin, my

22 guess -- like I said, I don't know what was going on

23 in her head but perhaps the fact that I was so

24 persistent in trying to meet with her over several

25 months.  And I think that she just -- you know, she

 1   didn't understand a whole lot of how defense teams

 2   work.  And maybe she just -- you know, I made it very

 3   clear, I'm here on behalf of, you know, your cousin,

 4   and we're -- we're going to do everything we can to

 5   help him.  And, you know, I'm a young woman, and

 6   people just think inappropriate things about young

 7   professional women sometimes.  That is my guess, but

 8   I don't know for sure.

 9        Q    So when you were communicating with

10   Ricky, I know there was a court order that allowed

11   you-all visitation.  I assume you used work e-mail to

12   communicate with him.

13             Was that one way that you communicated

14   with Ricky directly?

15        A    No.

16        Q    Okay.

17        A    He didn't -- he didn't have any e-mail

18   access.

19        Q    Okay.  Telephone calls, did you have any

20   telephone calls?

21        A    We would occasionally set up phone calls,

22   yes.

23        Q    Did he ever utilize a cell phone which is

24   contraband, but did he ever utilize one to -- he

25   obviously had access to one at certain points in

```
 1   time -- to contact you in that manner, by text or

 2   phone?

 3        A     Not that I remember remotely, no.

 4        Q     So it's my understanding that you got a

 5   JPay account --

 6        A     Uh-huh.

 7        Q     -- to communicate with him.

 8              Why was that done?

 9        A     That was done because there were a few

10   instances in which we had a court meeting set up,

11   like a court hearing set up or someone on the team --

12   we all kind of rotated, so there was someone from the

13   team going out to see him pretty regularly -- was

14   supposed to see him, and he knew that.  He knew --

15   maybe he knew when someone was supposed to come, or

16   he knew that there was supposed to be a court hearing

17   on, you know, July 27th, for example, and it would

18   get cancelled last minute for whatever reason.

19              He would have a lot of anxiety as to not

20   knowing what was going on.  Why is it cancelled,

21   someone was supposed to be out here to see me today

22   and no one's here today, what's going on.  And so I

23   set up the JPay account at the direction of Amber

24   Pittman, the lead attorney, so that we could have

25   kind of a quicker way to just message him and say,
```

1   you know, Court's cancelled, or so-and-so will be out

2   there to see you next week on this day.  So someone's

3   coming, you know, don't stress.

4        **Q     Were any of the attorneys using JPay?**

5        A    I think it was just -- I think I just did

6   all the communication for everybody, is my memory.

7        **Q     Okay.  You were the one who set up the**

8   **JPay account?**

9        A    Yes.

10       **Q     And you're aware that JPay is not just**

11  **for e-mail but also for payments to inmates?**

12       A    Yes.

13       **Q     Okay.  Did you ever make any payments on**

14  **his behalf or commissary or anything along those**

15  **lines?**

16       A    I don't remember.  I don't think so.  I

17  don't think so.  I don't remember.

18       **Q     It's possible that you did and you don't**

19  **recall?**

20       A    It's possible I did once or twice.  The

21  capital defenders office, the practice was if, for

22  some reason, we felt the need to put money on an

23  inmate's books, I wasn't -- we were not being paid

24  very much and, you know, neither were the attorneys,

25  but they were certainly being paid more than the

1    investigators.

2            And so kind of the practice there was if

3    something was going on and we felt the need to put

4    money on an inmate's books, usually, the attorney

5    would do that.  I frankly don't remember ever putting

6    money on an attorney's books the whole time I was at

7    the capital defenders office, but I can't promise

8    that I never did.  I do know attorneys in my cases

9    that would do that.

10       Q    Okay.  And if you have a JPay account,

11   you can utilize it either way for e-mail or money?

12       A    Right.

13       Q    Okay.  With other -- in other cases that

14   you handled, did you put that money on the books for

15   the inmates?

16       A    Then I don't remember that at all.

17       Q    Okay.

18       A    I don't remember that, no.

19       Q    Sure.

20            Okay.  We talked for a moment about the

21   media issue and the Facebook and everything that came

22   out after that.

23            Now, sitting here today, you don't have

24   any knowledge or information indicating that Nathan

25   Adkerson had anything to do with the media being

```
 1   present at the time you were arrested, do you?
 2       A   I don't know who had -- who set that up.
 3   I don't know.
 4       Q   Okay.  You don't have any evidence or
 5   knowledge.  I mean, someone did, but you don't know
 6   who it is.  Is that fair?
 7       A   Correct.
 8       Q   Okay.  And there was subsequent coverage
 9   indicating the charges were dropped as well, correct?
10       A   Correct.
11       Q   So to the extent it was in the media you
12   were arrested, it was also in the media when the
13   charges were dropped?
14       A   That's correct.
15       Q   Okay.
16           MS. MCGOVERN:  So are you doing okay?
17       Need a break?  Want to take a five-minute
18       break?
19           THE WITNESS:  Thanks for asking.  I'm
20       okay.  I do definitely need some lunch at
21       some point in my life, but not -- it
22       doesn't have to be for -- you know,
23       1:00 o'clock, maybe.
24           MS. MCGOVERN:  Let's go off the record
25       real quick.
```

1            THE VIDEOGRAPHER:  This is the end of

2      Media 1.  The time is 12:46 p.m.  We're now

3      off the record.

4            (Whereupon, the video camera was

5      turned off.)

6            (Whereupon, a brief recess was taken.)

7            (Whereupon, the video camera was

8      turned on.)

9            THE VIDEOGRAPHER:  This is the

10     beginning of Media 2.  The time is

11     12:53 p.m.  We're back on record.

12            (Whereupon, Exhibit No. 1 was marked for

13       identification by the court reporter.)

14   BY MS. MCGOVERN:

15      Q    All right.  We're going to try to finish

16   up here.  As a matter of housekeeping, I'm going to

17   go ahead and mark but retain the copy of the video

18   that was utilized as Defendant's Exhibit 1.

19            (Whereupon, Exhibit No. 2 was marked for

20       identification by the court reporter.)

21   BY MS. MCGOVERN:

22      Q    And then I am now going to show you, as

23   we finish up discussing JPay, what I've marked as

24   Defense Exhibit 2.  Sorry, I don't have an extra

25   copy, but if you and your attorney want to look that

1    over, just the text of that real quick, and I'm just

2    going to ask you a quick question.

3          A    Okay.

4          Q    And so do you remember receiving this

5    communication by JPay e-mail from Ricky Dubose?

6          A    Yes.

7          Q    And I'll read it since we've got a lot of

8    people online.  And I don't think I have a Bates

9    number for you guys on Zoom, but essentially, he's

10   writing to you and asking about your trip to visit

11   (inaudible), how was your trip.  And says, Oh, I have

12   a ring for you too, smiley face, smiley face.  Let me

13   know if you get this, please.

14         A    Uh-huh.

15         Q    So what ring was he talking about?

16         A    So Ricky had -- I don't know who did

17   this.  Another inmate at that facility would make

18   little, I don't know, jewelry pieces accessories and

19   give them to the other inmates there.  And he had

20   made several, is my understanding, little jewelry

21   items for Ricky.  You know, it's like facilities have

22   their underground marketplaces, so to speak, I guess.

23   And Ricky gave me one of these.

24         Q    Ricky gave you a ring?

25         A    Yes.  It's -- it was, like, made of, I

1  don't know, some, like, fabric, almost, like beaded

2  fabric, maybe.  I don't -- I don't know exactly what

3  the material was.  It was pretty -- what's the word

4  I'm looking for?  You know, it's not like a

5  sophisticated piece of, you know, making.

6       Q    It wasn't metal?

7       A    No.

8       Q    Do you still have it?

9       A    I do.

10      Q    Can you provide at least a photograph of

11 it to your counsel if not the actual item for

12 examination?

13      A    Sure.

14      Q    What was your understanding of why Ricky

15 was giving you a piece of jewelry?

16      A    You know, I think that it was not

17 uncommon, it still is not for many of my clients to

18 send, you know, pictures to members of their defense

19 team that they draw and, you know, try to give us

20 little gifts and mementoes of their appreciation.

21 You know, we -- Ricky had a team of like five people,

22 I think.  And we were the only people who he really

23 interacted with for many years.  You know, we were

24 doing a lot of work for him for free, meaning no cost

25 to him, and he was aware of that.  And he was

1   honestly one of the more polite and respectful

2   clients I've had.  He was very appreciative.

3            And I think that he just -- he wanted

4   to -- you know, he wanted to give me something that

5   was a token of his appreciation for what we were

6   doing for him.

7       **Q    A ring appears to have a little bit more**

8   **significance than just your standard piece of art or**

9   **something along those lines.**

10           **Did it seem in any way inappropriate to**

11  **be accepting a ring from someone you were working for**

12  **professionally in this capacity?**

13      A    You know, it was unusual.  It was

14  unusual, but, you know, I think he didn't make it

15  himself.  My impression was he told this other inmate

16  who was making different items like, Make

17  something -- can you make something for Lily?  I know

18  that he talked about all of us to other people

19  because he would kind of tell us that he would, you

20  know, talk about all of us to other people.  And I

21  don't know if it was Ricky's idea for it to be a ring

22  or if that's just what this other person made.  I

23  don't know.

24      **Q    But he chose to give you a ring, not a**

25  **friendship bracelet, not a piece of art.  He chose to**

```
 1   give you a ring and noted it in an e-mail that he

 2   was --

 3        A    Uh-huh.

 4        Q    -- with smiley faces about giving it to

 5   you, right?

 6        A    That's correct.  He did -- and he did

 7   give me art as well at other times like, you know...

 8        Q    Has any other client that you've worked

 9   with given you a ring?

10        A    No.

11        Q    And this didn't cause any concern or

12   suspicion with you?

13        A    No.  No.

14        Q    So I want to go ahead and move on to

15   November 6, 2019, and the visit that then led to the

16   arrest.  So why don't you walk me through that day as

17   you went to go visit Ricky, and we'll move through

18   that.

19        A    Uh-huh.

20             I had a morning visit, so I would usually

21   schedule mornings visits for 9:00 o'clock.  It was

22   always a while before I could get back there to see

23   him, so I probably wasn't back there to see him until

24   like 9:30.  I don't remember one whole -- I -- I'm

25   trying to think of, like, the content of that visit.
```

1    I don't remember a whole lot.  I remember some.  And,

2    you know, it was a standard run of the mill visit,

3    like -- like, all of the ones I had with him.

4                 And when I was leaving, I went out to

5    kind of that lobby area that I mentioned to you in

6    the main facility, and there's a door that's, you

7    know, obviously locked.  And it's like a -- mostly

8    glass, from what I remember, so you can, like, look

9    through and see.

10                And I remember standing there for a

11   while.  You know, usually, I would maybe have to

12   stand for a few seconds or something, and then the

13   officer doing the door keys would unlock it.  And I

14   remember standing there for quite a while and

15   wondering, like, What's going on?  Maybe they're in

16   the bathroom.  Like, make -- maybe, you know, they're

17   having -- something came up, and they're just not

18   paying attention that, you know, they need to unlock

19   this door.

20                And so I was standing there for a while,

21   and then I noticed some people -- and I'm sorry --

22   you know, outside from that standalone security area

23   coming up the path to come into the main facility

24   where I was.  Now I know it was Nathan Adkerson with

25   two other officers with him.  And I thought, Oh, this

1    is -- this is good.  When they come in, the door will

2    open, and I'll be able to go out.

3            But when they -- when they got there,

4    Nathan Adkerson said, Step aside, Ms. Engleman.  And

5    I remember being very shocked that he knew my name.

6    I'd never seen him before, had no idea who he was.

7    And so I kind of moved aside with them, and he told

8    me that he had an arrest warrant for contraband,

9    which, I'm sorry, I just still think it's so

10   ludicrous.

11           And so we -- we talked there in the

12   facility for 20 minutes, maybe.  We talked in the

13   facility.  We went outside.  He handcuffed me there.

14      Q    Outside or inside?

15      A    Inside.

16           He handcuffed me inside, and I was very

17   concerned about my case notebook and, you know,

18   retaining possession of that.  I was very concerned

19   about all of this being utilized in a way for prison

20   officials or other people to, like, learn privileged

21   information about Ricky.

22           So, you know, he handcuffed me there.  I

23   was able to still kind of retain possession of my

24   case notebook.  We went outside to the parking lot.

25   I was in an agency vehicle.  They searched the

1    vehicle.  And he explained to me that we had to wait

2    there for a while because an officer from the Butts

3    County Sheriff's Department had to come, and that was

4    quite a ways away.  Like, it was the town of Jackson

5    is, I don't know, 15 minutes away from the facility,

6    I think.

7             So we had to wait a while for a sheriff's

8    officer to come.  Mr. Adkerson explained, you know,

9    that I would be going to -- you know, being booked in

10   the sheriff's department and such.  And yeah, that's

11   what happened.  The sheriff's officer came and got in

12   the car, and we went to the sheriff's department.

13   And there it was when I saw the media at the

14   sheriff's department.

15       **Q    Okay.  So let me back up for just a**

16   **minute.**

17             **You say you talked with Nathan for about**

18   **20 minutes.**

19             **What was discussed during that**

20   **20 minutes?**

21       A    So he -- you know, he explained that he

22   had this arrest warrant.  He explained that he had

23   been recording -- they had been recording and

24   watching legal visits.  So I was shocked and frankly

25   scared because I thought that's not supposed to be

1  happening, like what are these people doing here.

2  That is -- that is not supposed to be happening.  And

3  it felt like they were playing -- it felt like they

4  were playing a game, that I wasn't really sure what

5  the rules were, because I was like, that's not

6  supposed to be happening.  And I know I did not give

7  my client contraband.  I also knew that Ricky was

8  strip searched after every single legal visit.

9            So it felt like they were -- I was just

10 very scared about what they were doing.  And, you

11 know, he told me that he watched this video in which

12 I gave something -- I passed something blue to Ricky.

13           And I remember just being, like, so

14 dumbfounded and saying something like, Was I picking,

15 like, lint off my shirt and maybe just, like, you

16 know, on the table or on the ground, like getting

17 lint off my shirt?  Like, what are you talking about?

18           And he's like, No, it's not lint.  And,

19 you know, he said several times, You're going to be

20 booked into the Butts County Sheriff's Department,

21 and then I want to sit down and talk to you about

22 what happened.

23           And that, of course -- I was like, Do you

24 think -- it felt to me at the moment like they were

25 just, like, manufacturing -- I'm not saying that

1   that's -- you know, I don't know what their motives

2   were.  But it felt to me in the moment that they were

3   manufacturing this arrest and the attempt to scare me

4   so that they could get me in a room alone and get me

5   to tell them privileged information about my client.

6   And I was, like, offended that he thought I would

7   maybe do that.

8        **Q    Did he ever ask you for privileged**

9   **communications?**

10       A    Well, he said, I want to sit down and

11  talk to you about what's going on with Ricky, yeah.

12            And I kept telling him, I'm not going

13  to -- I'm not going to talk to you about my client.

14       **Q    When he was talking to you about**

15  **contraband and saying he wanted to talk to you about**

16  **what was going on, did he ever say, I want your**

17  **privileged communications about your case with Ricky?**

18       A    No, but any of my communications with my

19  client are privileged, any of my -- so, you know, I

20  don't know how he could talk to me about my client

21  without me divulging privileged information.

22       **Q    Even though he was talking to you about**

23  **this contraband issue and what he saw on a video that**

24  **had nothing to do with verbal communications?  You**

25  **were assuming he wanted your --**

1        A    I --
**2**        **Q    -- privileged information?**
3        A    I don't -- I don't think that there's any
4    way for me to talk about my meetings with my client
5    without talking about what would be privileged
6    information.  At that moment, I did not see how that
7    was possible.  And it would be --
**8**        **Q    That was your assumption, though?**
9        A    Yes.  And it would be incredibly
10   inappropriate of me to talk to anybody about Ricky
11   Dubose without his lead attorney being there.  So,
12   you know, he said that many times.  And I kept saying
13   as politely as I could, I'm not going to talk to you
14   without Ricky's attorney there, without someone
15   representing me there.  Like, why would I -- why
16   would I ever do that?
17            So that was mostly it.  I remember one of
18   the female officers, I think, kind of patted me down.
19   That's mostly what I remember talking to him about.
**20**        **Q    Okay.  So you said that you knew for a**
**21   fact that Dubose was strip searched after every**
**22   visit.**
**23            What documents have you reviewed, and**
**24   what witnesses have you gathered that information**
**25   from?**

1        A    I feel -- I just want to be careful with

2   my answer because I feel like that's information I

3   know about that was received pursuant to a protective

4   order.  So I just want to be careful about that.

5             MR. BEGNAUD:  Do you want to --

6   BY MS. MCGOVERN:

7        **Q    My question, though, was very carefully**

8   **put.**

9        A    Okay.

10       **Q    What documents did you review that**

11  **demonstrate there was a strip search after every time**

12  **he saw you?  I don't mean court documents.  I mean**

13  **prison documents demonstrating there was --**

14       A    Yeah.

15       **Q    -- a strip search.**

16       A    Yes, but we received those documents

17  pursuant to a protective order.

18            MR. BEGNAUD:  I think we should

19       probably go off the record.  There's a

20       protective order you're not aware of.

21            MS. MCGOVERN:  Okay.  That would

22       encompass that?

23            THE WITNESS:  Yes.

24            MR. BEGNAUD:  Do you want to go off

25       the record?

1          MS. MCGOVERN:  Yeah.

2          THE VIDEOGRAPHER:  The time is

3     1:07 p.m.  We're now off the record.

4          (Whereupon, the video camera was

5     turned off.)

6          (Whereupon, a brief recess was taken.)

7          (Whereupon, the video camera was

8     turned on.)

9          THE VIDEOGRAPHER:  The time is

10    1:10 p.m.  We're back on the record.

11  BY MS. MCGOVERN:

12       Q    You didn't personally observe Ricky

13  Dubose being strip searched after each visit, did

14  you?

15       A    No.

16       Q    You weren't personally present to have

17  firsthand knowledge about whether or not that

18  occurred, correct?

19       A    That's correct.

20       Q    Okay.  In terms of the videos of the

21  communications, we talked about that earlier in your

22  testimony.  But you knew there was a video camera in

23  the room, and you did not ask if it was recording or

24  not, correct?

25       A    That's correct.  It never occurred to me

1    that it would be recording.

2         Q     So there's a video camera in a room in a

3    prison, and it never occurred to you that the video

4    camera in a prison would be recording?

5         A     Not for a legal visit, no.

6         Q     Okay.  And you don't have knowledge who

7    was in charge of that video camera working there,

8    whether it had to do with Warden Morales and the

9    people at Jackson State Prison versus anyone at OPS.

10   I think we talked about that earlier.

11        A     Yes, I don't have knowledge.

12        Q     All right.  And so you said that you had

13   this conversation with Mr. Adkerson, and he said he

14   wanted to talk to you, but he was -- wasn't he

15   referencing the contraband issue and what he believed

16   to be an exchange of contraband that he wanted to

17   talk to you about?

18        A     Yes.

19        Q     Okay.  Now, they went and searched

20   your -- it was him and you said there were two

21   officers with him?

22        A     Two -- yes, two female officers.  I think

23   that there were also OPS agents with him.  And I'm so

24   sorry, but I don't quite remember their names.

25        Q     Sure.

1            And I think one might have been Ms. Moss?

2       A    Yes.

3       Q    Okay.  All right.  But they were not the

4   Butts County sheriff officers?

5       A    That's correct.

6       Q    Correct.

7            And they went and searched your vehicle,

8   and then there was discussion about your phone as

9   well and what to do with that because of privileged

10  information, wasn't there?

11      A    Yes.

12      Q    Can you tell me about that?

13      A    Yes.

14           The capital defenders office did not give

15  us agency cell phones.  You know, we had obviously

16  desk phones, but we had to use our personal cell

17  phones for a lot of team communications.  You know,

18  my work e-mail, like I had Outlook app on there, you

19  know, that had all my work e-mail was to there and

20  tons of text messages with not just the Dubose team

21  but, you know, members from all the other teams I was

22  on.

23      Q    So ultimately, what happened that day in

24  terms of your phone?

25      A    They took it.  They said that they were

1  going to get a search -- a search warrant for it.  I

2  explained many times over that I was very concerned

3  because there was a lot of privileged information on

4  the phone.  Mr. Adkerson assured me that he would get

5  a search warrant, everything would be fine, and I

6  would get the phone back in about three days.

7              And I remember thinking in my head,

8  That's -- that's not going to happen.  I mean, I work

9  in this field.  It's like I knew that what was going

10 to happen was my agency was going to litigate that.

11 They were going to try to get a special master to

12 look at the phone.  You know, it wasn't just going to

13 be a thing of, Let's just get a search warrant and

14 look at the phone and give the phone back to her.  So

15 I knew that it was going to get tied up in

16 litigation.  And it was.  So I -- I -- you know, I

17 think the phone was released to me like a year later

18 or something.

19      **Q    You're aware that Mr. Adkerson is not an**

20 **attorney, correct?**

21      A    Yes.

22      **Q    And it was returned to you, and it was**

23 **ultimately decided not to -- not to search your**

24 **phone?**

25      A    Yes.

1      Q     In communications with your office, the

2   DA's office and others, correct?

3      A     Yes.

4      Q     The lawyers decided, correct?

5      A     Yes.

6      Q     You don't have any knowledge about

7   Mr. Adkerson's training, experience, background,

8   expertise or anything along those lines, correct?

9      A     Well, I know that he's a law enforcement

10  officer.

11     Q     Right.

12           But beyond that general statement, you

13  don't have any further knowledge about him, correct?

14     A     That's correct.

15     Q     So when the Butts County sheriffs came,

16  they picked you up and took you to the courthouse.

17  Mr. Adkerson was not with you, correct?

18     A     Yeah, that's correct.

19     Q     Okay.  Was that the last contact that you

20  had with Mr. Adkerson?

21     A     Yes.

22     Q     Okay.  Was there -- was there subsequent

23  communications that you're aware of -- and I'm not

24  asking what they were -- between your attorney, Don

25  Samuel, and Nathan Adkerson, to your knowledge?

```
 1        A    Yes.  I think -- I think Don had a phone
 2  conversation with him, you know, within the next week
 3  or so, maybe.  I don't know if they talked multiple
 4  times.
 5        Q    Okay.  So you went.
 6             Where were the media when you arrived at
 7  the Butts County courthouse?
 8        A    They were -- so we -- we pulled into the
 9  backside of the sheriff's department.  I'm sorry, I
10  don't know the terminology for these kinds of
11  buildings, but the -- I don't know, like, their
12  garage-looking thing.  And they were -- they were
13  right there, like right as I got out of the car.
14        Q    Okay.  And have you done any
15  investigation to try to determine who notified the
16  media?
17        A    Yes.
18        Q    And what has your investigation yielded?
19        A    I can't figure it out.
20        Q    Oh.
21        A    I don't know.
22        Q    Was your investigation just like looking
23  online or talking to people or -- and I'm not asking
24  what your attorney did.  I'm asking what you did.
25        A    I mean, we -- the -- we, as a Dubose
```

1    team, I mean, we pulled everybody up on the stand

2    that we could to ask them.

3         Q    Okay.  And so you were booked.  And then

4    tell me what happened after that.

5         A    I was booked.  Mark Winne with Channel 2

6    news was there to film the whole thing and kind of

7    pepper me with questions when I wasn't, you know,

8    actively answering questions of the people.  I was --

9    I was booked in.  I was placed in a holding cell.  I

10   was told that the next, like, bond hearing was, like,

11   at 2:00 o'clock or something and that I was just

12   going to have to wait until then.

13            At the bond hearing, they took me in, you

14   know, fully -- fully shackled with the waist chains

15   and everything, which seemed very excessive to me.

16   Mark Winne was set up in there as well, filmed it

17   all.  I remember that there were two other defendants

18   in there as well who seemed, you know, very confused

19   as to what was going on.

20            I was granted bond.  After the hearing,

21   that was when I was told I could call someone.  I was

22   told I could not call anyone until after the hearing.

23   It was very strange, in my opinion.  I was also told

24   that I could not bond myself out because I said

25   that's -- I'll pay the $5,000, and I was told I

1   couldn't -- I couldn't do that.  Someone else had to

2   pay -- I don't know if that's normal or not.  To me,

3   it was just -- seemed really weird.

4           So I had to call a bail bondsman, and I

5   called Amber Pittman, who is the lead attorney on the

6   Dubose team.  She had already found out what had

7   happened because I learned later Mark Winne had

8   called, like, the media rep or whatever for the

9   public defender council to ask them what was going

10  on.  They had no idea.  But because of that phone

11  call, you know, it kind of went down the chain of

12  command within my agency until the capital defenders

13  office found out what was going on.  So Amber was

14  already on her way.

15          So she got me.  And there was another

16  member of the Dubose team there with her, and we

17  drove back to the prison to pick up the agency

18  vehicle that was still there.  And then she -- you

19  know, I had multiple phone conversations on her cell

20  phone since I didn't have mine with the director of

21  the capital defenders office, who, you know, they had

22  no idea what was going on.  And he just said, We have

23  no idea what's going on.  Come into the office

24  tomorrow.  We'll talk about this, you know.  And she

25  drove me to a MARTA station, and I took MARTA home.

1        Q    All right.  And then subsequently, there

2   was an arraignment, and then after that, there were

3   discussions with your criminal attorney and DA Adams,

4   and the charges were ultimately dropped; is that

5   correct?

6        A    That's correct, about a year and a half

7   later.

8        Q    Okay.  And if some of the other folks who

9   want to ask questions more about that, I'll pass the

10  buck to them.

11       A    Sure.

12       Q    So in terms of damages you've

13  experienced -- we've talked a lot about your work

14  history and how that went and progressed.  And your

15  attorney is going to get me the financials so we

16  can -- we don't need to go further into that.

17            You have made claim about mental health

18  issues as a result.  So first, I want to ask about

19  what -- who you're treating with, if you're still

20  treating with them, and what you're treating for.

21       A    No, I'm not currently seeing a mental

22  health provider.  I saw LPC Lauren Alexander in

23  2020 -- 2020, I think it was.  Yes, 2020.

24       Q    For how long?

25       A    I actually didn't see her for too long.

```
 1   It was a few months.  I don't remember exactly how --
 2   how long that was, yes.
 3        Q    Okay.  And did she prescribe any
 4   medications?
 5        A    No.  She can't -- I mean, she's an LPC.
 6        Q    Okay.
 7        A    So she can't prescribe meds.  She
 8   recommended that I consult a psychiatrist, I go to a
 9   psychiatrist.  She thought that anxiety medication
10   would be really beneficial.  For various personal
11   reasons, I -- I didn't really want to do that.  So I
12   didn't do that.
13        Q    Okay.  You said you see a psychiatrist.
14             Who's that?
15        A    No, I don't.
16        Q    Oh, you don't, okay.
17        A    I said that she recommended --
18        Q    Okay.
19        A    -- I see a psychiatrist --
20        Q    Okay.
21        A    -- to get on antianxiety meds, but I
22   didn't want to do that.
23        Q    Have you, at any point in your life, been
24   on any mental health medications?
25        A    No, which is why I didn't really want to.
```

```
 1         Q    Okay.  Sure.
 2              And so you had essentially therapy
 3    with --
 4         A    Yes.
 5         Q    -- with Lauren Alexander for a few
 6    months?
 7         A    Yes.
 8         Q    And did she give you any diagnoses?
 9         A    I don't know what diagnoses is on, like,
10    her -- her billing paperwork because that's kind of,
11    like, diagnoses, primarily, is for, a lot of times,
12    the mental health world is so you can bill -- you
13    have to have a diagnosis to bill.  So I don't know
14    what she put down.  She told me informally, you know,
15    in a session, she said it -- you know, This is
16    obvious- -- obviously like very high anxiety, and
17    you're displaying a lot of PTSD symptoms.  I don't
18    know if that's a formal diagnosis that she put down
19    for billing purposes.  I haven't seen the records.
20         Q    Okay.  So you don't have a formal
21    diagnosis that you know of for PTSD?
22         A    That's correct.
23         Q    Okay.  And any other diagnosis that she
24    gave you that you're aware of?
25         A    Right.  I actually never saw paperwork.
```

1        Q    Okay.  All right.  Any other mental

2   health ramifications, issues, problems that you

3   experienced as a result of this incident for which

4   you're claiming damages in this case?  For example, I

5   think you mentioned insomnia in your discovery

6   responses.

7        A    Yeah, I'm just trying to think of how to

8   answer this because it feels very broad.

9        Q    It is.  It's kind of to give you your

10  chance to -- to tell me what's not just in the

11  medical records --

12       A    Right.  Right.

13       Q    -- and the financial documents.

14       A    Yeah.  You know, I -- for a long period

15  of time, there is very -- what I would call, like,

16  very acute and longstanding depression, because, you

17  know, at the time, this was -- it was incredibly

18  destabilizing, and it just came out of nowhere.  It

19  was completely not something I could have predicted

20  would have happened to me.  And, you know, to

21  immediately be placed -- I was immediately placed on

22  administrative leave, which I understand, you know,

23  why that happened, but I -- I've never been under

24  criminal prosecution before.  And I think I did not

25  have a proper understanding of how horrifically

1   stressful it is to be under a criminal prosecution

2   when you're innocent and you haven't -- and you feel

3   like these people are coming after me and I haven't

4   done anything.  And it really kind of takes away so

5   much that you have worked hard for in your life.

6           It was very -- it was very hard to -- you

7   know, I'm thinking about in the immediate aftermath

8   when I was on administrative leave for those

9   three months.  It was -- it was very challenging to

10  wake up every day because I didn't have -- I don't

11  want to say, like, I didn't have anything to do, but

12  it's, like, I would wake up and be, like, I'm not

13  doing what I'm supposed to be doing, which is going

14  into my work and my job because of this situation and

15  not knowing how it was going to turn out was -- it

16  was frankly terrifying.  And especially because I

17  understand that this is just my perception -- and I'm

18  not saying that this is reality, per se, but my

19  perception was that I had been targeted as a member

20  of his defense team.

21          You know, I had serious doubts that they

22  actually thought I had really done this.  I thought

23  that this was very kind of manufactured at the time.

24  And so it seemed it was very scary for me because I

25  felt like -- it felt like these, like, forces larger

1    than me were coming in and ripping my life apart.

2    You know, which is why I said I started working at

3    the Wing Factory just to kind of give myself

4    something to preoccupy myself with.

5              When I started going back to work in

6    mid-February, I remember when I first got that call

7    that they were bringing me back, I was elated, of

8    course.  And then the next day just terrified and,

9    like, overwhelming anxiety because it was -- it was,

10   like, suddenly, I realized I'm going back into this

11   environment, like my -- my -- my position is a

12   mitigation specialist with this agency working on

13   capital defense, like, could not keep me safe.  And

14   now I'm voluntarily going back?  Like, what if this

15   happens again?

16             It was very -- that's when the more to,

17   like, PTSD-type symptoms started occurring, was at

18   that point.  I did not go out into the field for a

19   few weeks.  I would just kind of go to the office and

20   do office work, and I struggled with that.  It felt

21   like this -- this job that I loved so deeply suddenly

22   felt extremely unsafe to me.  But I also felt like I

23   hadn't been working my cases for three months, like

24   there's been no mitigation specialist on my case.  I

25   had other cases, you know, outside of Ricky's case,

1    and those cases were just -- there was no mitigation

2    doing -- you know, specialist doing any work on those

3    cases.  I felt a lot of internal pressure to get back

4    out there and try to -- try to do my job.

5              So I remember I started going to -- I had

6    a client based out of Augusta.  He was incarcerated

7    in the county jail in Augusta.  I wouldn't go there.

8    I did not feel comfortable going to correctional

9    facilities.  But there were, you know, just

10   collateral witnesses to interview in the Augusta

11   area.  And I remember thinking, Okay, I could maybe

12   go and do that.  I won't go to a correctional

13   facility.  I think that I can handle, you know,

14   talking to some school teachers in Augusta.  Excuse

15   me.

16             And that was -- that did not go well.

17   And I remember just, like, paralyzing anxiety and

18   fear just about being out doing this job, and -- and

19   that was when I decided that I needed to get help.

20   That was when I -- like, I called my employee

21   assistance program, you know, from that hotel room in

22   Augusta, and they hooked me up with Lauren Alexander.

23             So she was great.  She was really good.

24   It was -- I think that she -- I think she did a

25   really good job of, you know, teaching me, like,

1   anxiety-coping skills.  And that was also around the

2   time that the pandemic was happening.

3           So the -- what am I trying to say,

4   everything kind of shut down.  And I wasn't going out

5   into the field anymore because of COVID.  We were

6   working remotely because of -- because of COVID.  And

7   during that summer, this was the summer of 2020, I

8   started feeling a little bit more stable in terms of

9   what was going on with the anxiety issues.  But there

10  was in terms of, like, my job being able to go out

11  into the field, being able to go to correctional

12  facilities because I just wasn't.  And so if you're

13  not doing something, you know, that's a nice way to

14  feel okay about it, I guess.

15          But it was really terrifying knowing that

16  this criminal prosecution was still going on.  In

17  November, I found out that I was -- had been

18  indicted.  It was an absolute shock to me.  I didn't

19  understand how a grand jury can indict me on a video

20  that I knew didn't show anything.  And I think that

21  it kind of, for me -- at least, again, my perception

22  reinforced this idea that it -- it just felt like it

23  was a shady process.  And that was, again, scary for

24  me to be in.

25          You know, immediately following the

1    indictment, my -- my huge concern suddenly became my

2    job security.  And Omotayo Alli made it very clear

3    that, you know, even though she moved me to that

4    other agency, the office of the mental health

5    advocate, that she -- she made it very clear that she

6    did not like the situation and that she, you know,

7    would be happy with me just not there at all.  And

8    that is, of course, eventually what happened

9    two months later.

10               It's very scary to be under a felony

11    indictment because of work that you do for an agency

12    and then have that agency terminate you because I

13    knew no one else was going to hire me, which is what

14    I was saying earlier when I said I felt very betrayed

15    by them.  They knew that.  They knew that.  And it

16    was -- you know, I have bills to pay.  It was -- it

17    was very scary, and it was very depressing.

18               It was a very hard place to be in until I

19    got the job I'm currently in, which happened a year

20    ago.  It felt like, you know, I went into significant

21    debt.  It felt like -- it's hard to explain, but it

22    felt like I was on this train, and I wasn't the

23    conductor.  It was, like, my own life.  And these

24    other people who didn't care about me who had no

25    concern for my well-being were, like, driving the

1   train, and I couldn't get off.  And it was just -- it

2   was just going.  And I was doing everything I could

3   to try to, like, make money for myself and have a

4   professional life and, you know, move forward with

5   these.  And I just -- it was -- it was very hard.  It

6   was very hard.

7            MS. MCGOVERN:  I'm not going to have

8        any further questions, but do you want to

9        break before we have the other counsel to

10       the extent they have any?

11           MR. BEGNAUD:  Thanks.

12           MS. MCGOVERN:  And thank you.  But

13       yeah, please feel free to take a

14       five-minute break.

15           THE VIDEOGRAPHER:  The time is

16       1:33 p.m.  We're now off the record.

17           (Whereupon, the video camera was

18       turned off.)

19           (Whereupon, a brief recess was taken.)

20           (Whereupon, the video camera was

21       turned on.)

22           THE VIDEOGRAPHER:  The time is

23       1:40 p.m.  We're back on the record.

24                    EXAMINATION

25   BY MR. COLE:

1        Q    Ms. Engleman, my name is Chuck Cole.
2    There are a number of defendants in this case, and my
3    client is Mike Riley.
4             Do you know who Mike Riley is?
5        A    No.  I definitely never met him --
6        Q    Okay.
7        A    -- to my knowledge.
8        Q    All right.  I'll be very brief.  But I
9    want to talk to you about the conference room where
10   this meeting occurred that was videotaped on
11   September 6th of 2019, this meeting between you and
12   Mr. Dubose.
13            Did I understand you to say that there
14   was a security guard or officer of some sort outside
15   of the meeting room?
16       A    Yes.
17       Q    And this meeting room had glass walls,
18   correct?
19       A    To be honest, I don't remember if the
20   wall was completely glass or if it was a mix.  I
21   think it was a mix.  But it was -- it was more
22   visible than some other correctional facilities I've
23   been to in terms of how much glass was there.  I do
24   remember that.
25       Q    During -- during that meeting on

1    September 6th of 2019 with Mr. Dubose, do you recall

2    being able to see the security officer or the

3    security guard?

4         A    I -- I don't remember particularly, but I

5    do remember that when I would be there -- you know, I

6    could just kind of move my chair, kind of look at

7    them, because sometimes they might indicate to us if

8    there were, like, another officer coming to relieve

9    them or something like that.  You know, I would

10   motion to them if we were finished or things like

11   that.  So I could kind of lean back and see them, but

12   I don't remember sitting, like, right there, if I

13   could just -- I don't remember.

14        Q    Okay.

15        A    Yeah.

16        Q    But on -- on September 6th of 2019, you

17   remember making eye contact with the security guard

18   or the security officer during your meeting with

19   Mr. Dubose?

20        A    I don't remember.

21        Q    I'll ask it more generally.

22             Generally, when you met with Mr. Dubose,

23   do you recall that you would make eye contact with

24   the security guard or the security officer who was, I

25   guess, outside the door?

1      A    Yes.

2      Q    Okay.  Did it ever bother you that a

3  security guard or security officer was sitting

4  outside within -- with the ability to see the inside

5  of the room?

6      A    Yes.

7      Q    And did you ever raise that issue with

8  anybody?

9      A    No.  No, because I understood that, you

10  know, what may be most comfortable to me in a legal

11  visit with a client, you know, has to be balanced by

12  facility security.  And it was not uncommon at other

13  facilities for guards to sit, you know, outside the

14  door.  You know, you always worry about if they could

15  accidentally overhear something that you're saying or

16  something like that.  But I understood that that was

17  just -- that was a security measure that needed to

18  happen.

19      Q    Okay.  In your mind, is there any

20  difference between a security guard being able to see

21  what's going on in your meeting with Mr. Dubose and

22  that meeting being recorded?

23      A    Yes.

24      Q    Okay.  Explain that for me.

25      A    This is, you know, my perception.  A

1   meeting being recorded concerns me more because I

2   worry about the ability to zoom in.

3        Q    I'm sorry, you can -- you're worried

4   about that?

5        A    The ability to zoom in --

6        Q    Okay.

7        A    -- and see written documents.  You know,

8   I was often there for -- you know, with my case

9   notebook and to talk to him about mitigation things,

10  but the other people on the team would often go there

11  with large quantities of discovery documents.  You

12  know, that concerns me.  It concerns me -- the

13  position of that camera is not such that you could

14  really see our mouths very well, but it concerns me

15  just in general having a recorded visit that could

16  then be shown to, you know, someone who could read

17  lips or something like that to try to figure out

18  what's going on.

19            The security officer outside the door was

20  there for security reasons and not to try to figure

21  out, you know, what we were talking about.  And

22  the -- the concern with recorded visit is that it

23  could be misutilized and used to that -- to that aim

24  of trying to figure out what we were talking about.

25        Q    Uh-huh.

1           And do you know whether during any of

2    your meetings with Mr. Dubose any sort of zoom-in

3    feature was used so people could see the contents of

4    documents?

5           A    I -- I don't -- I don't know.

6                MR. COLE:  Okay.  That's all I have.

7                          EXAMINATION

8    BY MR. COX:

9           Q    I have just a few questions.  My name is

10   Charlie Cox.  I represent Mr. Nix and Mr. Richey.

11          Have you met either one of those

12   gentlemen?

13          A    No, I don't think so.

14          Q    Other than you and other members of the

15   defense team, do you know if anyone else was able to

16   have had contact visits with Mr. Dubose between June

17   and November of 2019?

18          A    No, they weren't.

19          Q    I want to follow up just a few more

20   questions about the visits in the room and the guard

21   outside that you were just asked about.

22          As we looked at the video of you speaking

23   to Mr. Dubose, you were sitting on either side of a

24   long table.  And to your right was a wall that had a

25   lot of windows if not almost all glass, correct?

```
 1      A    Yes.
 2      Q    Mr. Dubose was in front of you, correct?
 3      A    Yes.
 4      Q    And then where was the guard situated in
 5  relation to you and Mr. Dubose and the glass windows
 6  on the right?
 7      A    So the guard was to my left.  Those glass
 8  windows were to my right.  What that was, was the
 9  kind of visitation views where you have the phones.
10  So -- so that's what that was from my -- from my
11  memory.  And so the hallway to come into the room
12  was -- was on my left.  And that's where the officer
13  sat.
14      Q    And when we looked at the video earlier,
15  you couldn't see the left side of the room that was
16  to your left.
17           Is that -- do you recall that?
18      A    The hallway.  It was a hallway.
19      Q    Okay.
20      A    Yeah.
21      Q    And was there a wall between you and the
22  guard or just a hallway?  Give me a little better
23  description of it.
24      A    Yes.  So it was a hallway, a wall and
25  there was the door.
```

1        Q    Okay.

2        A    So you come into the room with the door.

3   The door had a lot of glass in it.  My memory that

4   I'm -- my memory is that yes, the hallway had glass

5   too because I remember being able to walk down the

6   hallway, and I could see him sitting in the room up

7   there.  So it was pretty visible.

8        **Q    So when you are talking into the room**

9   **where you would meet with Mr. Dubose, you would walk**

10  **down a hallway and you could look to your right**

11  **through windows in the wall and see the room that you**

12  **would be meeting --**

13       A    It was to the --

14       **Q    -- with Mr. Dubose, correct?**

15       A    To the (inaudible) coming down the

16  hallway, yes.  So --

17       **Q    Okay.  All right.**

18       A    Yeah, come down the hallway.  And I'm not

19  supposed to gesture, but come down the hall -- you're

20  walking down the hallway, the room would be here.

21       **Q    Okay.**

22       A    So we would turn in and then turn -- turn

23  this way.  And I would be sitting, facing this

24  direction.  And then those other visitation booths

25  were to my right.

1       Q    Okay.  The result was you had glass
2   windows on either side of where you were meeting with
3   Mr. Dubose, correct?
4       A    That's my memory, yes.
5       Q    And then the guard would be on the
6   outside of the room to your left either looking
7   through a window or a door?
8       A    Yes.
9       Q    The window and the door while you were
10  meeting?
11      A    Yes.
12      Q    Okay.  And about how far away was the
13  guard when he was outside the other side of the door
14  while you were meeting with Mr. Dubose?
15      A    You know, it was a narrow hallway.  It
16  was a narrow hallway, so, you know, if -- if the door
17  is, like, right here, you know, they would be
18  maybe -- they would be sitting on the other side of
19  the hallway to allow any traffic to go through, you
20  know, sitting there in a chair, usually.
21      Q    Okay.  And --
22      A    Three feet -- three or four feet, maybe,
23  if I had to --
24      Q    Okay.  You testified earlier about
25  Mr. Dubose giving you a fabric-type ring that he had

1    created or somebody in the prison had created that he

2    gave you, correct?

3         A    Yes.

4         Q    And I think you said that he also gave

5    you some art; is that correct?

6         A    Like, on notebook paper.  He would -- he

7    would mail me -- you know, I would ask him sometimes

8    to write out certain things for me, you know, tell me

9    the names of all your cousins, kind of deal and mail

10   it in, things like that.  And he would sometimes

11   include just on notebook paper, you know, drawings

12   that he had done.

13        Q    And do you still have that art that he

14   gave you?

15        A    I -- I do.

16        Q    Okay.  That was separate than what may be

17   or was in his file with the defenders office?

18        A    It was in the file with the defenders

19   office.  And after he died this past June, I asked if

20   I could receive -- if I could -- if I could get the

21   things that -- like, that -- that he had made for me,

22   and they said that that was fine.

23        Q    Other than that art that he made, was

24   there anything else that you were able to take out of

25   what had been in his file at the defenders office

1   that you now have in your possession?

2       A    I have -- I have the letters -- the

3   letters that he sent me.  Most of them were, you

4   know, case -- very case specific.  But basically, the

5   capital defenders office gave me all the letters that

6   were addressed to me.  My understanding is everyone

7   on the team was allowed to keep -- because he would

8   write different people on the team different letters,

9   and we were able to keep the letters that he had

10  written us and the different things that he had sent

11  us individually.

**12       Q    Were all of the letters that you kept**

**13  from him case specific, or were some of the letters**

**14  personal that do not discuss the case?**

15      A    They all -- they all discussed

16  mitigation.  It was -- it was -- you know, the

17  letters that he would write to me, it would be me

18  saying things like, Please write down -- you know,

19  because memory -- in a meeting at the time, you know,

20  maybe he couldn't remember certain things, and I'd

21  say, Okay, please write down, you know, maybe your

22  earliest memory of your dad, or he had a lot of

23  issues with his family.  So I would ask about

24  different -- you know, Can you share with me some

25  memories of your dad's, you know, alcoholism or share

 1   me some -- some happy memories with this person or

 2   things like that.

 3           So they were -- they were all -- they

 4   were mostly personal stories.  There were some

 5   letters in which he would just kind of be talking

 6   about his -- the difficulty of being in a death

 7   penalty case and how depressed he was and things like

 8   that.  You know, we kept telling him if you're

 9   writing about your feelings, if you're writing about

10   the case, if you're writing about anything, write to

11   us.  You know, we're your legal team.  You know,

12   don't -- it's just not safe and smart to, you know,

13   write that to some- -- you know, someone else.

**14      Q    Are there other clients that you had that**

**15   you also kept their communications after you left the**

**16   defenders office?**

17      A    Yes.  I have a couple of letters from

18   some other clients.  I think the letters I've kept

19   from other clients are things that they sent me once

20   their case resolved.

**21      Q    When Mr. Dubose would write letters to**

**22   you, what name did he use to refer to you in the**

**23   letter?**

24      A    I remember this very well.  He would

25   always write Lily Engleman, and he would put it in

 1  quotation marks because I don't think he knew what

 2  quotation marks were for.  So he would -- he would

 3  Lily Engleman in quotation marks.

 4       Q    Like, on the outside of the letter?

 5       A    Uh-huh.

 6       Q    And what about at the -- the salutation

 7  part of the letter, or was there a salutation part of

 8  the letter?

 9       A    I honestly don't remember.  Hi, Lily,

10  maybe something like that.

11       Q    What name did you use when you

12  communicated with Mr. Dubose, use for him?

13       A    Ricky.  We all called him Ricky.  You

14  know, there are some clients who I called

15  Mr. So-and-So or Mrs. So-and-So.  There are some that

16  I think it's better to use their first name.

17            MR. COX:  Just one moment.  I don't

18       have any other questions.  Thank you.

19            MR. GREEN:  Is there anyone else in

20       the room that has questions?

21            MR. COX:  That's it for the room.

22                       EXAMINATION

23  BY MR. GREEN:

24       Q    Okay.  I just have a few questions for

25  you, Ms. Engleman.

1              MR. BEGNAUD:  Mr. Green.

2    BY MR. GREEN:

3         Q    I represent Ms. Moss.

4              You testified earlier that Ms. Moss was

5    present on the day you were arrested; is that

6    correct?

7         A    Yes.

8         Q    Prior to that, had you had any

9    interaction or contact with Ms. Moss?

10        A    No.

11        Q    Did she say anything to you the day she

12   was -- you were arrested?

13        A    I honestly don't remember very well.  I

14   remember talking to Mr. Adkerson a lot.  I remember

15   one of either Ms. Moss or one of the other women

16   patting me down, and maybe there was -- you know,

17   there would have been some communication about that.

18   I remember Mr. Adkerson doing most of the talking.  I

19   was -- I was very stressed, and I honestly don't

20   remember specifically.

21        Q    Okay.  Since then, have you had any

22   contact with Ms. Moss?

23        A    No.

24        Q    The testimony about the fabric ring that

25   was given to you, were there any items of jewelry or

1   anything else made for any other members of the legal

2   team?

3        A    I -- I'm honestly not sure.  I just -- I

4   don't remember.  I don't remember if he gave them --

5   if he gave other people things when they visited.

6        Q    And you may have already been asked this.

7   I apologize if you have been.

8             Can you describe the tattoos on his feet,

9   Mr. Dubose's feet?

10       A    No.  He had so -- he had so many.  He had

11  so many.  You know, I -- I remember ones on his head

12  a little bit better because those were ones I saw

13  every time I saw him.  I don't specifically remember

14  what was on his feet.

15            MR. GREEN:  That's all I have.

16            Does anybody else on Zoom have any

17     questions?

18            (Whereupon, a discussion ensued off the

19     record.)

20            MR. BEGNAUD:  And Eric O'Brien, are

21     you going to be going first?

22            MR. O'BRIEN:  Yes.

23            MR. BEGNAUD:  Okay.  Just identifying

24     for the Court Reporter.

25            MR. O'BRIEN:  Yeah, this is Eric

1      O'Brien.  I represent Jonathan Adams.

2                    EXAMINATION

3   BY MR. O'BRIEN:

4      Q    **Ms. Engleman, have you had any**

5   **conversations with Jonathan Adams?**

6      A    No.

7      Q    **Now, you describe the process around the**

8   **indictment as shady.**

9           **Can you go into a little more specifics**

10  **about what you mean by that?**

11     A    Around the indictment, specifically?

12     Q    **Yes.**

13     A    I remember -- I remember being informed

14  by Don -- this is what Don told me.

15          MR. BEGNAUD:  Actually, I think you

16      probably shouldn't be getting into what you

17      guys --

18          THE WITNESS:  Okay.  I won't say that.

19      Sorry.

20     A    It -- it seemed to come out of nowhere.

21  It was a year after the arrest.  That seemed bizarre

22  to me.  And I know that it was COVID time and

23  everything, but the fact that it took a whole year to

24  indict me, you know, seemed really unusual.  I -- I

25  knew that there wasn't any evidence.  I knew I didn't

1   give him anything.  I know that -- I knew that there

2   was no contraband -- contraband found on him.  And so

3   I -- I -- I just had -- I struggled to understand how

4   it was indicted.

5   BY MR. O'BRIEN:

6       **Q     Okay.  So there wasn't any acts or**

7   **statement by anyone with the district attorney's**

8   **office that you would describe as shady; is that**

9   **correct?**

10      A    I don't know how to answer that without

11  talking about conversations I had with Don Samuel.

12          MR. BEGNAUD:  If you guys want to take

13      a break, I can chat with Ms. Engleman about

14      her legal options, and we can see if we

15      want to waive that.

16          MR. O'BRIEN:  Yeah, that's fine.

17          MR. BEGNAUD:  Okay.

18          THE VIDEOGRAPHER:  The time is

19      2:01 p.m.  We're now off the record.

20          (Whereupon, the video camera was

21      turned off.)

22          (Whereupon, a brief recess was taken.)

23          (Whereupon, the video camera was

24      turned on.)

25          THE VIDEOGRAPHER:  The time is

1       2:05 p.m.  We're back on the record.

2              MR. BEGNAUD:  And my client and I

3       spoke.  And as we discussed off the record,

4       just now my client is going to limit --

5       this will be a limited waiver of

6       attorney/client privilege where my client

7       will answer the question that you were

8       asking.

9   BY MR. O'BRIEN:

10      Q     Let me (inaudible) this first.

11            In terms of the district attorney's

12   office, did you only deal with Don Samuel?

13      A     I'm sorry, you were breaking up a little

14   bit.

15            Can you say that again?

16      Q     Was Don Samuel the only individual that

17   you dealt with at the district attorney's office?

18      A     Don Samuel was my attorney.

19            You mean Jonathan Adams?

20      Q     No, I'm sorry.  There's another Samuels

21   in the district attorney's office, so I got

22   (inaudible).

23      A     Okay.

24      Q     Sorry about that.

25            Okay.  What conversations did you have

1    with Don Samuel that -- that you relate back to the

2    district attorney's office as being inappropriate or

3    shady?

4         A    So Don -- Don Samuel, my attorney, Don

5    Samuel, called me in November of 2021 to tell me that

6    I had been indicted about three weeks prior.  He said

7    he was very surprised by this himself because he had

8    conversations with Jonathan Adams in which he had

9    asked Jonathan Adams, If you think that you want to

10   move forward with an indictment, will you let me know

11   on the front end?

12             And Jonathan Adams had told him, Yes, I

13   will.

14             And so then when I was indicted and then

15   we weren't notified for three weeks later, Don was --

16   Don was very surprised and confused by that.  So he

17   -- he relayed that to me during that phone

18   conversation.

19        Q    Okay.  Was -- did Jonathan Adams ever

20   give an explanation for the lack of notification?

21        A    I don't know.  If so, that was not

22   communicated to me.

23        Q    Okay.  So that was the only statement

24   that -- that seemed inappropriate or not by procedure

25   from the district attorney's office?

1              MR. BEGNAUD:  You mean with regard to

2      this -- the indicting, specifically?

3              MR. O'BRIEN:  Yes.

4         A    Yes.

5  BY MR. O'BRIEN:

6         **Q    Okay.  Were there any other comments from**

7  **the district attorney's office outside of the**

8  **indictment that you seemed -- that were shady in your**

9  **terms?**

10        A    So there was -- there was an assistant DA

11 at the Butts County office who was primarily

12 responsible for prosecuting my case under direction

13 of Jonathan Adams.  I don't remember that

14 individual's name right now, unfortunately.  But I

15 remember once I was indicted and then we finally

16 obtained discovery was, you know, a year -- over a

17 year after my arrest before we got any -- any

18 discovery before we saw this video ourselves.

19              And Don set up an appointment with

20 Jonathan Adams to talk about the fact that there's

21 nothing on the video.  And he -- he told me that he

22 went down there to Butts County to meet with Jonathan

23 Adams, and when Jonathan Adams realized he wanted to

24 talk to him about the fact the video doesn't show

25 anything and he was trying to talk to him about

1  dropping the charges, Jonathan Adams got kind of

2  upset and, like, walked out of the room and was --

3  said something to the effect of, you know, This is --

4  this is a waste of my time.  I don't want to -- I

5  don't want to meet with you anymore.  And so from

6  then on, my understanding is Don dealt with and met

7  with the ADA whose name I don't remember.

8           But Don kind of communicated all of that

9  to me in the -- the sense -- he just seemed very

10  confused by it all.  He said that he's never really

11  had a district attorney react in that way.  Jonathan

12  Adams was amenable to setting up the meeting, was

13  there for the meeting.  And then when he found out

14  what Don wanted to talk about, he just, you know,

15  shut the meeting down and left.

16      **Q     And that's when he was frustrated, was**

17  **just based on the -- just the outset of the**

18  **conversation trying to get the charges dismissed?**

19      A     I'm so sorry.  Could you say that again?

20      **Q     So that was just at the outset of the**

21  **meeting?  It was just about the topic of trying to**

22  **get the charges dismissed?**

23      A     Yes.  He wanted Jonathan Adams to sit

24  down and watch this video with him and go through it

25  frame by frame talking about it.  And he refused.

1         Q     Okay.  And this is after the indictment?

2         A     Yes.  I want to say that this was like

3    February or March of 2021.

4         Q     Okay.  And just in terms of the

5    indictment and the timing of it and the length of

6    time that it took, you were still aware that your

7    charges were going to be presented to the grand jury,

8    you just weren't aware of the timing; is that

9    correct?

10        A     That's -- that's correct.  I mean, I

11   assumed after I was arrested in November 6, 2019, I

12   assumed that the case would be presented to the grand

13   jury, you know, that next -- what is it called? --

14   the next jury seating.  And it wasn't.  I -- we never

15   really got an explanation as to why it wasn't.

16            And, you know, when it then wasn't for

17   months and months and months, I thought, Well,

18   surely, they realize that there's nothing here in

19   this case, and they're just, I don't know, eventually

20   going to drop it.  I don't know why they're not doing

21   that yet.  So it -- by the time it was actually

22   indicted, it was a shock to me that it was actually

23   indicted.

24        Q     Okay.  And you -- you found out

25   three weeks later, so you weren't at the grand jury

 1  presentment.  That's correct?

 2      A    Correct.

 3      Q    **Okay.**

 4          MR. O'BRIEN:  Okay.  I don't have any

 5      other questions.

 6                      EXAMINATION

 7  BY MR. BINGHAM:

 8      Q    **Ms. Engleman, my name is Derrick Bingham.**

 9  **I represent testimony Tomeika Jordan, and I just have**

10  **a -- just very briefly -- just very brief follow-up**

11  **for you.**

12          **Do you know who Tomeika Jordan is?**

13      A    Yes.

14      Q    **And who do you understand Tomeika Jordan**

15  **is?**

16      A    I understand that she's an agent with

17  OPS, I believe, or she's --

18      Q    **(Inaudible).**

19      A    I'm sorry, go ahead.

20      Q    **No, I interrupted you.  I apologize.  Go**

21  **ahead.**

22      A    I know that she did a lot of -- of kind

23  of gathering records together.  I know that we --

24  "we," meaning the Dubose team, she -- she would -- I

25  know that she got initial discovery together in

1   the -- the murders of the correctional officers.  I

2   know that she had a hand in getting all of that

3   together.  I know that she dealt with a lot of, like,

4   records stuff there.

5          Q     Okay.  And that was -- was that before

6   you were arrested that she was involved in getting

7   the records together in the discovery --

8          A     Yes.

9          Q     -- and in that area?

10          A     Yes.

11          Q     After you were arrested, did you -- well,

12   first of all, have you ever spoken to her directly?

13          A     No.

14          Q     Was she present the day you were

15   arrested?

16          A     I don't think so.

17          Q     Do you have any personal knowledge of any

18   involvement or what involvement, if any, she may have

19   had in the decision to seek a warrant for your

20   arrest?

21          A     I think she saw the video and listened

22   (inaudible) about the video, but I'm not 100 percent

23   sure.

24          Q     Okay.  And what -- what do you base that

25   belief on?

1       A    I know that several people at SMU were

2  seeing the video, were shown the video, and I know

3  that there were discussions about arresting me and

4  such.  And I have a memory that she was maybe part of

5  that, but I'm -- I'm not 100 percent sure.

6       Q    And this memory that you have, would this

7  be based on documents you reviewed, or is that -- is

8  it based on documents you reviewed?

9       A    Yes.

10       Q    Not based on anything you know personally

11  from your own personal knowledge, correct?

12       A    That's -- that's correct.  I'm basing

13  this on -- I know in the discovery documents for my

14  case that I received with all the case reports and

15  everything that Nathan Adkerson wrote, there's --

16  there's just different names mentioned as to who --

17  I've seen different things.  I'm honestly -- I

18  honestly just don't remember all the different names.

19       Q    The -- with regard to the media -- I know

20  you've answered this question about other defendants.

21  I just want to just be clear.

22            You have no reason to believe that

23  Ms. Jordan had any role in contacting the media about

24  your arrest; is that correct?

25       A    I have no idea who contacted the media.

```
 1        Q    And as far as the recording of your
 2   meetings with Mr. Dubose, you don't have any reason
 3   to believe that Ms. Jordan personally had any role in
 4   recording those and recording these meetings or the
 5   decision to have a camera in that room or anything
 6   related to those recordings, do you?
 7        A    I -- I just don't know.
 8             MR. BINGHAM:  That's all the questions
 9        I have.  Thank you.
10                    EXAMINATION
11   BY MR. BALLINGER:
12        Q    Good afternoon, Ms. Engleman.  My name is
13   Eric Ballinger.  You commented on my picture earlier.
14        A    I do like your bow tie.
15        Q    You're too kind.  It's an old picture
16   and --
17        A    I didn't know that you could hear me at
18   the time.  I didn't know that you could hear me at
19   the time.  I think -- I thought I was on -- it was on
20   mute.
21        Q    Okay.  I represent Jose Morales.
22             Do you know who he is?
23        A    Yes.
24        Q    And who is he?
25        A    He's the warden.  I assume he still is.
```

1   At the time, he was the warden at special management

2   unit.

3         **Q    Okay.  And did you have any interaction**

4   **with Mr. Morales?**

5         A    Yes.  I interacted with him a few times.

6         **Q    Okay.  What were those interactions?**

7         A    The majority of them -- like I said, when

8   I would come to visit Ricky, I would have to wait in

9   that lobby area for a while.  And there would be, you

10  know, employees walking back and forth at different

11  times.  Mr. Morales would often walk by.  You know,

12  he knew who I was.  You know, I was a member of

13  Ricky's defense team.  He would stop.  He would say

14  hi.  Sometimes he would say things like -- you know,

15  asked me how long I had been waiting and kind of

16  indicate that he would tell officers to hurry up and

17  get Ricky.

18            I remember more prolonged conversation

19  with him one time.  I was there visiting Ricky with

20  another member of the Dubose team.  It was the two of

21  us together, and we were waiting in the lobby area.

22  And Warden Morales came up and started talking to us.

23  And he was just -- from what I remember, this was,

24  you know, maybe four years ago at this point, he was

25  just kind of talking about, like, ins and outs of

1  managing a correctional facility and, you know,

2  difficult inmates and just kind of telling, you know,

3  stories about what it's like to -- to run a

4  correctional facility.

5          You know, that was the most prolonged

6  interaction that I had with him.  We chatted with him

7  for maybe 15 minutes, I think.

8      Q    Did you have any negative interactions

9  with Mr. Morales?

10     A    No.

11     Q    Any unpleasant interactions with

12 Mr. Morales?

13     A    No.

14     Q    Okay.  Now, you have been -- in your

15 earlier testimony, you've been visiting inmates at

16 various correctional and institutions throughout your

17 entire career; is that correct?

18     A    Yes.

19     Q    And this was your first case where you

20 had -- were visiting inmates at the MTU?

21     A    SMU, special management unit, yes.

22     Q    SMU, sorry.

23          And how many -- how many inmates did you

24 have at the -- how many inmates did you have total on

25 your caseload at the time you started working on the

1    Dubose case?

2         A    At the time I started working on the

3    Dubose case was right when I first was hired.  And I

4    was put on three cases initially immediately.  If I

5    remember correctly, I'm actually worried that I'm

6    forgetting someone.  And I remember I received

7    another case -- no, I was put on -- yeah, I was put

8    on three, I think.  I received another case maybe

9    six months in, and I received another case maybe

10   six months after that.

11        Q    And all of these were capital cases?

12        A    Yes.  Every case that that office handles

13   is a capital case.

14        Q    And how many people total were on the

15   Dubose team?

16        A    So the team grew as time went on.  There

17   were two main attorneys.  I know as they were gearing

18   up to trial, they -- they added two more.  But for

19   the -- yeah, they added -- they added two more.  I

20   would say three, four, five, six, like seven-ish.

21   And again, it -- you know, it grew a little bit.

22   When we had team meetings, there were usually about

23   seven people there.

24        Q    And do you remember the names of the

25   people who were on the team?

1        A     Sure.  Yeah.

2        **Q     Who are they?**

3        A     Amber Pittman was the lead attorney.  She

4   was the first chair attorney at the Macon office.

5   Ms. Anna Szatkowski was the second chair attorney.

6   Jerry Ward, who was the director of the capital --

7   the capital defenders office, was also on the team.

8   He kind of did more consulting-type stuff, though he

9   participated heavily in the trial.  He wasn't quite

10  as involved in, like, the day to day, so to speak.

11            I was the mitigation specialist.  Ani

12  Szatkowski, who I mentioned earlier, she also was

13  part of the team officially, but she didn't have as

14  much to do with the day to day.

15            Deriana Doss was another mitigation

16  specialist.  She was the person who went on maternity

17  leave, who I -- who I kind of replaced when she was

18  on maternity leave.  When she came back from

19  maternity leave, she was still a member of the team.

20  She -- she handled certain aspects of the case but

21  wasn't quite as involved in certain other aspects.

22            Vivia Harris was the fact investigator.

23  And then there was another attorney named Shayla

24  Galloway who got pulled into the team maybe the last

25  year and a half leading up to trial.

1        Q    And how many times did you -- I'm sure

2    you don't know exactly -- the number exactly, but how

3    many times did you visit Mr. Dubose?

4        A    I would say between 20 and 25 times,

5    maybe, because I know I started seeing him August or

6    September of 2017.  I know I was arrested, you know,

7    November of 2019, so it's about a little more than

8    two years.  And I saw him -- I would visit him about

9    every three to four weeks.  You know, there may be a

10   month where it's a little bit different because I

11   would see him in court or things like that.  But on

12   average, it was about -- I would visit him about

13   every three to four weeks.

14       Q    So what came to work for the capital

15   defenders office?  Was there any training on what you

16   were or were not allowed to bring to -- to visit

17   inmates with at correctional facilities?

18       A    Well, every -- every facility is a little

19   bit -- is a little bit different.  You know, if they

20   got -- they all have the signs posted outside, you

21   can't bring in cell phones, you know, you can't bring

22   in weapons, of course, no metal, you know.  But some

23   facilities were very strict about things like staples

24   in your documents.  Other small town county jails,

25   you know, weren't as -- didn't seem to care about

1    stuff like that as much.

2              You know, my memory is that SMU was

3    obviously much more strict.  You know, I -- you know,

4    I remember not being able to bring in, like -- now

5    that I say that, I'm actually not sure about, like,

6    paperclips.  I don't know if I was -- you know, if I

7    would paperclip documents or not.  I don't remember.

8              But, you know, there was always a lot of

9    discussion as to I have a client in this facility,

10   has anyone been to this facility before, what are

11   they like.  You know, do they -- can I staple my

12   papers, or should I not staple my papers and things

13   like that.

14        **Q    And were all of your contact visits with**

15   **all of your clients, were they all -- were all your**

16   **visits with clients all contact visits?**

17        A    Yes.

18        **Q    At all of the institutions?**

19        A    Yes.

20        **Q    And were they ever restricted to just**

21   **through the glass telephone visits?**

22        A    No.  Ricky is -- Ricky asked me -- was

23   the only one that was ever restricted.

24        **Q    And so did you often -- did you ever have**

25   **to meet him through the -- through the -- with the**

1    telephone and glass?

2        A    I did.  SMU initially had a policy -- I

3    don't know if it's still in place -- that attorneys

4    can have contact visits with clients, but other

5    members of the legal team can't.  They have to have

6    visits through the glass.  So the first few times I

7    went to see him, I mean, I was, you know, in

8    training, still kind of learning stuff.  I always

9    went with an attorney.  And then once I started

10   visiting him one-on-one, it was the contact visits

11   through the glass.  This is very difficult.  The

12   phones were, like, incredibly staticky.  It was very

13   hard to hear each other.  And it's not conducive to

14   building the kind of rapport and relationship

15   building that a mitigation specialist is supposed to

16   build with their client.

17           And we got a court order authorizing, you

18   know, confidential contact visits for me and for

19   every member of the defense team.  And that was

20   standard protocol for my office.  My office had --

21   has had other clients in other cases housed at SMU,

22   and the standard protocol was to get a court order

23   allowing confidential contact visits for every member

24   of the team.

25       Q    And the -- when did you first notice that

1   there was a camera in the -- were you -- strike that.

2   Let me go back and ask you.

3          Were all of your visits -- contact visits

4   in the same conference room?

5      A    Yes.

6      Q    Okay.  And when did you first notice the

7   camera in the conference room?

8      A    I -- I will -- I will maybe amend my last

9   answer because the first several times I visited him

10  one-on-one, it was in a different booth with the

11  glass and the phone.  Once we moved to the contact

12  visit, yes, they were all in that room.  I don't

13  remember exactly when I first noticed the camera.

14  Probably that first visit.

15     Q    Did you ask anybody at the SMU if that

16  camera was recorded?

17     A    No.

18     Q    Did you bring it to the attention of

19  anybody at the SMU?

20     A    No.

21     Q    Did you bring it to the attention of

22  anybody on your team?

23     A    That's a good question.  I don't remember

24  if we would -- if it was mentioned amongst us.  I

25  honestly don't remember.  I honestly don't remember.

1  A lot of correctional facilities I went into and
2  others went into didn't have cameras in the
3  visitation room.  And so I don't remember if that was
4  something we all commented on like, Oh, that's kind
5  of weird.  I don't remember.
6       **Q    Now, how was this camera set up in the --**
7  **in the visitation room?**
8       A    To -- to my memory, it was -- it would
9  have been behind where Ricky was sitting, like in the
10 left corner.  You know, it was one of those, like,
11 round -- you know, like, round things, from what I
12 remember.
13      **Q    Was it mounted to the wall?  Was it**
14 **mounted to the wall?**
15      A    It was -- I think it was in the -- just
16 like in the corner, like where the wall and ceiling
17 meet, I think -- I think.  I -- you know, it's not
18 like I was staring at it.  I -- it was just kind of
19 out of my peripheral, you know, a lot of the times.
20      **Q    But the camera faced Mr. Dubose's back?**
21      A    Yes.  Yes.
22      **Q    So it wouldn't have been able to see his**
23 **face, correct?**
24      A    That's correct.
25      **Q    Unless he turned towards it?**

1       A    That's correct.

2       Q    **Okay.  So --**

3            THE WITNESS:  Oh, I can't hear you.

4            MR. BEGNAUD:  We can't hear you.

5            THE WITNESS:  We're all frozen.

6            THE VIDEOGRAPHER:  The time is

7       2:30 p.m.  We're now off the record.

8            (Whereupon, the video camera was

9       turned off.)

10           (Whereupon, a brief recess was taken.)

11           (Whereupon, the video camera was

12      turned on.)

13           THE VIDEOGRAPHER:  The time is

14      2:32 p.m.  We're back on the record.

15  BY MR. BALLINGER:

16      Q    **So anyone else comment about the video**

17  **camera?**

18      A    I'm sorry, say that one more time.

19      Q    **Did anybody else on the Dubose team**

20  **comments about the video camera?**

21      A    I don't remember.  I really don't

22  remember if we did or not.

23      Q    **And do you know if any other teams have**

24  **encountered the same camera in the visitation room at**

25  **the SMU?**

1    A    Yes.  I mean, at -- at the time, there

2  was another capital client my office was representing

3  that was at SMU.  And, you know, their team also had

4  no idea that they were being recorded until this

5  happened with me.  So I know that that was something

6  that they were, of course, very concerned about

7  themselves and, you know, worked with their judge and

8  SMU to make sure that that didn't happen.

9    **Q    And this other inmate at SMU, was that**

10  **Mr. Dubose's codefendant?**

11    A    Actually, I'm glad you mentioned that.  I

12  was thinking of someone totally different.  Yes,

13  there was Mr. Dubose's codefendant.  Of course,

14  because that was a codefendant case, this is why I

15  don't really think about him because I just didn't

16  have hardly any -- I didn't have any interaction with

17  that team about him because it was a codefendant

18  case, it was a conflict case.

19    There was a -- there was a third inmate

20  at SMU at the time.  His first name was Cesar.  His

21  last name escapes me right now, but he -- he was

22  there, and I know that his team was very -- very

23  concerned about the -- the recording situation.  I

24  assumed that Donnie Rowe, the -- Ricky's codefendant,

25  I assume that his team was also very concerned.  I

1  just -- you know, it was a complicate- -- we didn't

2  talk about that.

3      Q    The -- when you first started going to

4  meet with clients at the -- at the SMU, did anybody

5  from the Department of Corrections give you a

6  briefing or discuss with you what -- what types of

7  things are allowed and not allowed in for the contact

8  visits?

9      A    I don't remember that, no.

10     Q    Was there -- were there signs there

11  indicating what was allowed to -- or to be brought in

12  for contact visits?

13     A    You know, just the big sign out front

14  like you see at every facility that says, you know,

15  no cell phones, no wepers -- weapons, no lighters, no

16  lighter fluid.  I don't remember receiving -- I

17  certainly never received any kind of paper

18  documentation or anything like that from the facility

19  regarding, you know, what we could give our clients

20  during contact visits or bring in or anything like

21  that.

22     Q    Whenever you would check in, would

23  anybody ask you about if you had any contraband

24  items?

25     A    I honestly don't -- I don't remember.  I

1  don't remember if there was, like, a verbal, you

2  know, do you have any weapons on you?  I don't --

3  frank- -- I honestly don't remember.

4      **Q    I want to go back to something earlier in**

5  **your testimony.**

6          **You said -- mentioned somebody that --**

7  **somebody from Mr. Dubose's family said that you were**

8  **in love with him.**

9          **Who was that?**

10     A    That was a cousin.  I have a memory that

11 her name was Nicki or Niquita.  I don't remember her

12 last name.  She was in Texas.  I don't remember

13 exactly if -- I don't remember if she was, like, a

14 maternal or a paternal cousin.

15     **Q    And was that communication documented in**

16 **the capital defenders file?**

17     A    My interview with her?

18     **Q    Yes.**

19     A    Yes.  I wrote memos --

20     **Q    Where she made that comment?**

21     A    She made that -- she made that comment --

22     **Q    (Inaudible).**

23     A    She made that comment on a Facebook post

24 after I was arrested.  There were the -- the articles

25 regarding my arrest were -- you know, there are

 1  articles regarding my arrest out in the media.  And

 2  it seems she or someone else in the Dubose family

 3  shared an article on Facebook.  And she made a

 4  comment about -- to that effect on Facebook that

 5  Nathan Adkerson later found and -- yeah.  That was

 6  not a comment that she made to me.

 7       **Q    Do you have a copy?  Okay.  Do you have a**

 8  **copy of that Facebook post?**

 9            MR. BEGNAUD:  It's -- if I can help,

10       it's in the case file.  It's -- it's in --

11       Mr. Adkerson's case file is in the record

12       in this lawsuit.

13  BY MR. BALLINGER:

14       **Q    All right.  Let me ask you this:  Were**

15  **you in love with him?**

16       A    No.

17            THE COURT REPORTER:  I'm sorry, what?

18  BY MR. BALLINGER:

19       **Q    Did you have feelings for him?**

20       A    No.

21            MR. BEGNAUD:  Just a second, the Court

22       Reporter is asking -- the question was:

23       Are you in love with him?

24            THE COURT REPORTER:  Thank you.

25  BY MR. BALLINGER:

1      Q     It was, were you in love with him, but --

2  and the answer to that was no?

3      A     No.

4      Q     Did you have an emotional connection to

5  him?

6      A     You know, as much as I have an emotional

7  connection with all of my clients.  Even -- even now,

8  doing noncapital work, I have a caseload of roughly

9  about 12 clients, and, you know, I have an emotional

10  attachment with all of them.

11      Q     Anything different -- anything different

12  or different from the emotional connection between

13  Ricky Dubose and any of your other clients?

14      A     No.

15      Q     Did he -- did Mr. Dubose ever give you

16  any indications -- without going into any

17  confidential communications -- that he had an

18  emotional connection with you?

19      A     You know, he had an emotional connection

20  with everyone on his team.  And he was thankful.  He

21  expressed his appreciation to all of us.  You know, I

22  don't -- I never got any impression that he had some

23  kind of attachment to me more so than he did anyone

24  else on the team.

25      Q     Did he give anybody else on the team a

1   **ring?**

2        A    I don't -- I don't know what all he gave

3   other people.

4              MR. BALLINGER:  That's all the

5        questions I have.

6              MR. BEGNAUD:  And I don't have any

7        questions.

8              THE VIDEOGRAPHER:  This concludes the

9        deposition.  The time is 2:40 p.m.  We're

10       now off the record.

11             (Whereupon, the video camera was

12       turned off.)

13                        - - -

14       (Deposition concluded at 2:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1               E R R A T A   S H E E T

 2
         Pursuant to Rule 30(7)(e) of the Federal
 3  Rules of Civil Procedure and/or Georgia Code
    Annotated 81A-130(B)(6)(e), any changes in form
 4  or substance which you desire to make to your
    deposition testimony shall be entered upon the
 5  deposition with  a statement of the reasons given
    for making them.
 6
         To assist you in making any such corrections,
 7  please use the form below.  If supplemental or
    additional pages are necessary, please furnish
 8  same and attach them to this errata sheet.

 9                       - - -

10      I, the undersigned, LILY ENGLEMAN, do hereby
    certify that I have read the foregoing deposition
11  and that to the best of my knowledge said
    deposition is true and accurate (with the
12  exception of the following corrections listed
    below).

13

14

15  Page_____ Line_____should read:_____

16  Reason for change:_____

17

18  Page_____ Line_____should

19  read:_____

20  Reason for change:_____

21

22  Page_____ Line_____should

23  read:_____

24  Reason for change:_____

25
```

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
Lily Engleman on 02/14/2023                              Page 194

1   Page_____  Line_____should

2   read:_____

3   Reason for

4   change:_____

5

6   Page_____  Line_____should

7   read:_____

8   Reason for

9   change:_____

10

11   Page_____  Line_____should

12   read:_____

13   Reason for

14   change:_____

15

16   Page_____  Line_____should

17   read:_____

18   Reason for

19   change:_____

20

21   Page_____  Line_____should

22   read:_____

23   Reason for

24   change:_____

25

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
Lily Engleman on 02/14/2023                              Page 195

```
 1   Page_____ Line_____should

 2   read:_____ Reason for

 3   change:_____

 4

 5   Page_____ Line_____should

 6   read:_____ Reason for

 7   change:_____

 8

 9   _____

10   Signature

11   Sworn to and Subscribed before me

12   _____, Notary Public.

13   This_____day of _____, 2023.

14   My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2    STATE OF GEORGIA:

3    COUNTY OF COBB:

4

5         I hereby certify that the foregoing

6    transcript was taken down as stated in the

7    caption and the questions and answers thereto

8    were reduced to typewriting under my direction,

9    that the foregoing pages 1 through 195 represent

10   a true, complete and correct transcript of the

11   evidence given upon said hearing, and I further

12   certify that I'm not of kin or counsel to the

13   parties in the case; am not in the regular employ

14   of counsel of any of said parties; nor am I in

15   anywise interested in the result of said case.

16        This 28th day of Febuary 2023.

17

18        *Lynne C. Fulwood*

19

20                  LYNNE C. FULWOOD,
                    Certified Court Reporter
21                  State of Georgia
                    License No. B-1075
22

23

24

25

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023                    Index: $5,000..3:47:58

**Exhibits**

**EnglemanL - 2**
  6:3
  122:19,24

―――――――――

**$**

**$5,000**
  140:25

―――――――――

**1**

**1**  7:6
  122:2,12,
  18

**100**  174:22
  175:5

**1099**  28:23

**1099s**  28:5,
  18 29:1

**10:21**  7:10

**10:51**  37:25

**10:52**  38:7

**11**  48:1

**11:28**  66:20

**11:43**  67:2

**11th**  35:18
  37:1

**12**  47:24
  48:1 191:9

**120**  15:24
  18:9

**12:02**  86:11

**12:04**  86:18

**12:46**  122:2

**12:53**  122:11

**13th**  83:21

**1445**  9:23

**14th**  7:9

**15**  17:24
  30:17,18
  58:13
  129:5
  178:7

**18th**  24:16

**1988**  9:21

**1:00**  121:23

**1:07**  134:3

**1:10**  134:10

**1:33**  151:16

**1:40**  151:23

―――――――――

**2**

**2**  122:10,
  19,24
  140:5

**2.13**  32:1,5

**20**  20:12
  128:12
  129:18,20
  181:4

**2006**  13:14

**2009**  86:22

**2010**  13:24

**2015**  11:1
  14:1

**2017**  14:2
  45:12,16
  71:13
  181:6

**2019**  20:12
  83:21
  84:25 85:5
  126:15
  152:11
  153:1,16
  156:17
  172:11
  181:7

**2020**  10:19,
  21 21:15
  33:1
  35:18,19
  36:9 40:19
  142:23
  149:7

**2021**  16:21
  22:6,19
  27:11,19
  29:23
  30:9,10
  37:1 169:5
  172:3

**2022**  24:16
  27:23

**2023**  7:9

**23**  18:22

**25**  181:4

**27th**  118:17

**2985**  10:3

**2:00**  140:11

**2:01**  167:19

**2:05**  168:1

**2:30**  186:7

**2:32**  186:14

**2:40**  192:9,
  14

**2nd**  45:13

―――――――――

**3**

**30084**  9:23

**30315**  10:4

**30319**  10:23

**35**  30:6

**37,000**  29:23
  30:16

**3:45**  92:1

**3:45:35**  92:1

**3:47**  92:21

**3:47:11**
  92:24

**3:47:30**
  86:23

**3:47:51**  87:6

**3:47:58**
  87:19
  93:17

―――――――――

3:48   93:19

3:48:05   88:1
  93:25
  102:23

3:48:19
  103:1

3:48:21
  103:2

3:48:30
  103:3

3:48:36
  104:12

3:48:45
  104:14

3:48:50
  104:15

3:49:02
  105:20

3:49:04
  104:21

3:49:23
  106:1

3:49:30
  106:5

3:49:46
  107:5

3:50   108:9,
  16

---

**4**

40   30:6

4th   18:20

---

**5**

52   18:13

54   18:13

5th   9:21

---

**6**

6   126:15
  172:11

6th   84:1,25
  85:5 86:22
  152:11
  153:1,16

---

**7**

706 200-2062
  12:21

75   30:4

---

**9**

924   10:23

9:00   126:21

9:30   126:24

---

**A**

A-N-U-P-A-M-A
  48:25

a.m.   7:10
  37:25 38:7
  66:20 67:2

abilities

54:18

ability
  13:1,6
  154:4
  155:2,5

absolute
  149:18

absolutely
  61:5 80:7

abuse   26:3
  112:16

accepted
  22:5

accepting
  125:11

access   59:20
  117:18,25

accessories
  123:18

accidentally
  154:15

accommodate
  53:13

account
  118:5,23
  119:8
  120:10

accurate
  73:13
  87:23

accused
  51:22

acquitees

36:16

acquittals
  36:15

acting   26:7

action
  39:21,22
  91:22
  93:9,22

actions   12:3

active   22:6
  23:4
  27:13,15

actively
  140:8

acts   167:6

actual   41:23
  73:22
  74:17
  77:21
  79:10
  124:11

acute   145:16

ADA   171:7

Adams   8:5
  142:3
  166:1,5
  168:19
  169:8,9,
  12,19
  170:13,20,
  23 171:1,
  12,23

adaptive
  51:12

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.

added
  179:18,19

additional
  16:4 28:15

address
  9:22,25
  10:1,11,18

addressed
  161:6

Adidas
  95:12,14,
  19

adjacent
  88:12
  93:25
  104:13

Adkerson
  7:8,18
  81:16
  82:24
  110:7
  120:25
  127:24
  128:4
  129:8
  135:13
  137:4,19
  138:17,20,
  25 164:14,
  18 175:15
  190:5

Adkerson's
  138:7
  190:11

administrative

33:3 35:8,
12,23
36:2,3
145:22
146:8

admittedly
  59:2

advance
  72:13

adverse   80:4

advised
  56:24

advocacy
  27:12,25

advocate
  36:14
  40:25
  150:5

aftermath
  146:7

afternoon
  176:12

agencies
  43:5 44:6
  50:23

agency   26:23
  36:12,14,
  20 37:9
  40:22
  42:22,24
  43:11,15
  44:15,17,
  20 47:22,
  25 48:5,11

50:16
51:16
128:25
136:15
137:10
141:12,17
147:12
150:4,11,
12

agency's
  41:10

agenda   89:6

agent   173:16

agents
  135:23

agree   75:13
  76:11,15
  99:17
  104:11

agreed   99:25
  115:3

ahead   66:15
  81:3
  122:17
  126:14
  173:19,21

aim   155:23

air   41:15

Alaska
  111:18,20,
  21

alcohol
  50:19

alcoholism
  161:25

Alexander
  142:22
  144:5
  148:22

all-day
  51:25

allegations
  116:9

alleged
  75:6,9,12,
  15

Alli   37:6
  39:7,8
  40:4 43:2
  150:2

allowed
  94:21
  117:10
  161:7
  181:16
  188:7,11

allowing
  183:23

Amber   113:2
  118:23
  141:5,13
  180:3

amenable
  171:12

amend   184:8

amount   29:14
  110:6

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023                    Index: angle..assume

angle   99:3

Ani   180:11

ankle   74:24
 108:1

Anna   180:5

Annarita
 7:17 8:13

answering
 140:8

antianxiety
 143:21

Anu   49:14

Anupama
 48:25

anxiety
 118:19
 143:9
 144:16
 147:9
 148:17
 149:9

anxiety-coping
 149:1

anymore
 149:5
 171:5

apartment
 10:5,22

apologize
 165:7
 173:20

app   136:18

appeal   47:17

appearing
 25:7

appears
 106:1
 125:7

application
 39:14

appointed
 40:18
 42:10
 43:20

appointment
 115:4
 170:19

appreciation
 124:20
 125:5
 191:21

appreciative
 125:2

approved
 110:13

approximately
 18:7

area   10:25
 11:3,6,22
 127:5,22
 148:11
 174:9
 177:9,21

areas   90:17

argumentative
 99:14

arm   103:16
 106:9,13,
 16 107:24
 108:15

arms   90:23
 91:8
 93:14,22
 108:17

arraignment
 142:2

arrest   12:18
 22:13 36:4
 113:11
 126:16
 128:8
 129:22
 131:3
 166:21
 170:17
 174:20
 175:24
 189:25
 190:1

arrested
 12:11
 21:9,16,
 18,21 33:1
 35:14
 90:12
 121:1,12
 164:5,12
 172:11
 174:6,11,
 15 181:6
 189:24

arresting

 175:3

arrived
 139:6

art   125:8,
 25 126:7
 160:5,13,
 23

article
 190:3

articles
 109:14
 189:24
 190:1

arts   13:21

aspect   34:12
 72:17

aspects
 50:12
 180:20,21

assert   80:12

assess   54:18

assessing
 52:12

assistance
 148:21

assistant
 14:9 84:4
 170:10

assume   92:6,
 19 113:14
 117:11
 176:25
 187:25

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023                    Index: assumed..back

assumed
 77:19
 172:11,12
 187:24

assuming
 9:10 31:22
 131:25

assumption
 82:9 132:8

assured
 137:4

Athens  17:8,
 10,12
 71:22

Atlanta
 10:4,25
 11:3,6,21
 44:3 52:3
 71:21

attachment
 191:10,23

attack
 116:19

attempt
 89:25
 113:5,6
 131:3

attempted
 115:14

attend
 23:19,21

attention
 127:18
 184:18,21

attorney
 25:24
 26:18
 31:16
 77:22
 78:19 79:6
 98:18
 110:18
 111:19
 113:2
 118:24
 120:4
 122:25
 132:11,14
 137:20
 138:24
 139:24
 141:5
 142:3,15
 168:18
 169:4
 171:11
 180:3,4,5,
 23 183:9

attorney's
 120:6
 167:7
 168:11,17,
 21 169:2,
 25 170:7

attorney/
 client  71:1
 77:23
 78:20 79:3
 112:1
 168:6

attorneys

7:11 23:20
 26:15
 27:17
 28:11
 55:24
 83:10
 119:4,24
 120:8
 179:17
 183:3

audio  109:25
 110:6,16
 111:2

August
 45:12,13
 71:13
 181:5

Augusta
 148:6,7,
 10,14,22

aunts  11:21
 114:8

authority
 79:1,14

authorized
 80:14

authorizing
 183:17

autism  64:1,
 5

Avenue  10:3

average
 30:15
 181:12

aware  57:23
 60:10,16
 69:10,16,
 22 71:4
 76:18
 77:9,11
 79:1
 81:15,19
 94:22
 95:4,25
 96:1,2
 100:15
 113:10,15
 119:10
 124:25
 133:20
 137:19
 138:23
 144:24
 172:6,8

                B

B-R-  17:5

B-R-A-Y  17:6

bachelor's
 13:20

back  13:25
 20:10
 24:13
 32:7,17,
 21,23,25
 33:16
 35:16
 36:5,7,8,
 24 38:7,
 14,21

39:9,23
45:7,21
47:3 58:10
65:10,11
66:17 67:2
86:18,20
87:21
88:20,21
94:16 97:3
102:25
103:1,3
104:15,23,
25 105:2,
15,20
106:4
107:5,13
110:24
114:18
122:11
126:22,23
129:15
134:10
137:6,14
141:17
147:5,7,
10,14
148:3
151:23
153:11
168:1
169:1
177:10
180:18
184:2
185:20
186:14
189:4

backed  91:21

background
  13:10
  138:7

backlash
  116:1

backside
  139:9

backwoods
  56:6

bail  141:4

balanced
  154:11

Ballinger
  7:22
  176:11,13
  186:15
  190:13,18,
  25 192:4

bar  14:18
  78:17

barrier
  22:22 56:3

barriers
  56:18

base  8:15
  174:24

based  42:12,
  16 48:4
  69:11 98:9
  103:14
  113:21
  148:6
  171:17

175:7,8,10

basic  8:18

basically
  43:7 82:17
  161:4

basics  48:17

basing
  175:12

basis  26:13
  52:20 55:7
  99:12
  101:23

Bates  123:8

bathroom
  127:16

beaded  124:1

bed  93:4

begin  8:16

beginning
  7:6 88:25
  89:1,4
  122:10

Begnaud
  7:15,16
  9:14 32:3
  59:5
  63:10,14
  66:18
  70:17,22
  78:1,22
  81:2,23
  84:8,13
  86:7 87:7,
  9 88:9

94:3 96:7,
15 97:15
98:5,12
99:9,14,17
101:17
103:19
105:3,8,14
106:12
133:5,18,
24 151:11
164:1
165:20,23
166:15
167:12,17
168:2
170:1
186:4
190:9,21
192:6

behalf  117:3
119:14

behaviors
  61:8,10

belief
  174:25

believed
  135:15

Bell  39:1,
  10

bending  88:3

bends  92:24

beneficial
  143:10

benefits
  34:11

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023          Index: betrayed..broad

betrayed
  40:2,5
  150:14

big   52:24
  54:16  94:7
  95:11
  188:13

biggest
  24:21

bill
  144:12,13

billing
  144:10,19

bills   150:16

Bingham   8:2
  173:7,8
  176:8

biopsychosocia
l   46:20

birth   9:20

bit   27:15
  33:12
  34:16
  36:20
  44:15
  54:12
  63:15  67:4
  89:10  90:4
  102:20
  103:12
  114:23
  125:7
  149:8
  165:12
  168:14

179:21
181:10,19

bizarre
  166:21

bizarrely
  26:7

blah   56:12,
  13

blanket
  33:22

blanking
  28:21

blends   73:18

blocked
  108:13

blocking
  97:2

blue   130:12

board   44:11,
  23

body   78:6
  87:23
  90:16,25
  93:12,13
  106:17,19

bond
  140:10,13,
  20,24

bondsman
  141:4

booked   129:9
  130:20
  140:3,5,9

books   119:23
  120:4,6,14

boost   89:22

boosted   90:3

booth   184:10

booths
  158:24

bother   154:2

bottom   31:2

boundaries
  62:2,16,
  18,22,25

boundary
  62:4

bow   176:14

box   69:4

boxes   48:19

bracelet
  125:25

brain   47:10

brainstorm
  51:25  52:3

brainstorming
  50:4

branch
  71:21,23

branches
  71:18,21

brand-new
  42:5

Bray   17:3,4

18:7,15

break   8:24
  9:1  63:11
  66:16
  110:23
  121:17,18
  151:9,14
  167:13

breaking
  168:13

breather
  90:2

Brian   40:18

briefing
  188:6

briefly
  29:15
  173:10

Brill   39:20

bring   33:12
  49:16,17
  68:11,12,
  14  78:7
  89:17
  181:16,21
  182:4
  184:18,21
  188:20

bringing
  84:5  147:7

brings   109:6

broad   78:13
  145:8

broke   64:15,
  17

Brookhaven
  10:23

brother
  11:8,14
  116:5,14

brought   36:4
  38:10 65:9
  188:11

Brunswick
  71:22

buck   142:10

Buckhead
  14:18

build   54:6
  96:22
  183:16

building
  58:18
  183:14,15

buildings
  139:11

built   48:4

business
  11:19
  13:22
  19:11 31:2
  35:3
  96:18,25
  97:5
  100:12,14

busy   34:17

Butts   129:2
  130:20
  136:4
  138:15
  139:7
  170:11,22

buying   10:9

———————

C

———————

call   62:18
  113:6
  140:21,22
  141:4,11
  145:15
  147:6

called   36:13
  51:12
  74:24
  141:5,8
  148:20
  163:13,14
  169:5
  172:13

calls   115:8
  117:19,20,
  21

camera   7:3
  38:1,4
  66:21,24
  77:9,11
  79:22
  80:6,10,19
  81:1 85:12
  86:12,15
  87:22 92:9
  97:16,17

106:24
108:13
122:4,7
134:4,7,22
135:2,4,7
151:17,20
155:13
167:20,23
176:5
184:1,7,
  13,16
185:6,20
186:8,11,
  17,20,24
192:11

cameras
  76:19,24
  77:1,7
  80:1,8
  81:21
  82:25 97:2
  185:2

campus   58:16

cancelled
  22:1
  118:18,20
  119:1

capacity
  45:18
  60:5,10
  125:12

capital
  16:12
  18:8,11
  24:22,23,
  24 25:2,3,

6 28:14,16
33:5,16
36:8,10,
  11,24 39:2
40:2,9
43:1 45:8,
  10,25
46:8,11
47:18
50:15,20
51:1,7
55:23
57:22
63:23
71:17
72:23
73:19
111:22
112:11
115:20
119:21
120:7
136:14
141:12,21
147:13
161:5
179:11,13
180:6,7
181:14
187:2
189:16

car   129:12
  139:13

card   33:20

care   43:18
  150:24
  181:25

career  61:1
  70:7,9
  178:17

careful
  63:24
  133:1,4

carefully
  133:7

Carolina
  111:17,18

cartoon
  89:24

case  21:22
  25:24
  26:1,10,18
  27:13
  29:15
  36:23
  37:14
  46:11
  47:4,6
  48:20
  49:20 50:5
  67:24
  68:10,11,
  15 71:11,
  25 72:11,
  12,22
  73:12,19
  83:12
  96:22
  108:23
  109:20
  111:19
  112:11
  113:1

114:7
128:17,24
131:17
145:4
147:24,25
152:2
155:8
161:4,13,
14 162:7,
10,20
170:12
172:12,19
175:14
178:19
179:1,3,7,
8,9,12,13
180:20
187:14,18
190:10,11

caseload
  72:4
  178:25
  191:8

caseloads
  26:14

cases  18:2
  24:22
  25:2,6,11,
  17 26:13
  28:14,16
  46:8 47:18
  48:6 50:2,
  4 52:1,3,5
  73:7 74:12
  100:16
  111:13,16
  114:20

120:8,13
147:23,25
148:1,3
179:4,11
183:21

cash  33:12

casual
  56:14,17

casually
  55:25
  95:15

caused  92:25

ceiling
  185:16

cell  12:18
  83:23
  117:23
  136:15,16
  140:9
  141:19
  181:21
  188:15

Center  55:15

centralized
  44:24

certification
  19:8,9
  81:10

certifications
  15:4

Cesar  187:20

chain  141:11

chains  74:23

140:14

chair  153:6
  159:20
  180:4,5

challenging
  146:9

chance
  145:10

change  40:13

Channel
  140:5

character
  89:24

charge  82:11
  135:7

charged  30:3
  63:7,8

charges
  38:20
  39:4,6
  121:9,13
  142:4
  171:1,18,
  22 172:7

Charles  7:19

Charlie
  156:10

chat  167:13

chatted
  178:6

check  54:14
  188:22

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023     Index: checked..college

checked 68:4

checking
48:18

chest
106:11,13

child 43:14

children
12:1

choice 24:25

choose 32:17
37:15
91:10
108:18

chose
125:24,25

chosen 42:18

Chuck 7:21
152:1

citations
12:15

CJA 27:16
28:11 29:8
30:4

claim 142:17

claiming
145:4

class 51:5
58:9,11,
15,24

classes
14:19
23:15

classroom-type
50:12

clean 8:23

clear 69:14
103:24
104:20
108:16
116:4,16
117:3
150:2,5
175:21

cleared 69:4

client 18:4
26:2,5,6
46:21
47:7,9
49:17
51:2,7,10,
12 52:17
56:3,19
57:7 63:6,
8,24 67:25
70:25
76:20
77:24
78:20
79:13
81:15
96:20,25
98:14,20,
21 100:13
115:23
116:7
126:8
130:7
131:5,13,
19,20

132:4
148:6
152:3
154:11
168:2,4,6
182:9
183:16
187:2

client's
54:18

clients 29:6
41:19,24
46:23
52:13 53:9
54:2
56:16,20
57:15,18
61:6,7,17,
21 62:6,7
66:9,11
75:5,11
76:8 89:7
94:12
97:24
109:17
112:16
124:17
125:2
162:14,18,
19 163:14
182:15,16
183:4,21
188:4,19
191:7,9,13

clinic 16:15

clinical
15:5,19,

21,23
16:17
19:10,24
21:1 49:25

close 10:10
74:16

close-toed
55:3,20

closed 53:24

closer 90:7

closeted
52:18

clothing
109:15

code 109:24

codefendant
187:10,13,
14,17,24

cognitive
54:18
112:9

Cole 7:21
151:25
152:1
156:6

collateral
148:10

collaterals
112:18

collect 47:1
48:11

college
13:17,18,

19

**comfortable**
44:19 54:5
56:20
75:14
148:8
154:10

**command**
141:12

**comment** 39:8
62:10
63:19
114:2
186:16
189:20,21,
23 190:4,6

**commented**
176:13
185:4

**commenting**
95:16

**comments**
41:19
42:17
61:2,12
66:5,8
113:18,21
170:6
186:20

**commissary**
119:14

**common** 55:11

**communicate**
117:12
118:7

**communicated**
64:2
117:13
163:12
169:22
171:8

**communicating**
78:10,11
117:9

**communication**
78:6,7,9,
12,14
112:15
119:6
123:5
164:17
189:15

**communications**
71:2 77:24
78:19
79:2,16,18
88:6,15
131:9,17,
18,24
134:21
136:17
138:1,23
162:15
191:17

**community**
50:21
116:2

**compared**
108:6

**complete**
107:15

**completely**
46:13
106:9
145:19
152:20

**complex** 82:1

**complicate-**
188:1

**computer**
68:14 86:3

**concept** 42:4

**concern**
40:15
74:15
80:19
96:24
97:21
98:2,15,
16,17
101:19
126:11
150:1,25
155:22

**concerned**
53:5 89:5,
10 100:2
128:17,18
137:2
187:6,23,
25

**concerns**
42:16 44:1
52:4 100:1
155:1,12,
14

**concluded**
192:14

**concludes**
192:8

**condo** 10:7

**conducive**
183:13

**conduct**
48:13

**conducting**
84:18
96:25

**conductor**
150:23

**conference**
110:22
152:9
184:4,7

**conferences**
23:20
50:14,15

**confidential**
183:18,23
191:17

**conflict**
187:18

**confused**
101:5
140:18
169:16
171:10

**confusing**
44:3

Congratulation
s   19:5

connected
  16:22
  50:21

connection
  191:4,7,
  12,18,19

considered
  80:25
  81:5,8
  109:11

consult
  143:8

consulting-
type   180:8

contact
  113:5,9
  118:1
  138:19
  153:17,23
  156:16
  164:9,22
  182:14,16
  183:4,10,
  18,23
  184:3,11
  188:7,12,
  20

contacted
  175:25

contacting
  175:23

content
  126:25

contents
  156:3

context
  51:20
  63:19
  81:11

continuance
  26:16

continue
  16:19 35:6
  90:6

continued
  33:17,23

continuing
  14:24
  20:18
  102:24

contraband
  69:18 70:6
  83:22 84:5
  94:22
  95:25 96:3
  97:5,6,9
  98:3,11
  100:6,17,
  24 101:5,
  7,10,12
  110:11
  117:24
  128:8
  130:7
  131:15,23
  135:15,16
  167:2
  188:23

contraceptives
  12:24

contract
  28:13

contracted
  27:16

control
  89:14

conversation
  39:5,7,20
  40:23
  41:13
  62:5,7
  90:18
  91:25
  107:16
  135:13
  139:2
  169:18
  171:18
  177:18

conversations
  40:23 43:7
  61:17
  98:19
  112:13
  141:19
  166:5
  167:11
  168:25
  169:8

convicted
  23:2
  109:14

conviction
  69:13

copy   70:2
  122:17,25
  190:7,8

corner
  185:10,16

Corners   11:9

correct
  12:16 23:9
  31:7 59:1,
  21 60:18
  62:13
  67:11
  69:13
  73:14
  77:18
  79:10,19,
  20,23 80:4
  81:13,14,
  17 93:10,
  19 98:4,11
  99:11,20,
  23 100:11
  101:4,24
  102:10
  104:6
  106:16,17,
  24 107:4,7
  121:7,9,
  10,14
  126:6
  134:18,19,
  24,25
  136:5,6
  137:20
  138:2,4,8,
  13,14,17,
  18 142:5,6

144:22
152:18
156:25
157:2
158:14
159:3
160:2,5
164:6
167:9
172:9,10
173:1,2
175:11,12,
24 178:17
185:23,24
186:1

correctional
23:8 46:23
52:25
53:2,4
55:12,18
56:5 58:14
60:6,8,12,
14 70:7,9
71:15
74:4,18
80:18 99:6
101:4
102:7
148:8,12
149:11
152:22
174:1
178:1,4,16
181:17
185:1

Corrections
188:5

correctly
27:19
61:19
91:16
114:2
179:5

cost  124:24

council
36:13 37:7
40:4 44:14
141:9

counsel  41:5
124:11
151:9

country  44:8
75:9

counts  11:5

county  13:13
55:16 57:3
129:3
130:20
136:4
138:15
139:7
148:7
170:11,22
181:24

couple  8:18
26:17
33:10 39:5
111:8
115:13
162:17

courses
23:16

coursework
16:4 60:4

court  7:13
8:19 9:23
37:22 86:8
96:10
117:10
118:10,11,
16 122:13,
20 133:12
165:24
181:11
183:17,22
190:17,21,
24

Court's
119:1

courthouse
138:16
139:7

courts  25:8

cousin
114:3,21
116:21
117:3
189:10,14

cousins
11:21
114:8
160:9

coverage
121:8

COVID  149:5,
6 166:22

Cox  7:19

156:8,10
163:17,21

create  56:14

created
40:15
160:1

credentials
19:18

credibility
19:20

credit  33:20

crime  26:4

crimes  59:3
62:12

criminal
13:21
21:22
34:15
36:23
37:14 46:1
58:9 61:5
62:8,11
83:12
115:19
142:3
145:24
146:1
149:16

cuffs  74:24

current  9:22
10:11,18
45:1

customary
55:7 96:4

cut  55:2,3

---

D

---

DA  142:3
  170:10

DA's  138:2

dad  161:22

dad's  161:25

Dahlonega
  11:5,6
  13:13,15

daily  101:23

damages
  142:12
  145:4

danger
  100:24

data  60:21

date  7:9
  9:20

dating  64:9

David  7:23

day  19:1
  35:13,17
  46:22
  47:12
  53:12,13
  101:15
  102:3
  115:12
  119:2
  126:16
  136:23

146:10
147:8
164:5,11
174:14
180:10,14

day-to-day
  43:5

days  39:5
  137:6

deal  25:21
  53:14 54:1
  55:22
  65:14
  160:9
  168:12

dealing
  51:18,20
  53:4,23
  54:25
  56:19
  62:23
  75:14

dealt  61:1
  168:17
  171:6
  174:3

death  46:16
  51:9 58:22
  73:11 74:9
  75:8
  101:3,13
  102:4
  162:6

Deborah
  11:11

debt  33:20
  150:21

December
  13:23

decide  36:24

decided
  137:23
  138:4
  148:19

deciding
  46:15

decision
  42:11
  174:19
  176:5

deeply
  147:21

defendant
  12:5

Defendant's
  122:18

defendants
  115:20
  140:17
  152:2
  175:20

defender
  24:15,19
  28:7 41:18
  43:22
  44:2,5
  45:8,11,25
  141:9

defenders

16:12
18:9,11
23:14
24:23
27:10,21
33:5,16
36:8,10,
11,25 39:3
40:3 43:1
55:23
71:18
72:23
111:23
119:21
120:7
136:14
141:12,21
160:17,18,
25 161:5
162:16
180:7
181:15
189:16

defending
  63:7

defense
  36:13 37:7
  40:3 41:21
  42:8 44:13
  50:20 51:3
  55:16
  57:17
  60:22
  62:1,20
  69:24
  70:25
  73:13

78:4,5
84:21
96:19,22,
24 97:23
98:16,17
100:16
113:4
117:1
122:24
124:18
146:20
147:13
156:15
177:13
183:19

**defensive**
64:3
115:21
116:4

**deficits**
112:9

**degree** 13:21
15:14 16:2
34:23
45:15 80:2

**demonized**
115:24

**demonstrate**
133:11

**demonstrates**
82:4

**demonstrating**
133:13

**Dennis** 11:11

**department**

37:12,14
42:24
47:22
48:24 51:3
129:3,10,
12,14
130:20
139:9
188:5

**depo** 29:3

**deposed** 8:7,
16

**deposition**
7:6 71:4
87:1
192:9,14

**depressed**
33:6 162:7

**depressing**
35:1
150:17

**depression**
145:16

**Deriana**
180:15

**Derrick**
173:8

**describe**
41:2 165:8
166:7
167:8

**description**
157:23

**desk** 136:16

**destabilizing**
145:18

**details**
47:19

**detector**
68:9,24

**determine**
139:15

**develop** 50:5

**diagnoses**
144:8,9,11

**diagnosis**
144:13,18,
21,23

**Diagnostic**
58:16,22

**died** 102:8,
19 160:19

**difference**
15:10
24:21
154:20

**difficult**
34:9 178:2
183:11

**difficulty**
162:6

**digest** 47:3

**direct** 26:21

**direction**
43:10
118:23
158:24

170:12

**directly**
26:20
117:14
174:12

**director**
16:14
26:22 37:6
39:2 40:11
42:12,22,
25 43:3,15
44:16
47:23 72:5
112:25
141:20
180:6

**directors**
43:3
44:11,23

**disability**
51:6

**disabled**
47:8 51:8

**disagree**
99:18
106:12

**disciplinary**
69:17
70:1,8
95:25

**discovery**
41:5,6
83:12
84:14
145:5

155:11
170:16,18
173:25
174:7
175:13

discuss
89:15
161:14
188:6

discussed
65:12
70:15
77:16
89:15
129:19
161:15
168:3

discussing
87:5 90:2
122:23

discussion
53:2,20
56:1 136:8
165:18
182:9

discussions
53:14
55:10 61:3
142:3
175:3

dismissed
171:18,22

disparage
116:20

displaying

144:17

dispute
73:24 74:2

district
24:15
25:8,16
44:9 167:7
168:11,17,
21 169:2,
25 170:7
171:11

divulging
131:21

DOC 82:10

documentation
22:5,24
23:1,5
48:10
188:18

documented
48:9
189:15

documents
21:20
132:23
133:10,12,
13,16
145:13
155:7,11
156:4
175:7,8,13
181:24
182:7

Don 138:24
139:1

166:14
167:11
168:12,16,
18 169:1,
4,15,16
170:19
171:6,8,14

Donnie
187:24

door 53:24
57:6,8
59:12,15
75:23
113:7
127:6,13,
19 128:1
153:25
154:14
155:19
157:25
158:2,3
159:7,9,
13,16

doors 52:23

Doss 180:15

double-check
49:21

doubled
13:21

doubts
146:21

draw 124:19

drawings
160:11

dress 53:23
95:15

dressed
55:25

driving
150:25

drop 110:11
172:20

dropped
38:21
39:4,6
121:9,13
142:4

dropping
171:1

drove
141:17,25

drugs 52:11

Dubose 58:6
66:13
67:6,16
69:10
70:23
71:3,11
80:2,23
83:1,8
84:18 85:2
87:3,20
93:3 98:3
101:3,12
102:7
109:21
110:1
111:2
114:5

123:5
132:11,21
134:13
136:20
139:25
141:6,16
152:12
153:1,19,
22 154:21
156:2,16,
23 157:2,5
158:9,14
159:3,14,
25 162:21
163:12
173:24
176:2
177:20
179:1,3,15
181:3
186:19
190:2
191:13,15

**Dubose's**
165:9
185:20
187:10,13
189:7

**duly**  8:7

**dumbfounded**
130:14

**dynamic**  56:2
85:15

_____
**E**
_____

**e-mail**

117:11,17
119:11
120:11
123:5
126:1
136:18,19

**earlier**
91:25
134:21
135:10
150:14
157:14
159:24
164:4
176:13
178:15
180:12
189:4

**earliest**
161:22

**earned**  29:23
31:2

**earnings**
29:21

**easier**  24:11

**education**
14:25
20:19

**educational**
13:10
14:22

**effect**  171:3
190:4

**effort**
73:14,15

108:6

**elated**  147:7

**element**  34:5

**eligible**
15:25 51:8

**else's**
100:12,14

**embarrassed**
64:20,24

**emotional**
191:4,6,9,
12,18,19

**emotionally**
33:12 89:3

**employed**
81:17

**employee**
40:21
42:23
148:20

**employees**
42:9
177:10

**employment**
16:19,24
20:5 22:22
24:10
42:25
45:10

**encompass**
133:22

**encountered**
186:24

**encouraged**
51:16

**end**  30:10
90:7 122:1
169:11

**ended**  16:19

**ends**  14:12

**enforcement**
52:9 138:9

**engage**  113:4

**engaging**
56:17

**Engleman**
7:7,8,16
8:6,11
9:19
11:11,13,
15 71:2
128:4
152:1
162:25
163:3,25
166:4
167:13
173:8
176:12

**English**
13:22

**enjoy**  44:25

**enrollment**
13:14

**ensued**
165:18

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023                    Index: ensure..fabric

ensure  98:10

ensuring
  76:12

entail  49:13

entering
  67:15

entire  42:25
  72:23 89:1
  178:17

environment
  34:18
  53:24
  56:15
  96:14
  147:11

equipped
  75:18

Eric  7:22
  8:4
  165:20,25
  176:13

escape  98:4

escaped
  71:14
  73:25
  74:17
  76:11
  80:17 96:1
  97:7 100:2

escapes
  187:21

essentially
  15:20
  16:25

17:17
41:12
123:9
144:2

et al  7:8

Eugenia  9:19

evaluate
  47:11

event  80:4

eventually
  38:20
  150:8
  172:19

everybody's
  54:3

evidence
  121:4
  166:25

examination
  8:9 124:12
  151:24
  156:7
  163:22
  166:2
  173:6
  176:10

examined  8:8

excessive
  140:15

exchange
  110:13
  135:16

Excuse
  148:14

Exhibit
  122:12,18,
  19,24

exit  69:3

expect  62:6

expecting
  32:24

experience
  43:21
  57:20 67:5
  115:19
  138:7

experienced
  142:13
  145:3

experiences
  48:8

expert  47:8

expertise
  138:8

experts  47:5
  51:13

explain
  15:10
  61:24
  150:21
  154:24

explained
  129:1,8,
  21,22
  137:2

explaining
  22:23,24

explanation
  37:4
  169:20
  172:15

explore  64:4

explored
  112:12

exploring
  58:10
  112:8,9,11

expressed
  44:1
  191:21

extended
  114:13

extent  34:20
  73:19
  121:11
  151:10

external
  51:16

extra  33:12,
  14,19 34:4
  122:24

extremely
  112:18
  147:22

eye  153:17,
  23

_____

F

_____

fabric
  124:1,2
  164:24

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.

fabric-type
  159:25

face  123:12
  185:23

Facebook
  113:12,15
  120:21
  189:23
  190:3,4,8

faced  185:20

faces  126:4

facilitate
  71:19

facilities
  52:25
  53:3,17
  55:18
  57:2,5
  58:13,14,
  23 123:21
  148:9
  149:12
  152:22
  154:13
  181:17,23
  185:1

facility
  46:23 53:9
  55:12 56:5
  67:14,25
  69:5,9
  74:21
  75:20
  76:2,3,4,
  19,25 80:3

81:12
82:10
123:17
127:6,23
128:12,13
129:5
148:13
154:12
178:1,4
181:18
182:9,10
188:14,18

facing  75:7
116:8
158:23

fact  34:15
73:22,25
102:6
116:23
132:21
166:23
170:20,24
180:22

Factory
14:16
29:24
31:20
147:3

fair  42:15
43:9 44:25
92:18
100:8,25
101:11
121:6

fairly  50:21
78:13

95:15

fall  14:1

familiar
  25:16
  85:10

families
  46:24
  115:21

family  11:2,
  20 51:11
  66:8
  102:17
  111:7,12,
  13,17
  112:8,13,
  15,18
  113:15
  114:5,24
  115:23
  116:2
  161:23
  189:7
  190:2

father
  114:10
  116:6

fear  148:18

feature
  156:3

February  7:9
  35:18
  172:3

federal
  24:15
  27:10,21

28:8,9,12
43:22
44:2,5,6,
10

feedback
  27:5

feel  56:20,
  21 75:18
  76:2
  103:11,13
  115:22
  133:1,2
  146:2
  148:8
  149:14
  151:13

feeling
  40:15 42:1
  149:8

feelings
  162:9
  190:19

feels  64:24
  145:8

feet  76:7
  88:18
  91:16 92:8
  103:15
  107:18
  108:4,19,
  21 109:1,
  7,15
  159:22
  165:8,9,14

felony
  150:10

felt 33:7,
21 40:1,4,
5 41:2
44:19
47:6,7
51:15
53:18
57:14,15,
18,19 64:2
74:21,22
75:5,19,
21,24,25
76:8 96:3
119:22
120:3
130:3,9,24
131:2
146:25
147:20,22
148:3
149:22
150:14,20,
21,22

female
132:18
135:22

fetal 50:18

field 19:19
52:22 53:7
61:5 137:9
147:18
149:5,11

figure 26:9
139:19
155:17,20,
24

figuring
48:21

file 29:16
30:20
68:13
72:13,17
160:17,18,
25 189:16
190:10,11

fill 72:2

filling 7:22

film 140:6

filmed
140:16

finally 22:4
170:15

financial
145:13

financials
142:15

find 19:1

fine 71:6
82:22
110:4
137:5
160:22
167:16

finish 63:13
122:15,23

finished
153:10

fired 22:20
72:22

firsthand
134:17

five-minute
121:17
151:14

fixated 66:2

flight 69:11

flip 68:16,
17

flirtation
66:4

flirtatious
61:2 66:8

floor 55:13,
21

Florida 29:9
50:23

fluid 188:16

focus 56:16

focuses
73:21,22

folks 85:21
142:8

follow 29:3
156:19

follow-up
39:17
173:10

foot
103:12,13
104:5,9,21
106:5
107:14,21

forces
146:25

forensic
28:16,19

foreseeable
45:4

forgetting
179:6

form 9:12
59:5 78:1,
22 81:2,23
84:8 94:3
96:7,15
97:15
98:5,12
99:9
101:17
103:19

formal
23:14,15
24:3 39:14
144:18,20

forward
151:4
169:10

found 18:24
83:23
141:6,13
149:17
167:2
171:13
172:24
190:5

frame 171:25

frames

107:12

frank-   189:3

frankly
  96:23
  120:5
  129:24
  146:16

free   16:24
  124:24
  151:13

frequent
  97:4

freshman
  13:17,18

friend   10:15
  16:22

friendship
  125:25

friendships
  64:8

front   87:23
  157:2
  169:11
  188:13

frozen   186:5

frustrated
  171:16

full   9:17
  14:19,21
  26:13,14
  30:11,14
  36:5,7,8
  72:4

full-time
  26:11
  27:20
  28:13

fully   25:5
  83:24
  140:14

Fulton   55:16

function
  112:14

functioning
  51:12
  112:10

funded   44:10
  111:21,22

funding
  44:21

funny   63:22,
  23 65:16

future   33:7
  45:3,4

_____

_____
            G
_____

Galloway
  180:24

game   130:4

garage-looking
  139:12

Gary   8:2

gate   68:7

gathered
  132:24

gathering
  47:15
  173:23

gauge   73:2

gave   14:13
  22:16,18
  123:23,24
  130:12
  144:24
  160:2,4,14
  161:5
  165:4,5
  192:2

gearing
  179:17

general
  32:22 50:7
  82:9,10
  87:17
  107:19
  112:5
  138:12
  155:15

generally
  11:3 59:7
  153:21,22

generated
  69:25

gentlemen
  156:12

Georgia   9:23
  10:4,23
  13:15,19,
  25 14:4,23
  21:13

24:16 25:8
29:12
36:13 37:7
44:9 56:7
58:7,16,22
75:8 78:17
114:4,5

Georgia's
  32:4

germane
  108:23

gesture   8:20
  158:19

gestures
  8:22

get-go   116:5

ghosted
  115:6

gifts   124:20

girl   64:13
  65:3,4

girlfriend
  64:14
  110:14

give   21:23
  22:4 23:1
  34:1 35:7
  82:17
  103:21
  113:23
  115:1
  123:19
  124:19
  125:4,24

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.

Lily Engleman on 02/14/2023          Index: giving..halfway

126:1,7
130:6
136:14
137:14
144:8
145:9
147:3
157:22
167:1
169:20
188:5,19
191:15,25

giving 97:8,
19,20
98:13
124:15
126:4
159:25

glad 187:11

glass 127:8
152:17,20,
23 156:25
157:5,7
158:3,4
159:1
182:21
183:1,6,11
184:11

good 8:11,
12 20:21,
24 21:4
42:1,13
44:20
50:17
66:18
74:22
90:10

105:16
109:12
115:5,18
128:1
148:23,25
176:12
184:23

gosh 63:21

government
28:8,12
43:13,16,
20 44:5,7,
11,15

governor
42:13
43:20

governor-
appointed
42:10

governs
47:18

GPDC 41:5

graduate
14:9 45:15

graduated
13:12,23
14:2 45:16

graduating
15:9

grand 149:19
172:7,12,
25

grant 44:10

granted

140:20

great 27:6,8
43:2,24
116:11
148:23

greatly
102:21

Green 7:25
85:25
163:19,23
164:1,2
165:15

grew
179:16,21

gross 55:13

ground 8:18
130:16

group 17:15,
21 34:12

growing
112:17

guard 55:5
152:14
153:3,17,
24 154:3,
20 156:20
157:4,7,22
159:5,13

guards
154:13

guess 24:11
65:15
113:23
116:22

117:7
123:22
149:14
153:25

guesstimate
30:19

guest 52:6

guidance
53:22

guide 48:12

guidelines
47:13

guilt-
innocence
46:13

guy 53:12
94:8 95:11

guys 110:23
123:9
166:17
167:12

_____

H

habeas 25:3

habit 8:20

half 18:12,
16 57:9
87:14
94:11
107:16
142:6
180:25

halfway

90:20

hall  158:19

hallway  77:6
  157:11,18,
  22,24
  158:4,6,
  10,16,18,
  20 159:15,
  16,19

hand  174:2

handbook
  49:2

handcuffed
  74:23 76:6
  97:17
  128:13,16,
  22

handful  44:7

handle  26:15
  75:17
  148:13

handled
  90:10
  120:14
  180:20

handles
  179:12

hands  91:8
  108:17

happen  26:19
  33:13
  61:14
  76:12
  100:9

137:8,10
154:18
187:8

happened
  19:4 22:23
  26:4 34:1
  44:13
  65:13
  71:16 73:5
  94:6
  129:11
  130:22
  136:23
  140:4
  141:7
  145:20,23
  150:8,19
  187:5

happening
  33:21 80:4
  106:24
  107:2
  130:1,2,6
  149:2

happy  43:10,
  14 150:7
  162:1

hard  30:16
  35:2 62:4
  110:17,19
  146:5,6
  150:18,21
  151:5,6
  183:13

harm  60:6
  98:3

100:22

harmed
  101:21

Harris
  180:22

head  48:23
  66:3 88:3,
  7 90:14
  93:24 94:1
  96:4 103:1
  104:12
  105:24
  106:8,19
  107:24
  109:13
  116:23
  137:7
  165:11

head's
  102:25
  103:3

headed  40:4

heading
  44:18

health  26:3
  36:14
  40:25
  46:19
  142:17,22
  143:24
  144:12
  145:2
  150:4

healthy
  33:11

hear
  110:17,19
  116:12,18
  176:17,18
  183:13
  186:3,4

heard  39:3,5
  79:8 82:6
  109:21

hearing
  118:11,16
  140:10,13,
  20,22

heartbreaking
  40:8

heavily
  180:9

heaviness
  92:5,16

heavy  88:25
  89:2,9

held  51:24

helpful
  33:24

helping
  33:20
  41:24
  116:7

helps  19:22

high  13:11,
  12,13,16
  53:24
  57:24
  58:6,25

59:7
64:13,14
67:15
76:13,16
94:19
96:5,14
99:7 100:1
101:23
102:3
109:13
144:16

higher   59:2

highest
  19:18

hire   16:25
  150:13

hired   39:9
  179:3

hiring   47:8,
  11

historically
  100:15

histories
  112:16

history
  24:11 26:5
  41:17 64:9
  142:14

hit   86:23

hitting
  48:15 56:6

holding
  140:9

home   53:7
  115:1
  141:25

honest   59:22
  110:15
  152:19

honestly
  66:7 82:12
  83:24
  125:1
  163:9
  164:13,19
  165:3
  175:17,18
  184:25
  188:25
  189:3

honesty
  42:17

hooked
  148:22

hoping
  110:13
  114:25

horrible
  116:10

horrifically
  145:25

hosted   50:18

hotel   148:21

hour   30:4,7
  87:14

hourly   17:14
  30:2

hours   15:24
  18:6 30:8,
  13,17
  49:25

house   10:5,
  6,8,12,13

housed
  183:21

housekeeping
  122:16

huge   51:6
  150:1

Human   55:15

hurry   177:16

hurt   91:13
  109:2

husband
  116:6

hustle   17:2

hypothetically
  62:23

───────────
**I**
───────────

idea   33:21
  39:13
  44:14
  77:12
  82:12,21
  86:2,6
  97:16,17
  109:13
  125:21
  128:6
  141:10,22,

23 149:22
  175:25
  187:4

ideas   50:4

identification
  122:13,20

identified
  26:2

identify
  46:19,20
  47:5
  51:10,13
  63:25

identifying
  165:23

illicit
  52:11

illness   13:5

immediately
  15:17
  18:21
  73:7,8
  145:21
  149:25
  179:4

impair   13:1,
  6

impaired
  54:10

implementing
  37:8

importance
  76:16

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023          Index: important..initially

important
 41:10
 112:19

impression
 95:7
 116:21
 125:15
 191:22

impressions
 103:22

inactive
 22:8

inappropriate
 41:20,25
 61:1,11,
 12,25
 62:10
 63:20 66:5
 117:6
 125:10
 132:10
 169:2,24

inaudible
 20:8 30:13
 31:16
 39:20
 45:21 49:9
 57:11
 74:14
 82:1,13
 85:25
 87:10,11,
 12 88:10
 95:13
 112:25
 123:11

158:15
168:10,22
173:18
174:22
189:22

incarcerated
 148:6

incident
 145:3

include
 101:2,7
 160:11

included
 101:3

including
 11:20 34:4
 70:10 78:4
 101:4,8,14
 113:14

incredibly
 40:2 132:9
 145:17
 183:12

independently
 44:12
 81:17

indicating
 84:4
 109:22
 120:24
 121:9
 188:11

indications
 191:16

indict
 149:19
 166:24

indicted
 21:23
 40:20
 149:18
 167:4
 169:6,14
 170:15
 172:22,23

indicting
 170:2

indictment
 36:11
 37:10
 38:11
 40:22 43:8
 150:1,11
 166:8,11
 169:10
 170:8
 172:1,5

indigent
 41:24 42:8

individual
 43:5 74:16
 168:16

individual's
 170:14

individually
 161:11

individuals
 54:9 97:2
 100:6

101:14,20
102:18

informally
 144:14

information
 22:13
 25:17
 31:14
 47:16
 48:21
 54:7,20
 56:23
 67:14 82:4
 83:7 95:22
 96:21
 109:23
 110:11
 112:19
 114:9,11
 115:1
 120:24
 128:21
 131:5,21
 132:2,6,24
 133:2
 136:10
 137:3

informed
 166:13

infractions
 70:8

initial
 84:17
 173:25

initially
 48:2 71:10

72:10
179:4
183:2

injured
101:20

injuries
60:6

injury  47:10
101:3,13
102:4

inmate  60:11
97:4,6
123:17
125:15
187:9,19

inmate's
119:23
120:4

inmates
53:23
54:25 59:3
60:7,15,25
100:17,23
119:11
120:15
123:19
178:2,15,
20,23,24
181:17

innocent
146:2

inputting
49:19

inquiry
79:23

ins  107:15
177:25

insanity
36:15

inside  68:19
101:15
128:14,15,
16 154:4

insomnia
145:5

instances
95:24
118:10

institutions
178:16
182:18

instructed
55:2

intellectual
51:6
112:10

intellectually
47:7 51:8

intend  45:3

interact
53:23
61:20

interacted
42:25
61:22
124:23
177:5

interacting
54:5 62:19

78:10

interaction
42:21
56:18,22
164:9
177:3
178:6
187:16

interactions
40:20 64:7
79:13 83:8
96:20
97:24
98:20
110:2
113:22
177:6
178:8,11

interactive
50:9

interchangeabl
y  46:4

interest
41:23

interested
19:16,17

internal
51:15
148:3

interned
55:14,16

interrupted
173:20

interrupting
8:21

interruption
37:21

interview
51:11
52:17
108:19
115:18
148:10
189:17

interviewing
47:1 54:1

interviews
48:14
49:16

introduce
7:12

invested
42:7,9
44:17

investigates
46:9

investigation
83:8 110:2
111:6
139:15,18,
22

investigator
46:2,3
73:20,22
180:22

investigators
55:24
120:1

involved

12:4 43:4
52:9 70:5
71:10 74:3
81:20
82:24 83:7
174:6
180:10,21

**involvement**
174:18

**IQ** 47:9

**irons** 97:18
108:1

**issue** 70:13
95:5
120:21
131:23
135:15
154:7

**issues** 13:4
18:3 26:3
27:4 43:25
44:22
46:19,20
51:19
52:4,21,24
53:2,10
60:23
81:10
96:2,3
97:5 100:6
112:2
142:18
145:2
149:9
161:23

**item** 124:11

**items** 101:8
123:21
125:16
164:25
188:24

————————
**J**
————————

**Jackson**
57:23
67:5,11
70:10
76:13,20
81:13,16,
19 82:5
129:4
135:9

**jail** 148:7

**jails** 57:3
181:24

**Jamie** 17:3,4

**January** 15:7
16:2 18:20
24:16
27:23 33:1
37:1 43:23

**jeans** 56:7

**jeopardy**
41:14

**Jerilyn**
39:1,10,20

**Jerry** 180:6

**jewelry**
123:18,20
124:15

164:25

**job** 19:22,
23 22:20
27:4,20
39:23 40:7
41:14
45:1,17
48:16,18
49:18
50:13,17
75:13
90:10
98:23
99:4,8,23
114:16
146:14
147:21
148:4,18,
25 149:10
150:2,19

**John** 11:15

**joint** 13:14

**Jonathan** 8:5
166:1,5
168:19
169:8,9,
12,19
170:13,20,
22,23
171:1,11,
23

**Jordan** 8:3
173:9,12,
14 175:23
176:3

**Jose** 7:23

176:21

**JPAY** 118:5,
23 119:4,
8,10
120:10
122:23
123:5

**judge** 26:19
187:7

**judges**
25:11,15,
19

**July** 118:17

**jump** 66:16

**jumped** 45:8

**juncture**
93:15

**June** 71:16
156:16
160:19

**Juneau** 9:23

**jury** 11:16
46:15
149:19
172:7,13,
14,25

**justice**
13:21 58:9
61:5 62:9,
12

**justification**
80:5

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023      Index: K-E-A-R-N-S..laughing

**K**

**K-E-A-R-N-S**
  26:25

**Kearns**  26:22

**Kemp**  40:18

**Kennesaw-
woodstock**
  11:8

**key**  59:20
  110:23

**keys**  127:13

**killed**  75:6,
  10 80:17
  116:14

**kind**  11:7
  13:10
  14:11
  15:24 17:1
  19:13,19,
  25 25:13
  26:1,7,9,
  12 27:14
  34:11,12,
  17 36:17
  39:8,9
  43:16
  44:1,15
  45:7 46:11
  47:18
  48:2,3,12,
  15 50:1,3
  51:15,25
  52:6,12,17
  53:10,13

54:23
55:8,19,21
57:10
64:5,16
65:4,14
66:2
68:17,19,
22 71:19
72:1,5,8
73:18
87:13,16,
22 89:15,
17,22
90:2,3,7,
12,17
111:15
112:5,8
115:6,7
118:12,25
120:2
125:19
127:5
128:7,23
132:18
140:6
141:11
144:10
145:9
146:4,23
147:3,19
149:4,21
153:6,11
157:9
160:9
162:5
171:1,8
173:22
176:15

177:15,25
178:2
180:8,17
183:8,14
185:4,18
188:17
191:23

**kinds**  23:20
  52:10
  54:2,9
  75:15
  101:9
  139:10

**knew**  56:5
  57:15,16
  70:7 72:5
  75:1,10,11
  80:9 84:12
  89:8 97:8,
  19,20
  112:25
  114:24
  118:14,15,
  16 128:5
  130:7
  132:20
  134:22
  137:9,15
  149:20
  150:13,15
  163:1
  166:25
  167:1
  177:12

**knock**  113:6

**knocking**
  52:22

**knowing**  48:5
  62:15,18,
  21 118:20
  146:15
  149:15

**knowledge**
  70:4 82:3,
  23 83:2,4,
  6 84:17,23
  99:22
  120:24
  121:5
  134:17
  135:6,11
  138:6,13,
  25 152:7
  174:17
  175:11

**L**

**lack**  13:5
  169:20

**language**
  62:1 78:6

**large**  57:17
  155:11

**larger**  20:4
  40:3
  146:25

**latest**  32:24
  83:25

**laugh**  92:25

**laughing**
  92:21 93:5

Lauren
  142:22
  144:5
  148:22
law   52:9
  79:11
  138:9
lawsuit   12:7
  190:12
lawyer   23:22
lawyers
  109:23
  138:4
laypeople
  46:5
lead   111:19
  113:2
  118:24
  132:11
  141:5
  180:3
leader   43:10
leading
  180:25
lean   153:11
leaned   93:21
leaning
  93:4,17,18
  107:24
learn   48:17
  111:24
  128:20
learned   48:7

61:8,10
89:20
141:7
learning
  183:8
leave   33:2,3
  35:8,12,23
  36:2,3
  72:1,10
  73:3
  145:22
  146:8
  180:17,18,
  19
leaving
  127:4
led   126:15
left   18:8,
  11 27:13
  77:5
  103:12
  104:4,5,9
  105:6,21
  106:5
  108:15
  157:7,12,
  15,16
  159:6
  162:15
  171:15
  185:10
left-hand
  107:6
leg   69:1
  74:23

97:18
legal   12:3
  23:11,17
  24:3
  39:21,22
  41:5
  77:20,25
  78:17,25
  80:7,11
  100:12,13
  129:24
  130:8
  135:5
  154:10
  162:11
  165:1
  167:14
  183:5
legally
  80:13
legitimate
  100:1
length   172:5
lessons   48:7
letter
  22:18,19,
  23 84:4,10
  162:23
  163:4,7,8
letters
  15:16
  161:2,3,5,
  8,9,12,13,
  17 162:5,
  17,18,21

letting   39:9
level   15:7,
  18 19:18
  58:1
  106:16
LGBT   52:15
license
  16:10
  20:8,21,24
  21:7
licensed
  15:12
  19:25 20:1
  34:23
licenses
  15:3
licensure
  15:6,8,13,
  18,22 16:3
  18:19,25
  19:22
  20:15
  21:2,12,25
  22:20
licensures
  15:11
lied   40:5
life   12:4,
  15 33:22
  46:16
  64:3,6
  65:1 115:1
  121:21
  143:23
  146:5

147:1
150:23
151:4

lifetime
48:5

lifted   92:5
108:4

lifting
107:21

light   96:2

light-hearted
90:4

lighten   92:2

lightened
92:4

lighter
92:17
188:16

lighters
188:15

Lily   7:7,16
8:6 9:19
72:8 90:10
125:17
162:25
163:3,9

limit   168:4

limited
168:5

lines   23:16
55:9 61:3
119:15
125:9

138:8

lint
130:15,17,
18

lips   155:17

Lisa   29:10

listen
110:20

listened
109:25
110:5,16
174:21

LISTSERVS
50:22

literature
13:22

litigate
137:10

litigation
137:16

live   10:21
11:3,4

lived   10:22,
24 61:7,9
114:3,4,5

lives   17:8
61:7,9

living   30:16

LLC   27:12,
15,24 28:1
29:7,16,22
30:3,21
35:3

lobby   76:25
127:5
177:9,21

local   91:8

located
76:19 80:2
84:4

locked
59:17,18
80:16,22
127:7

long   9:25
10:17 22:8
26:5 32:23
72:12,16
73:4 87:14
89:4
142:24,25
143:2
145:14
156:24
177:15

longer   40:11
43:19

longstanding
145:16

looked   22:21
53:21
93:24 94:5
103:17
156:22
157:14

lost   22:20

lot   14:12
15:15 17:1

28:15,16
29:10,11
33:7 44:19
46:24
49:18 50:1
51:14,15
52:13
53:1,25
54:1,2,8,
17 56:1
58:23
61:6,9,15
62:3,8
64:1,8
89:18,19
94:6 101:9
108:16
112:12,13,
16 114:7,
10,12
115:19
117:1
118:19
123:7
124:24
127:1
128:24
136:17
137:3
142:13
144:11,17
148:3
156:25
158:3
161:22
164:14
173:22
174:3

182:8
185:1,19

**lots** 64:6

**loud** 29:19

**love** 40:9
113:19
189:8
190:15,23
191:1

**loved** 40:7
116:19
147:21

**loving**
116:14

**low** 55:3

**lower** 15:7,
18

**LPC** 142:22
143:5

**luck** 40:10

**ludicrous**
128:10

**Lumpkin**
13:13

**lunch** 63:16
121:20

——————————
                M
——————————

**Macon** 71:22,
23 180:4

**mad** 91:5

**made** 30:16

39:8
41:16,19,
21 42:11
61:1,11,12
63:19 76:2
101:8
111:2,11
114:1
117:2
123:20,25
125:22
142:17
150:2,5
160:21,23
165:1
189:20,21,
23 190:3,6

**mail** 160:7,
9

**main** 58:16
69:5 76:24
127:6,23
179:17

**maintaining**
42:13

**major** 29:6

**majored**
13:21

**majority**
177:7

**make** 48:14
54:14 56:1
62:9 68:18
79:23 98:2
103:14
113:21

116:4,15
119:13
123:17
125:14,16,
17 127:16
151:3
153:23
187:8

**makes** 9:7
65:4

**makeup** 55:2

**making** 97:22
124:5
125:16
153:17

**male** 52:13
53:23

**man** 80:16

**manage** 81:12

**management**
13:23 43:5
177:1
178:21

**manager**
32:22
33:25

**managing**
178:1

**manner**
61:20,23
118:1

**manufactured**
146:23

**manufacturing**
130:25
131:3

**map** 47:4
49:20

**March** 172:3

**mark** 7:16
19:9
122:17
140:5,16
141:7

**marked**
122:12,19,
23

**marker** 86:22

**markers** 86:5

**marketplaces**
123:22

**marks** 163:1,
2,3

**married**
11:24

**MARTA** 141:25

**Mary** 11:13

**Maryjane**
7:25

**master** 15:13
137:11

**master's**
14:1 15:14
16:1 34:23

**material**
124:3

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023      Index: maternal..memories

maternal
  189:14

maternity
  72:1,9
  73:3
  180:16,18,
  19

matter  7:7
  21:3,4
  122:16

max  53:24
  57:24
  58:7,25
  59:7 67:15
  76:16
  94:19
  96:5,14
  99:7 100:2
  101:23
  102:3
  109:13

Mcgovern
  7:17 8:10,
  13 9:10,
  15,16 32:6
  38:8 59:6
  63:12,15,
  17 66:15
  67:3 71:6,
  7 78:15,24
  81:4 82:1,
  2 84:11,15
  85:20
  86:2,19
  87:2,12,18
  88:11
  94:15 96:8

97:1 98:1,
7,13,24
99:1,10,
12,16,19,
21 101:18
102:12,16
103:20,25
105:5,9,
13,16,19
106:14
121:16,24
122:14,21
133:6,21
134:1,11
151:7,12

meaning  72:3
78:13
124:24
173:24

meant  78:13

measure
154:17

measures
56:25 57:4
81:21
82:5,11

media  7:6
113:11
120:21,25
121:11,12
122:2,10
129:13
139:6,16
141:8
175:19,23,
25 190:1

medical  13:4
46:25
145:11

medication
143:9

medications
12:23 13:1
143:4,24

meds  143:7,
21

meet  54:19
115:14
116:24
158:9
170:22
171:5
182:25
185:17
188:4

meeting  37:2
51:24,25
59:14
64:10
100:12,13
112:7
118:10
152:10,11,
15,17,25
153:18
154:21,22
155:1
158:12
159:2,10,
14 161:19
171:12,13,
15,21

meetings
  52:20
  61:16
  65:13
  111:25
  132:4
  156:2
  176:2,4
  179:22

member  61:25
  68:2 69:24
  96:19
  115:23
  116:2
  141:16
  146:19
  177:12,20
  180:19
  183:19,23

members  11:2
  51:11 66:8
  67:18
  102:18
  111:13
  112:13
  113:16
  114:24
  124:18
  136:21
  156:14
  165:1
  183:5

mementoes
  124:20

memories
  116:12,13,
  17,18

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023          Index: memory..money

161:25
162:1

memory 68:5,
6 74:25
87:13,16
119:6
157:11
158:3,4
159:4
161:19,22
175:4,6
182:2
185:8
189:10

memos 189:19

men 55:6

mental 26:2
36:14
40:25
46:19
142:17,21
143:24
144:12
145:1
150:4

mentioned
40:13
127:5
145:5
175:16
180:12
184:24
187:11
189:6

message
118:25

messages
136:20

messed 105:9

met 8:14
113:2
115:16
152:5
153:22
156:11
171:6

metal 68:9,
24 124:6
181:22

mid-february
147:6

mid-november
36:9,21

mid-september
83:21

Mike 7:21
152:3,4

mill 127:2

Milledgeville
13:20

mind 63:10
73:24 74:2
90:1 98:13
109:6,18
154:19

mindful
54:12
89:13

mine 10:15
16:22

63:24
141:20

minimum
31:22,25

minor 12:14

minored
13:22

minute
104:25
107:10
118:18
129:16

minutes
110:17
128:12
129:5,18,
20 178:7

mischaracteriz
ation 84:9

mislead
91:24

missed 103:8

mission
44:17

misutilized
155:23

mitigating
74:8,14

mitigation
16:14
24:20
25:5,25
26:12
27:12,25

28:13
29:9,12
30:6 46:2,
6,8,17
47:19,22,
23 48:1,
14,23
51:1,24
52:1 55:24
61:16
65:12
71:24
72:5,9,17
73:20
112:2
113:1
147:12,24
148:1
155:9
161:16
180:11,15
183:15

mix 152:20,
21

mom 113:3

moment 22:2
120:20
130:24
131:2
132:6
163:17

Monday 33:18

money 33:14,
19 34:4
119:22
120:4,6,

11,14
151:3

monitoring
80:20

month 18:23
181:10

monthly
14:13
50:25
51:24
52:20

months 22:9
26:17 36:4
37:11
42:2,6
71:16
72:17
95:18
115:13
116:25
143:1
144:6
146:9
147:23
150:9
172:17
179:9,10

mood 89:22
90:3

mood-wise
89:17

Morales 7:24
84:3
110:10,12
135:8
176:21

177:4,11,
22 178:9,
12

morning
8:11,12
126:20

mornings
126:21

Moss 8:1
136:1
164:3,4,9,
15,22

mother
112:21
113:3
114:9
116:6

motion
153:10

motivation
41:23

motives
131:1

mounted
185:13,14

mouths
155:14

move 42:19
98:25
126:14,17
151:4
153:6
169:10

moved 10:19

37:11
65:7,10
128:7
150:3
184:11

movement
103:16
108:6

moving 9:24
93:14

MS- 14:23

MSW 14:23

MTU 178:20

multidisciplin
ary 50:8

multiple
71:18
111:11
114:20
139:3
141:19

murder 74:3

murdered
71:15
74:17

murderer
109:14

murderers
75:12

murders
174:1

mute 176:20

N

named 180:23

names 11:10
135:24
160:9
175:16,18
179:24

narrative
22:14

narrow
159:15,16

Nathan 7:8,
18 81:16
82:24
110:7
120:24
127:24
128:4
129:17
138:25
175:15
190:5

national
50:20

natural
108:6

neck 91:8
92:13

needed 28:14
47:6 56:10
68:14 69:3
72:1 76:12
89:7,8
90:5 97:24

148:19
154:17

negative
27:2,5
178:8

neglect
112:17

neighbors
46:25

neuropsych
47:11

news  60:21
115:24
140:6

nice  33:19
149:13

Nicholas
11:15

Nichols  93:3

Nicki  189:11

night  64:18

nights  33:18

Nikes  94:9,
10,17,23

Niquita
189:11

Nix  7:19
156:10

Noah  7:25

nod  8:20

non-capital
24:22

noncapital
191:8

nonprofit
44:8,10,20

nonprofits
44:22

nonresponsive
98:25

normal  141:2

North  13:15
111:17,18

Northern
24:15
25:8,16
44:9

notebook
68:10,11,
15 78:7
128:17,24
155:9
160:6,11

noted  126:1

notice  94:8
183:25
184:6

noticed
103:8
127:21
184:13

notification
169:20

notified
139:15
169:15

November
16:21 36:9
126:15
149:17
156:17
169:5
172:11
181:7

number
12:18,20
123:9
152:2
181:2

———————

O

O'BRIEN  8:4
165:20,22,
25 166:1,3
167:5,16
168:9
170:3,5
173:4

object  59:5
78:1,22
81:2,23
84:8 88:9
94:3 96:7,
15 97:15
98:5,12
99:9
101:17
103:19

objection
70:17
99:13

objections
9:12

obliterates
87:22

observe
134:12

observed
100:7

obtained
170:16

obvious  41:6

obvious-
144:16

occasionally
117:21

occupied
33:11

occur  25:1
100:18,19,
20

occurred
66:6
134:18,25
135:3
152:10

occurring
88:5
147:17

October
10:19

odds  14:12

offended
131:6

offense
  57:22
  73:23

offenses
  75:16

offer  16:24

office  16:12
  18:9,11
  23:14,21
  24:23
  25:24
  27:10,21
  33:5,16
  36:8,10,
  12,13,25
  39:3 40:3,
  25 43:1
  46:2
  55:16,23
  65:11 68:8
  71:18
  72:3,24
  79:11
  111:23
  119:21
  120:7
  136:14
  138:1,2
  141:13,21,
  23 147:19,
  20 150:4
  160:17,19,
  25 161:5
  162:16
  167:8
  168:12,17,
  21 169:2,

25 170:7,
11 179:12
180:4,7
181:15
183:20
187:2

officer
  57:6,10,12
  59:11,15,
  20 75:22
  77:3 97:18
  100:7
  106:23
  127:13
  129:2,8,11
  138:10
  152:14
  153:2,8,
  18,24
  154:3
  155:19
  157:12

officers
  23:8 53:4
  60:6,15
  71:15
  74:4,18
  75:2,24
  80:18 99:6
  101:4
  102:7
  127:25
  132:18
  135:21,22
  136:4
  174:1
  177:16

officially
  180:13

officials
  98:22
  128:20

older  11:8

Omotayo  37:6
  39:7,8
  40:4 43:2
  150:2

on-the-job
  50:9

one's  118:22

one-on-one
  183:10
  184:10

one-on-ones
  55:1

ongoing
  32:18

online  123:8
  139:23

open  19:11
  115:17
  128:2

open-toed
  55:12

opened
  27:12,18

opening  25:1

operated
  28:1

operates
  44:12

opinion
  78:25
  140:23

OPS  81:17
  82:4,6
  83:7
  135:9,23
  173:17

options  20:4
  167:14

oral  12:24

order  16:3
  54:19
  117:10
  133:4,17,
  20 183:17,
  22

original
  65:10

Outlook
  136:18

outs  107:16
  177:25

outset
  171:17,20

overhear
  154:15

oversaw  82:4

overwhelming
  147:9

owner  28:4

owns 10:15

**P**

p.m. 86:11,
 18 122:2,
 11 134:3,
 10 151:16,
 23 167:19
 168:1
 186:7,14
 192:9,14

paid 14:12
 16:22
 119:23,25

painful
 91:14

pair 95:12

pandemic
 32:12 34:7
 149:2

panel 27:17
 28:11

pant 69:1

pants 55:5
 68:21,25

paper 160:6,
 11 188:17

paperclip
 182:7

paperclips
 182:6

papers
 182:12

paperwork
 38:16
 144:10,25

paralegal
 24:1

paralyzing
 148:17

paramount
 76:16

parents
 11:4,10

park 67:21
 115:16

parking
 128:24

part 14:7,
 15,20
 31:19 58:9
 62:20
 89:16 90:1
 111:6
 114:16
 163:7
 175:4
 180:13

participate
 51:17

participated
 180:9

partner
 19:12

parts 52:2
 90:15

pass 142:9

passed
 18:21,24
 19:3 70:23
 97:6
 130:12

past 48:7
 65:6
 160:19

pat 69:2

paternal
 189:14

path 127:23

patted
 132:18

patting
 164:16

pause 105:7

pay 33:20
 35:9
 140:25
 141:2
 150:16

paycheck
 41:10 46:1

paying
 127:18

payments
 119:11,13

Peachtree
 11:9

pen 68:11

penalty
 46:10,14,
 16 51:9
 72:14
 73:11,21
 74:9 75:8
 162:7

people 17:1,
 25 34:18
 36:15,16
 42:18
 43:25
 50:21 53:8
 54:4,5,6
 59:7
 61:12,18,
 20,22
 62:8,11
 64:7 71:20
 75:6,10,15
 78:3 84:20
 96:13
 100:22,23
 114:8,17
 116:14,16
 117:6
 123:8
 124:21,22
 125:18,20
 127:21
 128:20
 130:1
 135:9
 139:23
 140:8
 146:3
 150:24
 155:10

156:3
161:8
165:5
175:1
179:14,23,
25 192:3

people's
52:23
96:24

pepper   140:7

percent
174:22
175:5

perception
146:17,19
149:21
154:25

perfectly
59:24 60:3

period   16:9
29:3 45:22
84:19
103:4
145:14

periodically
86:24

peripheral
185:19

persistent
114:15
115:15
116:24

person   46:15
62:20 72:9

73:3 78:5
115:22
116:3,10,
17 125:22
162:1
180:16

personal
11:19
22:14
53:16
75:16 81:1
83:4 84:23
136:16
143:10
161:14
162:4
174:17
175:11

personally
75:14
84:16 98:8
134:12,16
175:10
176:3

phase   46:10,
13,14
72:14
73:11,21

phone   12:18
17:13,14
117:21,23
118:2
136:8,24
137:4,6,
12,14,17,
24 139:1
141:10,19,

20 169:17
184:11

phones
136:15,16,
17 157:9
181:21
183:12
188:15

photograph
124:10

physician
21:20

pick   141:17

picked
138:16

picking
130:14

picks   104:21

picture
176:13,15

pictures
124:18

piece   124:5,
15 125:8,
25

pieces
123:18

Pittman
113:2
118:24
141:5
180:3

place   23:3

76:23
89:12
92:17
115:5
150:18
183:3

places   60:14

plaintiff
7:15 12:4

play   86:23
91:22
104:24

played   86:25

playing
86:21
130:3,4

pocket   68:20

pockets
68:19

point   21:21
22:19
33:19
36:23 40:1
63:11 86:5
87:5 88:5,
8,12 90:22
93:23
102:24
106:9,20
107:2
112:24
121:21
143:23
147:18
177:24

points
  117:25

policies
  47:14

policy  37:8,
  17  38:10
  40:13  42:5
  183:2

polite  125:1

politely
  132:13

politically
  43:25

popping
  32:15

port  69:6
  77:5

ports  76:5,
  22

position
  14:9  24:18
  39:15
  40:14
  42:10,12
  55:14
  79:10,15
  92:14
  147:11
  155:13

positioned
  87:21

positions
  55:17

positive
  34:11
  56:22
  116:16

possession
  49:6
  128:18,23
  161:1

possibility
  39:22

post  23:8
  81:10
  189:23
  190:8

posted  59:15
  181:20

posts
  113:12,15

potential
  37:20
  38:13  47:5

potentially
  42:14
  44:16
  62:18
  115:25
  116:1

poverty
  112:17

power  44:24
  56:2

practice
  17:7
  19:10,14

119:21
  120:2

practices
  48:4,9
  49:3  51:2

predicted
  145:19

preemptively
  39:8

preferable
  55:5

preoccupy
  147:4

prepared
  30:22

prescribe
  143:3,7

present  7:11
  56:17
  121:1
  134:16
  164:5
  174:14

presented
  172:7,12

presenting
  18:4

presentment
  173:1

pressure
  148:3

pretty  37:16
  55:25  57:4

59:18
  67:25  89:9
  95:13
  104:20
  106:8
  118:13
  124:3
  158:7

previous
  69:17
  89:20

previously
  8:16  21:8
  73:25
  74:17
  76:10
  95:21  96:1
  97:7  100:5

primarily
  73:21
  144:11
  170:11

prior  10:21
  12:3  15:7
  20:24
  27:9,11
  29:23
  42:21  43:3
  55:14
  57:20
  69:11,13
  71:16
  85:5,16
  92:7  95:24
  164:8
  169:6

priority
  76:13

prison  51:19
  53:24
  58:3,11
  60:17
  67:16
  71:15
  73:25
  76:11,16
  81:11,22
  82:10 84:6
  96:5,14,23
  98:2,22
  99:7
  100:2,23
  101:15,20,
  23 102:3
  109:13
  128:19
  133:13
  135:3,4,9
  141:17
  160:1

prison's
  97:5 98:15

prisons
  54:25
  57:21

private
  19:13,16
  28:13

privilege
  71:1 77:23
  78:20 79:5
  112:1

168:6

privileged
  79:13
  112:4
  128:20
  131:5,8,
  17,19,21
  132:2,5
  136:9
  137:3

problems
  145:2

procedure
  169:24

procedures
  98:10

proceedings
  37:21

process
  149:23
  166:7

produced
  109:20

professional
  19:19 34:4
  45:18 56:9
  60:5
  61:20,22
  62:20
  81:11
  117:7
  151:4

professionally
  125:12

professor
  14:10 17:9

profoundly
  54:10

program
  14:4,5
  24:15,19
  28:7 42:18
  43:22 44:2
  45:11,25
  148:21

programs
  44:5

progressed
  142:14

prolonged
  177:18
  178:5

prom  64:13,
  18

promise
  120:7

prompted
  83:24
  108:25

proper  45:9
  145:25

prosecuting
  170:12

prosecution
  34:16
  145:24
  146:1
  149:16

protect
  41:9,10
  80:3

protected
  78:20
  79:3,16,19

protective
  56:25
  133:3,17,
  20

protocol
  183:20,22

protocols
  98:10

provide
  16:16
  22:12
  25:10 29:1
  31:12
  124:10

provided
  67:13
  95:22

provider
  142:22

providers
  46:25

providing
  25:9
  100:17

psychiatrist
  28:16,20
  29:11 30:5
  143:8,9,

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023          Index: psychological..recall

13,19

psychological
20:2

psychologist
20:1

PTSD
144:17,21

PTSD-TYPE
147:17

public   36:13
37:7  40:3
41:17,18,
21  44:13
55:16
115:16
141:9

published
113:11

pull  68:22
85:19

pulled   37:2
72:6,7
110:24
139:8
140:1
180:24

purpose   35:5

purposes
58:8
144:19

pursuant
133:3,17

pursue  39:21

put   22:6
36:18,21
59:7  62:13
73:7,8
89:12  94:1
96:4
109:13
119:22
120:3,14
133:8
144:14,18
162:25
179:4,7

putting
82:25  88:7
106:3
120:5

———————
Q
———————

quantities
155:11

quarters
74:16

question
8:25  9:2
41:22
72:15,21
88:14
108:25
123:2
133:7
168:7
175:20
184:23
190:22

questions
13:6  64:6
140:7,8
142:9
151:8
156:9,20
163:18,20,
24  165:17
173:5
176:8
192:5,7

quick   121:25
123:1,2

quicker
118:25

quotation
163:1,2,3

———————
R
———————

raise   154:7

raises
108:15

ramifications
21:7  145:2

random   25:23
26:18
52:23

rape   63:8

rapist  62:24

rapport
183:14

rate   30:3

react  171:11

read   51:3
60:21,23
85:22
90:11
123:7
155:16

readily
91:10

real   64:17
121:25
123:1

reality
146:18

realize
172:18

realized
147:10
170:23

reason   8:24
9:3  12:12
38:23  59:8
64:17
118:18
119:22
175:22
176:2

reasonable
80:5

reasons
113:3
114:12
143:11
155:20

recall   29:20
92:23,25

104:15
108:12
119:19
153:1,23
157:17

**recalling**
111:1

**receive**
18:18 49:8
55:8 66:13
70:2
160:20

**received**
13:20
15:6,8
16:2 17:11
28:5,18
31:5 38:16
55:19
66:10
133:3,16
175:14
179:6,8,9
188:17

**receiving**
123:4
188:16

**recess** 38:3
66:23
86:14
122:6
134:6
151:19
167:22
186:10

**recollection**

84:3 87:4
107:11,20

**recommendation**
15:16

**recommended**
143:8,17

**record** 7:12
9:18 28:17
37:23,25
38:7 66:20
67:2 69:25
70:18,19,
22 86:7,9,
11,18
121:24
122:3,11
133:19,25
134:3,10
151:16,23
165:19
167:19
168:1,3
186:7,14
190:11
192:10

**recorded**
85:4
154:22
155:1,15,
22 184:16
187:4

**recording**
77:13
109:20
110:6,16
111:2

129:23
134:23
135:1,4
176:1,4
187:23

**recordings**
110:1
176:6

**records**
47:1,2,3
48:12
49:19 51:4
144:19
145:11
173:23
174:4,7

**reduces**
56:18

**refer** 162:22

**referencing**
135:15

**referred**
77:24

**referring**
83:16

**refused**
171:25

**regard** 39:22
76:1 170:1
175:19

**regular** 50:6
96:4

**regularly**
54:14

75:23
111:15
118:13

**rehire** 37:19
38:13
39:18

**rehired**
38:13,21

**reinforced**
149:22

**reiterate**
88:21

**relate** 169:1

**related**
102:18
176:6

**relation**
110:1
157:5

**relations**
43:2

**relationship**
32:18
183:14

**relationships**
54:6

**relatives**
114:13

**relayed**
169:17

**released**
137:17

**relevant**

26:4 29:2

**relieve**
  153:8

**remainder**
  18:15

**remember**
  27:19
  49:15
  50:18 52:8
  53:1 58:15
  59:22 60:1
  64:11,15
  68:13
  83:24
  88:24
  89:5,13
  90:9,13,16
  91:12,16
  93:2 94:10
  95:12,16
  103:6
  107:15,17
  108:20,22,
  24,25
  114:2,14
  115:3,16
  118:3
  119:16,17
  120:5,16,
  18 123:4
  126:24
  127:1,8,
  10,14
  128:5
  130:13
  132:17,19
  135:24

137:7
140:17
143:1
147:6
148:5,11,
17 152:19,
24 153:4,
5,12,13,
17,20
158:5
161:20
162:24
163:9
164:13,14,
18,20
165:4,11,
13 166:13
170:13,15
171:7
175:18
177:18,23
179:5,6,24
182:4,7
184:13,23,
25 185:3,
5,12
186:21,22
188:9,16,
25 189:1,
3,11,12,13

**remind**  45:14

**remotely**
  94:14
  118:3
  149:6

**remove**  91:23
  93:10,15,

22 103:9

**removing**
  103:17
  104:22

**renew**  21:10,
  12,15 22:2

**renewal**
  21:13

**renewed**
  22:22

**renting**
  10:9,16

**rep**  141:8

**rephrase**
  80:21

**replaced**
  180:17

**replay**  91:9
  104:3

**report**  70:2

**reported**
  48:2

**reporter**
  7:13 8:19
  37:22 86:8
  96:10
  122:13,20
  165:24
  190:17,22,
  24

**reports**
  69:17 96:1
  175:14

**represent**
  36:15
  156:10
  164:3
  166:1
  173:9
  176:21

**represented**
  71:17

**representing**
  7:15,23
  71:20,23,
  25 132:15
  187:2

**requests**
  47:2

**require**
  110:22

**requirements**
  15:15

**research**
  14:9,11

**reserve**  9:12

**resolved**
  162:20

**respectful**
  125:1

**responding**
  115:7

**responses**
  145:6

**responsible**
  170:12

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.
Lily Engleman on 02/14/2023      Index: responsiveness..room

responsiveness
 9:13

restate  9:4
 101:6

restaurant
 14:8,14
 29:25 31:6
 32:15,19,
 25 33:10
 34:24 35:5

restricted
 182:20,23

result  20:5
 100:22
 102:6
 142:18
 145:3
 159:1

retain
 122:17
 128:23

retaining
 128:18

return  29:16
 30:20,22,
 24 31:1,14

returned
 137:22

returns  29:2

review  28:17
 83:25
 133:10

reviewed
 132:23

175:7,8

reviewing
 109:6

revisiting
 40:11

Richey  7:20
 156:10

Ricky  57:11
 58:5
 59:14,19
 67:6
 71:13,23,
 25 72:13
 74:22 76:6
 80:1,22
 83:1,8
 84:18
 85:1,6
 89:2 97:17
 98:3
 101:12
 109:21
 110:1,7,9,
 17 111:2
 112:12
 114:6,24
 117:10,14
 123:5,16,
 21,23,24
 124:14,21
 126:17
 128:21
 130:7,12
 131:11,17
 132:10
 134:12
 163:13

177:8,17,
 19 182:22
 185:9
 191:13

Ricky's
 83:23
 111:7
 113:3
 114:2
 125:21
 132:14
 147:25
 177:13
 187:24

right-hand
 103:17

rightfully
 115:24

rights  55:15
 70:24

Riley  7:21
 152:3,4

ring
 123:12,15,
 24 125:7,
 11,21,24
 126:1,9
 159:25
 164:24
 192:1

ripping
 147:1

risk  53:16,
 19 59:2
 69:11

100:21
 101:11,13
 102:4

risks  51:19
 100:3
 101:2

role  45:24
 47:16
 175:23
 176:3

roll  68:22,
 25 105:15

rolling
 106:2
 107:6,13

room  41:13
 57:7 59:19
 77:6,8,10
 80:16,22
 85:13
 91:18
 100:8
 131:4
 134:23
 135:2
 148:21
 152:9,15,
 17 154:5
 156:20
 157:11,15
 158:2,6,8,
 11,20
 159:6
 163:20,21
 171:2
 176:5

184:4,7,12
185:3,7
186:24

rotated
  118:12

rotating
  26:13

roughly
  18:12
  191:8

round  185:11

row  58:22

Rowe  187:24

rules  8:18
  130:5

run  54:16
  127:2
  178:3

running
  82:25

_____

        S

safe  40:16
  57:14
  60:14
  75:5,25
  76:8
  147:13
  162:12

safer  76:2

safety
  52:21,23
  53:16

60:23 81:1

sally  69:6
  76:5,21
  77:5

salutation
  163:6,7

Samuel
  138:25
  167:11
  168:12,16,
  18 169:1,
  4,5

Samuels
  168:20

sat  157:13

Saturday
  9:24 10:2

scanner  68:4

scare  131:3

scared  44:15
  56:10
  129:25
  130:10

scary  33:8
  146:24
  149:23
  150:10,17

scenarios
  57:22

schedule
  126:21

scheduling
  53:11

school
  13:11,12,
  13,16,25
  14:10
  64:13,14
  148:14

scoot  102:14
  109:3

screen  86:1,
  3

scrutiny
  75:1

search
  133:11,15
  137:1,5,
  13,23

searched
  128:25
  130:8
  132:21
  134:13
  135:19
  136:7

seating
  172:14

seconds
  105:15
  127:12

secretive
  41:15

secure  74:21
  75:21 76:4

security
  33:22

51:19
53:2,16
57:4 60:23
67:22 68:8
69:3 74:22
76:11,15,
22,23
81:10,12,
21 82:5,11
96:13 99:7
100:3
107:1
110:22
127:22
150:2
152:14
153:2,3,
17,18,24
154:3,12,
17,20
155:19,20

seek  174:19

selection
  11:16

send  21:19
  23:5 47:2
  124:18

senior
  13:14,16

sense  9:7
  19:19
  34:23
  42:7,8,11
  55:11
  75:17
  107:19

114:22
171:9

sentence
54:13
74:11

sentences
54:16

sentencing
73:12

separate
46:14
58:18
160:16

September
9:21 21:14
84:1,25
85:5 86:22
152:11
153:1,16
181:6

served 35:4,
5

server 14:8

session
144:15

sessions
17:14 50:4

set 50:2
77:2 85:16
115:4
117:21
118:10,11,
23 119:7
121:2

140:16
170:19
185:6

setting
60:8,12
76:16
81:20
85:10
171:12

settings
50:12
60:14

seven-ish
179:20

sex 52:15,
16 64:19

sexuality
52:12,15

shackled
140:14

shadowing
49:18

shady 149:23
166:8
167:8
169:3
170:8

shakedown
83:22

shanks
101:8,9

share 85:25
86:3
161:24,25

shared 190:3

Shawn 28:21

Shayla
180:23

She'd 39:6

She'll 91:5

sheriff
136:4

sheriff's
129:3,7,
10,11,12,
14 130:20
139:9

sheriffs
138:15

shifts 33:10
34:1

shirt
130:15,17

shock 149:18
172:22

shocked
128:5
129:24

shocking
90:12

shoe 88:22
94:7 95:11
104:5

shoes 55:3,
12,20
68:24
88:21

91:20,24
93:10,23
94:2,7,8,
13 95:10,
17 103:9

short 110:6

show 68:19,
23,25 86:4
89:10 91:7
102:12
107:12,22
108:18
109:15
122:22
149:20
170:24

showed
22:21,25
67:20
112:24

showing
91:15 92:8
108:16

shown 116:11
155:16
175:2

shut 149:4
171:15

sic 67:5
86:22

side 17:2
103:18
107:6
116:7
156:23

157:15
159:2,13,
18

sight   107:23

sign   188:13

signed   68:4

significance
125:8

significant
51:9
101:19
150:20

significantly
48:18
108:5

signs   181:20
188:10

silos   73:16

similar
19:25
24:18,20

single   130:8

sister   11:6,
7,12
111:18
116:6

sit   130:21
131:10
154:13
171:23

sitting
56:12
57:10

92:14
97:18
102:1
120:23
153:12
154:3
156:23
158:6,23
159:18,20
185:9

situated
157:4

situation
63:2 71:13
75:18
146:14
150:6
187:23

sizeable
65:2

skills
112:15
149:1

sleep   13:5

slide   91:19,
20

slow   54:11

slower   54:12

small   25:4
29:13
36:14
57:3,21
181:24

smart   33:14

162:12

smiley
123:12
126:4

smiling
92:1,15

SMP   67:5,7

SMU   57:23
58:18,21,
25 67:8,11
68:5 76:13
81:16,19
82:5 175:1
178:21,22
182:2
183:2,21
184:15,19
186:25
187:3,8,9,
20 188:4

sneakers
56:7

so-and-so
64:12
119:1
163:15

social   14:2,
5,10 15:6,
7,13,14,21
16:15,17
17:1,9
19:10,24
20:2 34:5,
12,24
36:19
45:18,19

61:8,10
64:3,6
65:1 90:11

sock   94:2
103:17
104:5,21,
22 105:21
106:2,6
107:6,13
108:9

socks   69:2
88:20
91:18,24
93:10,23
103:9
106:3
109:7

sole   28:2

solely   24:24

some-   162:13

someone's
53:7 55:21
56:6 119:2

something's
57:14

sophisticated
124:5

sort   87:20
152:14
156:2

Sounds   66:18

source
114:9,11

Southern
  55:15

Southwest
  10:4

space  98:14

speak  8:21
  46:12,14
  113:8
  114:21
  123:22
  180:10

speaker  52:6

speaking
  156:22

special
  137:11
  177:1
  178:21

specialist
  24:21 25:5
  26:12
  29:9,12
  30:6 46:6,
  9,17 47:20
  71:24
  73:20
  147:12,24
  148:2
  180:11,16
  183:15

specialist/
mitigation
  46:3

specialists
  28:14 48:1

52:1 55:25

specific
  45:24 76:1
  82:23
  161:4,13

specifically
  40:12 55:2
  95:12
  104:17
  164:20
  165:13
  166:11
  170:2

specifics
  166:9

spell  17:5

spend  46:24
  112:20

spent  34:3
  114:6,9,12

spoke  168:3

spoken  78:5
  174:12

sports  14:18

spring  22:5,
  19

squarely
  87:21

stable
  114:23
  149:8

staff  16:17
  80:3

staffed  25:5

stand  127:12
  140:1

standalone
  68:8 76:22
  127:22

standard
  95:4
  109:17
  125:8
  127:2
  183:20,22

standards
  78:18

standing
  20:22,25
  21:5
  127:10,14,
  20

staple
  182:11,12

staples
  181:23

staring
  185:18

start  13:10
  23:15
  24:12 35:3

started
  33:15
  35:13 44:4
  45:9,10,12
  49:4,25
  54:24

71:12
72:10 73:6
88:25
89:17
91:15
147:2,5,17
148:5
149:8
177:22
178:25
179:2
181:5
183:9
188:3

starter
  48:12

state  9:17
  13:19
  14:1,4,23
  24:19 28:7
  37:9 42:22
  43:16
  45:10,25
  52:2 58:3,
  23 71:19,
  20 111:7
  135:9

state-issued
  91:18

statement
  103:14
  138:12
  167:7
  169:23

states  79:2

staticky

183:12

station
  141:25

status  22:3,
  6,8 23:4
  37:19
  38:13
  42:13

stay  36:25
  37:13 45:3

Step  128:4

Stephanie
  26:22

stipend
  14:13

stipulations
  9:11

stop  86:24
  87:25
  104:3
  105:2
  177:13

stopped
  64:16
  87:19
  115:7

stories
  89:23
  162:4
  178:3

story  27:25
  30:21
  63:22,23
  64:22,24

65:2,8,10,
  16,24

strange
  140:23

strategic
  89:25

stress  119:3

stress-
relieving
  34:19

stressed
  164:19

stressful
  146:1

strict  75:1
  181:23
  182:3

strike  71:9
  84:24
  98:25
  184:1

strip  130:8
  132:21
  133:11,15
  134:13

strong  48:19
  114:11

structure
  44:24
  54:13

struggled
  147:20
  167:3

stuck  69:1,2

studies
  23:17 58:9
  60:5,9

stuff  15:25
  24:5 79:7
  83:23
  109:24
  174:4
  180:8
  182:1
  183:8

subject  85:4

submit  39:14

submitted
  25:17

subsequent
  16:10
  18:19
  20:15
  109:19
  121:8
  138:22

subsequently
  142:1

substance
  26:3

subtract
  31:8

successful
  48:6,7

sudden  42:3

suddenly
  33:24

147:10,21
  150:1

suffered
  102:21

Sullivan
  29:10

summer  40:19
  58:11,12
  149:7

Sunday  33:17

super  56:8

supercedes
  21:2

superior
  65:5

supervise
  17:18  48:3

supervised
  15:22

supervisees
  17:22

supervising
  17:25

supervision
  15:24
  16:10,11,
  16,18,23
  17:2,11,
  15,21
  19:21
  49:25
  50:10

supervisor

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.

26:21

supplemental
  22:13

support
  79:10
  80:13

supports
  79:15

supposed
  47:20
  105:14
  118:14,15,
  16,21
  129:25
  130:2,6
  146:13
  158:19
  183:15

surely
  172:18

surface
  106:16
  107:24

surmise  79:9

surprised
  169:7,16

surveillance
  81:21

suspended
  21:7

suspicion
  126:12

swear  7:13

sworn  8:7

symptoms
  51:10
  144:17
  147:17

syndrome
  50:19

system  62:9,
  12

Szatkowski
  180:5,12

——————————

T

——————————

table  9:1
  88:4,7,12
  92:24
  93:4,18,
  19,25
  94:6,12
  96:5 97:3
  100:7,9
  102:24,25
  103:2
  104:13
  106:9,10,
  16,22
  107:23,25
  108:7
  109:14
  130:16
  156:24

tables  34:4

takes  146:4

taking  9:1
  14:19

105:22
106:6
107:9,13

talk  18:1,2
  49:21
  50:2,3
  52:4,10,
  11,21
  53:10
  54:11
  56:20
  57:20
  64:21
  89:7,9,21,
  25 90:3,5
  94:9,13
  114:7
  125:20
  130:21
  131:11,13,
  15,20
  132:4,10,
  13 135:14,
  17 141:24
  152:9
  155:9
  170:20,24,
  25 171:14
  188:2

talked  37:11
  39:1 45:22
  52:16
  61:15 67:4
  83:10 89:3
  90:17
  112:15
  120:20

125:18
128:11,12
129:17
134:21
135:10
139:3
142:13

talking
  52:14
  64:8,16
  65:9,19
  66:1 78:11
  87:15
  89:18
  90:14,15
  91:5
  107:17,18
  108:25
  112:7,18
  123:15
  130:17
  131:14,22
  132:5,19
  139:23
  148:14
  155:21,24
  158:8
  162:5
  164:14,18
  167:11
  171:25
  177:22,25

targeted
  146:19

tasked  73:10

tattoo  91:14
  109:2

tattoos
  88:17
  89:18,21
  90:14,15,
  23 91:11,
  13 92:8
  104:10
  107:18
  108:17,18,
  21 165:8

taught  61:19

tax  29:2

teachers
  46:25
  148:14

teaching
  148:25

team  50:6,8
  57:17
  62:1,21
  67:18 68:2
  69:25
  73:14,15
  77:25 78:4
  84:21
  96:19,24
  97:20
  98:16,17
  100:12
  113:4
  118:11,13
  124:19,21
  136:17,20
  140:1
  141:6,16
  146:20

155:10
156:15
161:7,8
162:11
165:2
173:24
177:13,20
179:15,16,
22,25
180:7,13,
19,24
183:5,19,
24 184:22
186:19
187:3,17,
22,25
191:20,24,
25

team's  70:25

teams  60:22
  100:16
  117:1
  136:21
  186:23

telehealth
  17:16,19,
  20

telephone
  111:3
  117:19,20
  182:21
  183:1

telling  87:9
  131:12
  162:8
  178:2

tells  65:24

temporary
  43:17

ten  30:17,
  18 105:8,
  13,14,15

ten-second-
back  105:3

tend  8:20

terminate
  150:12

terminated
  33:24
  34:22
  35:22,24
  37:2,10
  38:11 40:9
  42:3,16
  45:23

terminology
  139:10

terms  23:6
  25:8 35:7
  47:15
  52:25
  53:15 66:4
  79:21
  81:12
  91:11 96:3
  134:20
  136:24
  142:12
  149:8,10
  152:23
  168:11

170:9
172:4

terrified
  147:8

terrifying
  146:16
  149:15

test  18:20

testified
  95:21
  159:24
  164:4

testify  13:2

testimony
  25:9,10
  82:17
  134:22
  164:24
  173:9
  178:15
  189:5

testing  20:2
  47:9 50:12

tests  16:4,5

Texas
  111:12,14,
  15 114:3,
  14,19
  115:13
  189:12

text  118:1
  123:1
  136:20

texts  115:8

LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.

thankful
  191:20

themes   46:9

theories
  46:10

therapist
  19:13,16
  52:15,16

therapy
  15:20
  19:11
  144:2

thing  50:6
  51:6 85:24
  102:13
  105:4
  137:13
  139:12
  140:6

things  27:17
  34:9,19
  41:3,11,25
  48:15,20
  56:1 61:15
  65:3 68:10
  76:7 89:7
  94:14
  95:20
  101:7
  117:6
  153:10
  155:9
  160:8,10,
  21 161:10,
  18,20
  162:2,7,19

165:5
175:17
177:14
181:11,23
182:12
185:11
188:7

thinking
  50:3 90:10
  98:21,22
  114:1
  137:7
  146:7
  148:11
  187:12

thought   33:9
  36:19
  41:20
  47:10
  63:21 72:4
  75:21
  78:12
  82:14
  97:11
  113:18
  127:25
  129:25
  131:6
  143:9
  146:22
  172:17
  176:19

throwing
  55:21

Thursday
  10:10

tie  176:14

tied  137:15

Tifton  71:22

tight  50:21

time  7:10
  8:22 12:18
  14:7,15,
  20,21 16:9
  29:2
  30:11,14
  31:19
  32:12,15,
  23,24 33:7
  34:7,16,
  21,25
  36:5,7,8
  37:24
  38:6,15
  39:2 41:11
  45:22
  46:24
  47:25
  49:24
  50:18
  51:25
  52:10
  57:10 58:6
  64:19,23
  65:6,18
  66:19
  67:1,7
  68:1 70:1
  72:23
  77:19
  80:18
  84:18
  86:10,17,

22 87:6,16
88:5 89:4
93:23
94:18
100:18,19,
20 103:4
111:13
112:20
114:7,10,
12 115:4,
12 118:1
120:6
121:1
122:2,10
133:11
134:2,9
145:15,17
146:23
149:2
151:15,22
161:19
165:13
166:22
167:18,25
171:4
172:6,21
176:18,19
177:1,19
178:25
179:2,16
186:6,13,
18 187:1,
20 192:9

timeframe
  30:9 35:11
  37:3

timeframes

35:7

**timeline**
45:9

**times** 32:15,
21 50:2
61:9 67:17
68:1 75:3
111:8
126:7
130:19
132:12
137:2
139:4
144:11
177:5,11
181:1,3,4
183:6
184:9
185:19

**timing**
172:5,8

**tips** 31:23
32:8

**tired** 67:10

**title** 45:25

**today** 12:19
13:1 83:4
102:1
118:21,22
120:23

**Today's** 7:9

**token** 125:5

**told** 36:22
37:5,7,12

38:22 39:3
40:21,24
41:12 42:6
64:22
79:11
125:15
128:7
130:11
140:10,21,
22,23,25
144:14
166:14
169:12
170:21

**Tomeika** 8:2
173:9,12,
14

**tomorrow**
115:9
141:24

**tons** 136:20

**top** 32:8
56:8 57:9

**topic** 52:24
65:10
171:21

**topics** 50:25
52:7 65:9

**total** 18:9
178:24
179:14

**totally**
93:24
102:14
187:12

**touch** 8:15

**toured**
58:12,22

**town** 57:3,
21 129:4
181:24

**track** 81:24

**traffic**
12:14
159:19

**trailer** 56:6

**train** 52:6
150:22
151:1

**trained**
46:18
61:24
114:17

**training**
19:20
20:15
23:7,8,11,
15 24:1,3,
8 26:8
48:13
49:8,11
50:10,17,
18 51:5,9,
14,15,18
53:15
54:1,3,8,
17 55:9
61:14
81:9,11
138:7

181:15
183:8

**trainings**
50:25
52:19

**trajectory**
87:14

**transcript**
8:23

**transfer**
40:24

**transferred**
13:19
36:12,17

**trauma** 26:6

**travel** 52:3

**treating**
142:19,20

**trial** 25:6
46:14
72:19,22
179:18
180:9,25

**trials** 46:12

**trip** 111:21
114:19,21
123:10,11

**trips** 111:11

**true** 67:24

**trust** 41:3

**truthfully**
13:2,7

Tucker   9:23

tuition
   14:12

turn   65:2
   68:19
   146:15
   158:22

turned   7:4
   38:2,5
   66:22,25
   86:13,16
   122:5,8
   134:5,8
   151:18,21
   167:21,24
   185:25
   186:9,12
   192:12

twisting
   92:13

type   22:3
   70:5

types   23:7
   188:6

——————————

——————————

U

UGA   17:9

Uh-huh   16:8
   17:17 27:3
   29:17
   30:25 33:4
   35:20 46:7
   49:5,12
   51:21
   57:25

59:13
72:20 88:2
90:21
92:3,22
93:6,20
95:23 99:5
104:19
106:3,7
107:8
108:11
113:13,17
118:6
123:14
126:3,19
155:25
163:5

ultimately
   54:21
   136:23
   137:23
   142:4

uncles   11:21
   114:8

uncomfortable
   41:16
   52:14

uncommon
   124:17
   154:12

uncovering
   64:25
   112:19

under-   87:13

undergrad
   58:10

underground
   123:22

underlying
   73:12

understand
   9:2 13:6
   23:3 44:4
   54:15
   62:25
   72:15
   77:21,23
   80:5 116:8
   117:1
   145:22
   146:17
   149:19
   152:13
   167:3
   173:14,16

understanding
   39:11
   48:20 59:9
   67:6 71:8
   77:18,22
   78:16
   79:25
   80:17
   83:19,20
   88:19
   96:12
   99:23
   110:9
   113:20
   118:4
   123:20
   124:14
   145:25

161:6
171:6

understood
   9:5 154:9,
   16

uniform
   47:17

unit   25:3,6
   177:2
   178:21

university
   13:15,19
   14:1 15:2

unlock
   127:13,18

unpleasant
   178:11

unsafe   40:6
   57:18,19
   147:22

unusual
   94:11,14
   109:16
   125:13,14
   166:24

upset   171:2

utilize
   117:23,24
   120:11

utilized
   122:18
   128:19

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
Lily Engleman on 02/14/2023 V-I-S-H-W-A-M-I-T-R-..voluntarily

---

**V**

V-I-S-H-W-A-M-
I-T-R-A  49:1

vague  63:25

Valentine's
 35:17

variety  20:4
 50:25
 113:12

vary  30:3
 57:4

vehicle
 128:25
 129:1
 136:7
 141:18

verbal  69:14
 78:19
 79:2,15,18
 131:24
 189:1

verbally
 77:14

verify  107:1

versus  7:8
 135:9

veteran
 51:3,4

Victoria
 11:13

video  7:3
 38:1,4

66:21,24
83:25
85:23
86:12,15,
 21,25
90:7,9
102:13,14
103:21,22
109:4,6
111:1
122:4,7,17
130:11
131:23
134:4,7,22
135:2,3,7
149:19
151:17,20
156:22
157:14
167:20,23
170:18,21,
 24  171:24
174:21,22
175:2
186:8,11,
 16,20
192:11

videos
 134:20

view  87:22

views  157:9

violence
 60:11

Vishwamitra
 49:1

visible

91:10
106:15,23
107:2
152:22
158:7

visit  12:19
46:23
67:16
74:25
77:3,20
78:8  80:7,
 11  83:25
84:25
85:1,4,15
86:21
87:14,17
88:24
89:1,2,4,
 8,14  90:13
96:5
109:12
123:10
126:15,17,
 20,25
127:2
130:8
132:22
134:13
135:5
154:11
155:15,22
177:8
181:3,8,
 12,16
184:12,14

visitation
 77:6,8,10

110:13
117:11
157:9
158:24
185:3,7
186:24

visited  58:5
165:5
184:9

visiting
85:7
177:19
178:15,20
183:10

visitors
60:7,22
80:3

visits  49:17
53:11
67:23  83:1
84:18,20
85:5,16
89:20  94:7
126:21
129:24
156:16,20
182:14,16,
 21  183:4,
 6,10,18,23
184:3
188:8,12,
 20

Vivia  180:22

voice  109:19

voluntarily

---

147:14

————————————

W

————————————

W-2   31:5

waist   140:14

wait   77:1
  129:1,7
  140:12
  177:8

waiting   34:3
  177:15,21

waive   167:15

waiver   168:5

wake
  146:10,12

walk   46:5
  77:4 94:24
  126:16
  158:5,9
  177:11

walked   95:8
  171:2

walking   45:7
  53:7 77:8
  90:9
  158:20
  177:10

wall   152:20
  156:24
  157:21,24
  158:11
  185:13,14,
  16

walls   152:17

wanted   8:15
  19:11,12,
  20 21:19
  28:17
  37:15
  64:21
  65:21,22
  89:15 94:8
  95:15
  110:12
  114:21
  125:3,4
  131:15,25
  135:14,16
  170:23
  171:14,23

wanting   56:1
  65:2 114:7

Ward   180:6

warden   81:20
  84:3 99:7
  110:10,12
  135:8
  176:25
  177:1,22

warrant
  128:8
  129:22
  137:1,5,13
  174:19

waste   171:4

watch   88:25
  171:24

watched

130:11

watching
  90:6
  129:24

ways   54:4
  129:4

weapons   24:8
  181:22
  188:15
  189:2

wear   55:11,
  20 95:14

wearing   56:7
  68:21
  94:17
  95:19

week   30:13,
  17 33:10,
  17 119:2
  139:2

weekly   50:24

weeks   49:16
  72:18
  147:19
  169:6,15
  172:25
  181:9,13

weird   141:3
  185:5

welfare
  43:14

well-being
  150:25

wepers
  188:15

whatsoever
  21:22

Wi-fi   110:21

widely   57:4

window   57:9
  159:7,9

windows
  156:25
  157:5,8
  158:11
  159:2

Wing   14:16
  29:24
  31:20
  147:3

Winne   140:5,
  16 141:7

witnesses
  132:24
  148:10

woman   53:17
  55:1 114:1
  117:5

women   55:6
  60:17,21,
  22 61:4
  62:12
  117:7
  164:15

wondering
  127:15

**LILY ENGLEMAN vs NATHAN ADKERSON, ET AL.**
Lily Engleman on 02/14/2023                    Index: word..years

word  33:2
  41:22
  124:3

wore  34:21
  68:21
  95:7,18

work  13:11
  14:2,5,10,
  22 15:6,8,
  14,19,21,
  23 17:9
  19:10
  20:16
  23:12
  24:6,12,
  14,22,24
  25:9,25
  26:10,20
  27:10
  28:13,15
  29:8 30:4,
  5 32:24
  33:10 35:5
  40:6,9
  43:13,16
  48:3 51:1
  58:8 63:20
  66:6 73:16
  81:16
  101:15,21
  111:16
  114:20
  117:2,11
  124:24
  136:18,19
  137:8
  142:13

146:14
147:5,20
148:2
150:11
181:14
191:8

worked  14:7
  28:20
  29:9,10,
  11,13,14
  30:10 35:2
  41:18,21
  43:14 57:2
  71:20
  72:22
  75:11
  79:12
  113:1
  126:8
  146:5
  187:7

worker  15:13
  16:15,17
  19:24
  34:24
  36:19
  45:18,19
  90:11

workers  17:1
  20:2

working
  14:3,15
  18:2 24:12
  27:9 28:10
  29:24
  30:11
  31:19

33:17
34:24
40:14
42:16
44:4,14,19
47:23 51:2
61:5 71:12
72:12,16
73:6,11
100:22
125:11
135:7
147:2,12,
23 149:6
178:25
179:2

workplace
  67:15

works  17:10
  102:3

world  51:7
  58:11
  144:12

worried
  44:21
  155:3
  179:5

worry  154:14
  155:2

worse  89:12

worst  63:18

wrapped
  37:14

wraps  36:23

write  78:8
  160:8
  161:8,17,
  18,21
  162:10,13,
  21,25

writing  78:7
  123:10
  162:9,10

written
  22:14
  79:18
  155:7
  161:10

wrote  22:18,
  22 175:15
  189:19

─────────────
      Y
─────────────

year  13:14,
  16,17,18
  17:3 18:22
  21:13,17
  24:17
  27:14
  29:23,24
  55:15,17
  137:17
  142:6
  150:19
  166:21,23
  170:16,17
  180:25

years  10:24
  15:23 16:1
  21:13,14

```
   32:5 34:3
   41:19
   47:24 68:6
   85:8 94:11
   107:16
   113:5
   124:23
   177:24
   181:8

yesterday
   110:24

yet also
   116:14

yielded
   139:18

you-all  18:5
   63:22 87:5
   110:3
   117:11

young  55:1
   114:1,6,25
   117:5,6

younger  11:7
   114:4


        Z

zoom  17:15
   18:1 50:25
   85:21
   123:9
   155:2,5
   165:16

zoom-in
   156:2
```