**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **LILY ENGLEMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION FILE** |
| **v.** | ) | **NO.:  1:21-cv-01992-MLB** |
| | ) | |
| **NATHAN ADKERSON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**DEFENDANT JONATHAN ADAMS' RESPONSES TO PLAINTIFF'S**</u>
<u>**STATEMENT OF ADDITIONAL MATERIAL FACTS**</u>

COMES NOW, Defendant Jonathan Adams (hereinafter "District Attorney Adams"), named as Defendant in the above-styled matter and pursuant to Fed. R. Civ. Pro. 56(B)(3), hereby files his Responses to Plaintiff's Statement of Additional Material Facts, showing the Court as follows:

**Lily Engleman, Ricky Dubose, and Nathan Adkerson**

1. In the fall of 2019, Plaintiff Lily Engleman was a mitigation specialist and licensed social worker with the Office of the Georgia Capital Defender, a position she had held since 2017 and her first job after earning her master's degree in social work from Georgia State University in May of 2017. (See Engleman Depo. pp. 13-14, 45.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

1

2.  Ms. Engleman's work as a mitigation specialist involved working as part of a capital defendant's criminal defense team to prepare for the mitigation phase of the capital trial; the work involved spending time with and interviewing the clients and their family members, teachers, and medical providers, collecting and reviewing records, identifying and working with potential expert witnesses, and developing themes and theories in support of the defense of the capital client with the aim of preparing the defense team with as much relevant information as possible to advocate against the execution of the client at the death penalty phase of the criminal trial. (See Id. at 46-47.)
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

3.  Ms. Engleman used her skills as a counselor to find the best manner and methods of communication – both verbal and non-verbal – to build rapport with her clients so that the client would feel comfortable sharing personal details of their lives that may help in the capital phase of their case. (See, e.g., Engleman Depo., pp. 53-54.)
    **RESPONSE: District Attorney Adams objects to this statement as improper, irrelevant, and not material**

4.  As part of her job with the Office of the Georgia Capital Defender, Ms. Engleman was assigned to the defense of Ricky Dubose; the Dubose defense team consisted of approximately seven professionals – four attorneys, two mitigation specialists, and a fact investigator. (Id. at 179-80.)
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

5.  Dubose was accused (and ultimately convicted) in a high-profile criminal case in which Dubose and a co-defendant killed two Department of Corrections officers while escaping from custody in 2017. (See, e.g., Adkerson Depo., pp. 54-55.)
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

2

6. Defendant Nathan Adkerson is a special investigator with the Office of Professional Standards ("OPS"), the criminal investigation division of the Georgia Department of Corrections ("GDC"). (Adkerson Depo., p. 22.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

7. Adkerson had investigated the Dubose capital case and worked with the prosecution – the day Dubose and his co-defendant killed two GDC guards and escaped, Adkerson himself responded to the location of the murders and interviewed witnesses, he set up for three days at the command post during the manhunt for Dubose and his co-defendant checking locations and following leads, and he later continued to investigate Dubose and Dubose's co-defendant's histories within GDC facilities to help with their criminal prosecutions. (Id. at 54-58.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

8. In the summer and fall of 2019, Dubose was housed at the Special Management Unit ("SMU"). (See Id. at 60-61.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

### Rampant Contraband at SMU in 2019

9. In the summer and fall of 2019, contraband was rampant at SMU. (Morales Depo., pp. 22-24.) Morales would find contraband every day, and cigarettes were routinely found in the holding cells where incarcerated people had non-contact visits with family and other personal visitors. (Id.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

10. Adkerson was intimately familiar with the rampant contraband at SMU; he worked primarily out of SMU and the Georgia Diagnostic Prison and testified

3

that 40-60% of his caseload of 300-400 cases involved investigating contraband with an additional percentage involving corruption (which centered around corruption related to staff bringing in contraband). (Adkerson Depo., p. 100.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

11. During his work before September 2019, it was Adkerson's experience that contraband came from family members and GDC staff, with throw-overs and drone drops also contributing to the contraband problem; Adkerson was not aware of any instance of smuggling on the part of an incarcerated person's attorney or member of the legal team. (Id. at 99-101.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

### Adkerson's Investigation into Dubose's Criminal Defense Team

12. On September 13, 2019, Adkerson was at SMU to investigate a contraband incident that was unrelated to Dubose – an incarcerated person's fiancée had tried to smuggle $300 and a wedding ring. (Id. at 74.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

13. While Adkerson was at SMU on September 13, 2019, Warden Morales approached him about some suspicious notes he had found in the trash. (Morales Depo., pp. 36-37.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

14. Morales found the notes in a bag of trash on the ground sitting between cells (Id. at 28.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

15. The trash bag was filled with trash gathered from many different cells (F building had 28 cells), and it also contained trash and waste that had been clogging the sewage system. (Id. at 28-30.)
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

16. The notes Morales brought to Adkerson on September 13, 2019, are copied here. (Id. at 36-37, Exhibit 1.)
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

17. The notes are undated with no page numbers. (Id.)
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

18. Regarding "L" – the notes clearly implicate "L" as being involved in a smuggling operation, but there is some ambiguity. The notes state that drugs will be picked-up from "L" and put in balloons so that "she" can bring the drugs next week or the following, but it is ambiguous whether "L" is smuggling the contraband directly or preparing the contraband to be picked-up by "she". (Id.)
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

19. Morales agreed that the notes are ambiguous and can be read multiple ways as to what role "L" plays in the smuggling operation – preparing packages to be picked-up by someone else to smuggle in or preparing the packages and smuggling them in. (Morales Depo., pp. 37-40.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

20. It is also unclear when the contraband in balloons from "L" will be picked- up and brought into SMU; the note references the alleged smuggling plot taking place in the future – next week or the following week – but the notes are undated. (Id. at 36-37, Exhibit 1.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

21. There is also a statement in the notes that "the MF aint even search me," but it is unclear who "she" is, who "the MF" is, and when the MF did not search the writer. (Id.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

22. The notes say nothing about Ms. Engleman. (Id.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

23. According to Morales's Deposition testimony, after Adkerson received these notes from Morales, Adkerson decided to investigate Dubose's criminal defense team and requested to review video footage from Dubose's most recent contact meetings with members of his defense team. (See, e.g., Morales

Depo., p. 42 (after securing the notes from Warden Morales, Adkerson "wanted to – to see the cameras").)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

24. Dubose had most recently met with the fact investigator on his capital defense team, Vyvia Cabiness-Harris ("Harris") on September 12, the day before the notes were found. (See Adkerson Depo., Exhibit 3 (email from Adkerson to his superiors on September 13, 2019).) Prior to that, Dubose had met with Ms. Engleman on September 6, one week before the notes were found. (Id.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

25. Adkerson and Moss pulled and reviewed the video from these two privileged meetings between Dubose and members of his legal team (Id.; see also Morales Depo., pp. 45-50.)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

26. Adkerson was aware at the time that there were constitutional concerns with watching a video recording of a capital defendant meeting with a member of his defense team, but he weighed Mr. Dubose's privacy concerns against his own concerns with security and decided the security concerns outweighed Mr. Dubose's constitutional rights. (Adkerson Depo., pp. 93-94 ("I had to weigh, at the time, security issues there, concerns of a possible escape attempt, contraband coming in, with not trying to violate Mr. Dubose's constitutional rights. And it was security and safety of the public and people there and trying not to violate his rights at the time.").)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

27. Adkerson emailed his superiors that afternoon that both videos showed contraband being passed to Dubose. (See Adkerson Depo., Exhibit 3.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

28. Starting with Adkerson's account of the September 6 Engleman-Dubose visit, Adkerson tells his superiors that the video shows Ms. Engleman pass a blue object to Dubose – the vides shows her "reach behind her back and appear to be holding some blue in color object" and that one can then see her "reach under the table and appear to drop something" after which Dubose "takes his right foot and appears to pick something up with his foot and then he conceals the item in his sock and shoe." (Adkerson Depo., Exhibit 3 (highlighting supplied), also found as Jordan Depo., Exhibit 1)
    **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

29. In contrast to Adkerson's e-mail description of the Engleman-Dubose meeting, Adkerson testified in his deposition (after being sued and developing his legal defense) that he always subjectively believed that the Engleman-Dubose meeting was only suspicious and "open to interpretation," as to whether the video showed an actual item of contraband being passed, that he "can't really see anything drop," but that he interpreted the body language communication between Ms. Engleman and her client that he viewed in their private and privileged meeting to suggest that she had passed Dubose contraband. (Adkerson Depo., pp 121-23, 179-80.)
    **RESPONSE: District Attorney Adams objects to this statement as improper and argumentative/speculative.**

30. Maryjane Moss also viewed the video of the September 6 meeting and described it as "suspicious," but she testified that the video does not show any object passed from Ms. Engleman to Dubose. (Moss Depo., p. 33-36.)
    **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

31. Objectively, the video does not show any item or items being passed by Ms. Engleman to Dubose or Dubose concealing any item(s) in his socks. (Doc. 25. (filed under seal).)
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper and argumentative/speculative.**

32. While Adkerson represented in this email that the notes appeared to corroborate Adkerson's claim that Ms. Engleman had passed Dubose contraband on September 6, a week before the notes were discovered (Adkerson Depo., Exhibit. 3), the "notes" themselves reference a future smuggling plot that may include one or two other people, including one person identified as "L" – not something smuggled by "L" in the past, and nothing about Ms. Engleman or her September 6, 2019, visit. (Morales Depo., Exhibit 1).
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper and argumentative/speculative.**

33. Regarding Adkerson's account of the September 12 Harris-Dubose visit, Adkerson recounted that the video showed Harris slide Dubose a package that he picked up and put in his crotch. (Id.)
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

34. After Adkerson and Morales viewed the Dubose-Harris video on September 13, Morales searched the holding cell where Dubose was moved after his September 12 visit with Harris and found contraband tobacco in the back of the holding cell. (Id.)
    **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

35. Morales also reported that Dubose had turned the video camera in that holding cell – the holding cell where Dubose was placed after his visit with Harris and where Morales had discovered the contraband tobacco – toward the wall. (Id.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

36. There is no mention in Adkerson's September 13 e-mail that any contraband was found in connection with the September 6, 2019, Engleman-Dubose meeting; the e-mail makes clear that the contraband was found in the cell where Dubose was moved after his September 12 visit with Harris. (Id.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

37. Despite his initial understanding that the contraband found in the holding cell on September 13 implicated Harris, when Adkerson presented his case against Ms. Engleman to prosecutors and the magistrate, he told them that that this contraband was found in the holding cell after Dubose's meeting with Ms. Engleman – presenting the evidence he had that was inculpatory of Harris as though it inculpated Ms. Engleman. (See, e.g., Adkerson Depo., pp. 87-88.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

38. SMU policy was to strip search an incarcerated person after an attorney- client contact visit (Morales Depo., pp. 53-55), and there were no items discovered on Dubose during a strip search after his meeting with Ms. Engleman on September 6, 2019 (See generally Adkerson Depo. Exhibit 1 (the full investigative file makes no mention of any contraband found on Dubose after his meeting with Ms. Engleman on September 6, 2019)).
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

39. In pushing his case against Ms. Engleman, however, Adkerson testified that Warden Morales told him that Dubose was not strip searched after his September 6 visit with Ms. Engleman. (Adkerson Depo., p. 147.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

40. For his part, Morales testified in his deposition and in a separate court proceeding that SMU policy was to strip search an incarcerated person after an attorney-client contact visit and, to Warden Morales's knowledge, Dubose was strip searched after his contact visit with Ms. Engleman on September 6. (See Morales Depo., pp. 53-55.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

41. Moreover, Adkerson did not make any mention of Warden Morales allegedly telling him that Dubose was not strip searched after September 6 meeting anywhere in his investigative notes, and Adkerson even admitted in his deposition that in the three-plus years after the investigation began, he never mentioned to anybody that Morales told him Dubose had not been searched after his meeting with Ms. Engleman – the very first time he made the claim that Warden Morales told him that was in his deposition. (Adkerson Depo., pp. 115-16, 147.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

### Adkerson Meets with Adams and Nix

42. Based on Adkerson's description of the video and statement that the notes appeared to corroborate the video to his superiors, he and his superiors, including Defendant William Clayton "Clay" Nix, Director of OPS, scheduled a meeting with the Butts County District Attorney, Defendant Jonathan Adams, to discuss a potential case against Ms. Engleman during the week of September 13, 2019. (See Adkerson Depo., pp. 102-04; see also Adams Depo., pp. 20-22.)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

43. Tomekia Jordan testified that OPS agents met with the DA's office to "determine whether or not the district attorney would support criminal charges" (Jordan depo., pp. 38-39) and that the DA's office approved of Adkerson seeking charges (Jordan depo., p. 41).
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

44. Before showing the September 6 video to Defendant Adams, Defendant Nix, and others at the mid-September meeting, Adkerson told those in attendance that the video was going to show Ms. Engleman passing Dubose contraband, priming his audience to expect the video to show the passing of contraband. (See Adams Depo., p. 23.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

45. Defendant Adkerson testified in his deposition that it was the consensus of everyone in the room that the video was open to interpretation as to whether Ms. Engleman can be seen passing contraband to Dubose. (Adkerson Depo., pp. 122-23.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

46. In contrast, Defendant Adams testified that there was no discussion at the meeting of the video being open to interpretation and that he believed he saw the same thing that Adkerson told him he would see before showing him the video. (Adams Depo., p. 27.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

47. Defendant Adams testified that Adkerson specifically told everyone at the meeting that the video showed Ms. Engleman passing contraband to Dubose. (See id.)
    **RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

48. Defendant Adams did eventually acknowledge that the video objectively does not show any contraband or that he does not recall actually seeing any contraband in the video. (See id. at 67).
    **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

49. Defendant Nix similarly testified that at this meeting led by Adkerson there was no discussion of the video being open to interpretation as to whether Ms. Engleman passed Dubose any contraband and that the only discussion was that there was an item and that they simply did not know what it was. (See Nix Depo., p. 51.)
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

50. Adams recalls that Adkerson, as lead investigator, also presented the facts and evidentiary support he believed he had in support of arresting and prosecuting Ms. Engleman. (Adams Depo., p. 22.)
    **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

51. Adams recalls that Adkerson presented the following evidence in support of his "case" against Ms. Engleman: a. The video; b. A note that contained information about contraband and that "L" had provided the contraband; c. There had been a cell inspection that had produced contraband; and d. There was an incarcerated person who would testify that Dubose had told him that his legal team was bringing in contraband. (See Adams Depo., p. 20.)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

52. It seems Adkerson kept Adams oblivious as to the ambiguities within the "L" note and what it actually says. (See id.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

53. In his deposition, Adams acknowledged that the note is ambiguous as to whether "L" is the supplier or the smuggler, and he acknowledged the obvious – that "L" could refer to anybody with or without an "L" in their name. (Id. At 51.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

54. By Adams's account, he was also oblivious to the circumstances of the contraband found by Morales in the holding cell and was obviously oblivious to the fact that it implicated Harris rather than Ms. Engleman. (See id. at 54-58 (lacking any detailed specifics of the contraband found, other than he believed from Adkerson that the contraband inculpated Ms. Engleman).)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

55. The evidence concerning the statements of another incarcerated person was not uncovered until late-October 2019 – after this initial meeting – and they are exculpatory of Ms. Engleman (See Adkerson Depo., Exhibit 1, Adkerson 00094-00097.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

56. Still, it is evident from Adams's testimony that Adkerson presented this evidence to him at some point, but Adkerson never told Adams that this

witness (Javaris Roundtree) actually provided an exculpatory statement concerning Ms. Engleman and provided detailed evidence that pointed away from Ms. Engleman being the "L" from the notes. (Compare Adams Depo., p. 20 (even at his Deposition, Adams still believed that the other incarcerated person's testimony would generally support the case against Ms. Engleman, with seemingly no knowledge that the witness said nothing to inculpate Ms. Engleman and actually provided a statement that explicitly exculpated Ms. Engleman) with Adkerson Depo. Exhibit 1, Adkerson 00094-00097 (notes from Adkerson's interview with Roundtree).)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

### The Live Surveillance of Privileged Attorney-Client Meetings Begins

57. At the mid-September meeting, Adkerson advised Adams that he intended to surveil Dubose's meetings with his capital defense team in real time; he intended to access the video system in the attorney-client visitation room while Dubose met with members of his legal team and to watch those meetings in real time. (Adams Depo., pp. 31-33.)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

58. In the September meeting, nobody discussed getting a warrant to surveil these meetings, nor did any of the participants reach out to legal counsel to discuss the legal propriety of surreptitiously watching and recording meetings between a capital defendant and his legal defense team. (Adams Depo. pp. 32-36.)

**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

59. Adkerson live-monitored a number of additional meetings between Dubose and his defense team. (See Adkerson Depo., pp. 142-43, 186.)

**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

60. Ms. Engleman's next meeting with Dubose was on October 8, 2019; Adkerson live-monitored this privileged meeting between Ms. Engleman and her client. (Adkerson Depo., p. 142.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

61. Adkerson did not see anything being passed between Ms. Engleman and Dubose when live-monitoring this meeting, and nothing was found on Dubose when he was searched after the visit. (Adkerson Depo., p. 143.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

62. Adkerson and Moss live-monitored a meeting between Dubose and his lawyer, Nathanial Studelska on September 24, 2019, where Studelska did not pass anything to Dubose and nothing was found on Dubose when he was searched after the visit. (Adkerson Depo., Exhibit 1, Adkerson 00073.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

63. Finally, Adkerson and Moss live-monitored a meeting between Dubose and Ms. Engleman on November 6, 2019, where again nothing was passed. (Adkerson Depo., p. 186, Exhibit 1, Adkerson 00109.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

64. In fact, Adkerson did not see anybody pass Dubose anything during any of the times that he live-monitored privileged meetings between Dubose and his capital defense team. (See supra.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

### Second Meeting Between Adkerson, Adams, and Nix

65. Adkerson met again with Adams, Nix, and others on October 15, 2019, and the decision was made to seek an arrest warrant and have Ms. Engleman arrested and prosecuted based on Adkerson's description of the evidence against her. (See Adkerson Depo., p. 125.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

66. Adkerson maintains in this litigation that the decision was made to proceed against Ms. Engleman based on the totality of the evidence that he presented, which he described as "the video, the notes, the interviews with the other inmates, the observations …." (Adkerson Depo., pp. 153-55.)
**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

67. Adams testified that the decision was made to proceed against Ms. Engleman based on the video, Adkerson's characterization of the contraband found in the cell (i.e. evidence of Ms. Engleman's guilt rather than Harris's), the notes found by Morales, and the other incarcerated person's statement. (See Adams Depo., p. 31.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

68. Adkerson and Adams both mention the interviews of other incarcerated people as supporting the decision to seek a warrant for Ms. Engleman's arrest at the October 15th meeting, but these interviews did not happen until after the meeting on October 15, 2019. (See Adkerson Depo., Exhibit 1, Adkerson 00094-00097, Adkerson 00098-00101.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

69. Nix, on the other hand, testified that the decision to seek a warrant against Ms. Engleman was made based on the video, alone. (See Nix Depo., pp. 51-52.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

70. Jordan described the meeting as follows, "I mean, we provided what we had and then we asked did [Adams] advise us -- we asked if we had enough to seek a warrant, and he advised us that we did." (Jordan depo., p. 62.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

71. Likewise, Nix testified that the purpose of meeting with Adams was to determine if Adams would support criminal charges against Ms. Engleman (Nix Depo., p. 48); Nix explained that if Adams had said no, "we wouldn't have pursued the matter no further at that point. But when he said he would support it, then I told them to go ahead and continue their investigation." (Nix Depo., p. 50.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

72. Nix even had Adkerson check back in with Adams one more time before taking out the warrant to be sure that Adams would support the decision (Nix Depo., pp. 52, 58.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

73. Adkerson testified, "after talking to Mr. Adams, he indicated that he would be comfortable if we proceeded with the one count of providing items prohibited to an inmate. Obviously from the video, could we say what the items were 100 percent conclusive? No. But on the face of the statute, he -- she can't -- or nobody can give Dubose something without prior approval from the Warden or consent of the Warden." (Adkerson depo., p. 153.)

**RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

74. When John Richey, OPS Deputy Director, found out that Adkerson planned to take out a warrant against Ms. Engleman, he called Adkerson out of concern. (Richey Depo., pp. 53-54.)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

75. Richey asked Adkerson to walk through the evidence with a fine-tooth comb to describe all the evidence Adkerson believed supported a charging decision, which Richey recalled being that Adkerson believed that Ms. Engleman had passed Dubose a pen or a pencil. (Richey Depo., pp. 54-56.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

76. Richey made it known that it was his position that it would be unreasonable to take out a warrant based on the evidence Adkerson presented to him. (Richey Depo., p. 57.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

77. Adkerson responded by telling Richey that the prosecutor's office was willing to prosecute, giving Richey the impression that Adkerson had been given direction by the DA's office to prosecute. (Richey Depo., pp. 58-59.)
**RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

**Adkerson's "Evidence" Against Ms. Engleman Gets Weaker Before He Seeks the Warrant for Her Arrest**

78. On October 23rd and 24th, 2019, Adkerson interviewed Javaris Roundtree, Dubose's cell mate. (Adkerson Depo., pp. 162-66, 229; see also Adkerson Depo., Exhibit 1, Adkerson 00094-00097 ("Roundtree Interview Notes"),

Audio Recording of Roundtree Interview ("Roundtree Interview Recording," Exhibit A hereto).)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

79. Roundtree identified numerous sources of contraband at SMU, including several lieutenants, correctional officers, and a counselor. (See id.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

80. In the October 23 interview, Roundtree identified a black female on Dubose's defense team who was bringing contraband into SMU. (Id.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

81. Roundtree identified the black female on Dubose's defense team who had brought contraband to Dubose by name – Vyvia Harris. (Id.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

82. Adkerson learned that Harris was saved into Roundtree's and Dubose's contraband cell phone as "TULU." (Id.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this**

**statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

83. Roundtree's interview corroborated the evidence Adkerson had against Harris – the September 12, 2019, video, which showed Harris passing Dubose contraband, and the September 13 search of the holding cell where Dubose was taken after his visit with Harris, where Morales found the contraband mentioned in the prison note and where Dubose had turned the camera to point into the wall. (See id., Adkerson Depo., Exhibit 3.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

84. In the October 24 interview, Roundtree reported that a female member of Dubose's gang the Ghostface Gangsters, who was outside the prison, was part of a smuggling operation and escape plan with Dubose, where she and other Ghostface Gangsters were planning to use a drone to smuggle a gun into SMU which Dubose would use to escape, and this female Ghostface Gangster had a last name starting with "L" – Diamond Loyd. (Id.) Adkerson even had Roundtree identify Loyd's picture out from downloads in a contraband cell phone. (Id.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

85. The audio recording of the interview reveals that Adkerson pressed hard for information from Roundtree about Ms. Engleman, but Roundtree specifically said that Ms. Engleman was "not doing nothing" – and that he was "positive" of this fact. The relevant portion of the recording reads as follows (Roundtree Interview Recording at 34:14): Timestamp: 34:14 – 35:24 ADKERSON: And you mentioned Lily…what's the deal with Lily? ROUNDTREE: She not doing nothing. ADKERSON: You sure? ROUNDTREE: Positive. [Pause] ADKERSON: Got her on video passing two items to him. ROUNDTREE: [unintelligible]. ADKERSON: Wrapped up in a ball? MOSS: That he puts in

his sock? ROUNDTREE: …I don't know about that…didn't know that. MOSS: he's been holding out on you ADKERSON: Brother been-- ROUNDTREE: that must have been recently, though ADKERSON: Brother done held out something on you.

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

86. Ultimately, Roundtree identified numerous sources of contraband who could have been the "L" in the prison notes: one, and only one, member of Dubose's defense team, a black female named Vivya who ran by the name "Tulu;" Dubose's Ghostface Gangster accomplice Diamond Loyd; and several lieutenants. (Id.) But when asked about Ms. Engleman, Roundtree said she was not bringing in contraband. (Id.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

87. Adkerson interviewed Dubose directly on October 25th and October 30th, 2019. (Adkerson Depo., Exhibit 1, Adkerson 00098-00101 ("Dubose Interview Notes"), October 25th Audio Recording (Exhibit B hereto)).

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

88. In the October 25th interview, in both the notes and the recording itself, Dubose identified numerous sources of contraband into SMU, including several lieutenants, correctional officers, and a counselor, but there is no mention of his defense team. (See id.)

**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this**

**statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

89. According to Adkerson's notes concerning the October 30th interview, Dubose admitted to Adkerson to having received "stuff" from his defense team in the past, but his notes do not indicate that the "stuff" was contraband, as opposed to legitimate legal materials. (Dubose Interview Notes at Adkerson 00100.)
   **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

90. According to the same notes, when Adkerson asked Dubose directly about contraband coming from Ms. Engleman, Dubose specifically denied having ever received any contraband from her. (Id.)
   **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

91. The audio recording of the October 30th interview is conspicuously missing from the case file Adkerson turned over to the District Attorney. The interview itself was recorded, as Adkerson states in his notes from the interview (see Dubose Interview Notes, Adkerson 00101 ("For further details, refer to the recording of this interview, which was captured using a digital recorder. The recording will be saved to a CD and placed in the rear of the case file.")), but that recording was never turned over to Ms. Engleman in criminal discovery as part of the case file Adkerson turned over to the prosecution, while the case file did contain all the recordings of the Roundtree interviews and the other Dubose interview (see Engleman Affidavit, Exhibit C hereto).
   **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory, and speculative allegation and contrary to the evidence.**

**Adkerson's False Statements Under Oath and Misleading Omissions to the Magistrate**

92. Adkerson applied for an arrest warrant against Ms. Engleman on November 4, 2019. (See Adkerson Depo., p. 171, Exhibit 4.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

93. Adkerson swore out an affidavit with the operant language below. Id.
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

94. In his affidavit, Adkerson swore under oath that "on the date of September 6, 2019 at between 3:42 p.m. and 3:39 p.m. hours [Ms. Engleman] was observed passing [Dubose] two small unknown items that [Dubose] was observed picking the items up from the floor and then hiding said items in his socks as to avoid detection by staff." (Id. (emphasis added).)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. Otherwise, the Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

95. Adkerson did not swear in his affidavit that it was his interpretation of the body language or belief that something was passed or that it was "open to interpretation" whether any contraband was passed. (See id.)
**RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

96. Nor did Adkerson indicate in his affidavit that there even was a video – he only states that Ms. Engleman "was observed" passing contraband. (Id.)
   **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves.  District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

97. In his deposition, Adkerson contends that while his arrest warrant affidavit is unequivocal in what Ms. Engleman and Dubose were "observed" doing on September 6, 2019, he contradicted his sworn written testimony in an unrecorded FaceTime oral testimony to the magistrate, telling the magistrate that he would not feel comfortable moving forward based on his interpretation of the body language in the video, alone. (See Adkerson Depo., p. 180.)
   **RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

98. Adkerson did not show the magistrate the video. (Id. at 179.)
   **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

99. According to Adkerson's Deposition version of events, he presented the following to the magistrate: a. He presented his sworn statement that on September 6, 2019, Ms. Engleman "was observed" passing two items to Dubose and that Dubose "was observed" hiding two items in his socks; b. He gave a contradictory oral description that, notwithstanding his affidavit, the video was less clear and that he would not feel comfortable proceeding with an observation of the video, alone; c. He provided a description of the "L" notes, but he did not show or read the notes to the judge; d. He identified the items of contraband that were found in the holding cell on September 13, 2019 – as though they were inculpatory of Ms. Engleman rather than Harris; e. He told the magistrate that Roundtree had told him that Dubose's "defense team was bringing contraband in," and he told the magistrate that Roundtree did not identify a specific member of the defense team who was involved; and f. He told the magistrate that Dubose had confirmed that members of his defense team "was bringing in contraband." (Id. at 171-181.)

**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

100. Adkerson's account of how he described the video to the magistrate strains credibility because it directly contradicts his affidavit, of course, and because it runs counter to every previous description of the video that he provided to anybody, anywhere, at any point prior to his deposition, including, but not limited to, the following: a. On the date that he first saw the video, Adkerson reported to his superiors that the video showed Ms. Engleman reaching behind her back and dropping a blue object that appeared to be a balloon (Adkerson Depo., Exhibit 3.) b. Adkerson described the video to his superior, Tomekia Jordan, the same way he did in the September 13 e-mail – that the video showed Ms. Engelman dropping a blue object on the ground that Dubose put in his sock. (Jordan Depo., pp. 34-35.) According to Ms. Jordan, Adkerson never expressed that the video was open to interpretation over whether it showed contraband being passed. (Id. at 42-43.) c. Maryjane Moss, who was new at the time and who reported to Adkerson, testified that she never saw any contraband in the video, but that at the initial all-hands meeting with their superiors, Adkerson told everybody in the meeting that the video showed an object being passed – and he did so before he showed the video. (Moss Depo., pp. 40, 49-50.) d. Clay Nix, Director of OPS, testified that in the first meeting with Adkerson, when Adkerson first played the video of the September 6, 2019, visit for him, that Adkerson did not suggest that the video was open to interpretation as to whether it showed a piece of contraband (Nix Depo., p. 43.) e. Likewise, Adams testified that Adkerson told him before viewing the video that the video would show Ms. Engleman passing contraband – he does not recall the exact number of items that Adkerson told him would be passed. (Adams Depo., pp. 23-29.) f.    When Adkerson was later trying to secure a search warrant for Ms. Engleman's phone, he wrote the following description of the video in the draft warrant application that he sent to the assistant district attorney. (Adkerson Depo., Exhibit 5, pp. 5-7 (emphasis in the original).)
**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

101. Even in his Deposition version of events, Adkerson's other material misstatements and omissions to the magistrate – not counting the misrepresentations concerning the video – are laid bare: a. Adkerson

identified the contraband found in the holding cell as inculpating Ms. Engleman (see Adkerson Depo., pp. 178-79), while knowing full well: (1) the contraband was found on September 13 in the holding cell where Dubose had been taken after his meeting with Harris on September 12; (2) Dubose also turned the camera in that holding cell into the wall after his September 12 meeting with Harris; and (3) by contrast, Dubose had met with Ms. Engleman a week before the search, it is not even clear Dubose was housed in that holding cell after the visit with Ms. Engleman, and the holding cell was a high-traffic area4 where Morales had previously found cigarette butts. Adkerson knew this evidence inculpated Harris, not Ms. Engleman, but he used it in his presentations of his "case" against Ms. Engleman; b. Adkerson identified Roundtree to the magistrate as a witness who will inculpate Ms. Engleman by testifying that Dubose's defense team generally was bringing in contraband and "not identifying any specific team member." (See Adkerson Depo., p. 175.) This is categorically false. Roundtree specifically identified a black female named Harris, or "TULU," as the only member of Dubose's defense team he knew who had brought contraband into SMU. Roundtree explicitly stated he was "positive" Ms. Engleman was "not doing nothing." (Roundtree Interview Notes; Roundtree Interview Recording.) c. Adkerson described the "L" note to the magistrate as inculpating Ms. Engleman, (see Adkerson Depo., pp. 177-78), but he omitted the numerous other potential "L's" that he found during his investigation – Loyd, TULU, lieutenants, etc. (see Roundtree Interview Notes, Roundtree Interview Recording, Dubose Interview Notes, Dubose Interview Recording). He also omitted the numerous and obvious ambiguities concerning the notes to the magistrate. (See Morales Depo., pp. 36-37, Exhibit 1.) d. Adkerson presented the Dubose interview as also inculpating Ms. Engleman, (see Adkerson Depo., p. 176), but he omitted that he had explicitly asked Dubose about Ms. Engleman and that he had denied that she had ever brought him contraband (see Dubose Interview Notes). **RESPONSE: District Attorney Adams objects to this statement to the extent it contradicts the referenced document(s)/recording(s), which speak for themselves. District Attorney Adams further objects to this statement as improper, argumentative/speculative, and not material.**

102. Based on Adkerson's affirmative misrepresentations and material omissions, discussed above, the magistrate issued an arrest warrant for Ms. Engleman's arrest on November 4, 2019. (Adkerson Depo., p. 173.)

**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

### Ms. Engleman Arrested, Perp-Walked, Indicted, Fired, and Ultimately Cleared

103. After Ms. Engleman's next visit with her client, Dubose, on November 6, 2019, Adkerson arrested her. (Adkerson Depo., pp. 184, 186.)
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

104. Someone had tipped-off WSB-TV News so that Ms. Engleman could be perp-walked in front of their cameras and pointed questions from their investigative reporter who had been prepared to badger and embarrass her. (Engleman Depo., p. 140.)
    **RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**

105. On October 14, 2020, Adkerson went before a grand jury and presented the case.
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

106. Ms. Engleman was indicted based on Adkerson's version of the facts.
    **RESPONSE: The Court may properly consider this statement for purposes of summary judgment; this does not create a genuine issue of material fact.**

107. After being indicted, Ms. Engleman was fired from her job as a mitigation specialist with the Office of the Georgia Capital Defender. (Engleman Depo., p. 37.)
    **RESPONSE: District Attorney Adams objects to this statement as a self-serving, conclusory allegation and contrary to the evidence.**

108. On May 6, 2021, more than a year and a half after she was arrested, the charges against Ms. Engleman were finally dismissed.

**RESPONSE: District Attorney Adams objects to this statement as improper, speculative/argumentative, and not material.**


This 7th day of July, 2023.

Respectfully submitted,

**BUCKLEY CHRISTOPHER & HENSEL, P.C.[1]**

/s/ Timothy J. Buckley III

_____

TIMOTHY J. BUCKLEY III
Georgia State Bar No. 092913
ERIC J. O'BRIEN
Georgia State Bar No. 383745
Attorneys for District Attorney Adams

2970 Clairmont Road NE
Suite 650
Atlanta, Georgia 30329
(404) 633-9230 (telephone)
(404) 633-9640 (facsimile)
tbuckley@bchlawpc.com
eobrien@bchlawpc.com

---

[1] Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

29

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2023, I electronically filed DEFENDANT JONATHAN ADAMS' RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record:

Mark A. Begnaud
Michael J. Eshman
Eshman Begnaud, LLC
315 W. Ponce De Leon Ave
Suite 775
Decatur, Georgia 30030
*Attorney for Plaintiff*

Charles J. Cole
McRae Bertschi & Cole LLC
1872 Independence Square, Suite D
Dunwoody, Georgia 30338
*Attorney for Defendant Mike Riley*

Charles E. Cox, Jr.
Charles E Cox, Jr., LLC
P.O. Box 67
Macon, Georgia 31202
*Attorney for Defendant John Richey and Defendant Nix*

Derrick L. Bingham
Julie R. Comer
Stites & Harbison, PLLC
303 Peachtree Street NE, Suite 2800
Atlanta, Georgia 30308
*Attorney for Defendant Tomekia Jordan*

Paul Henefeld
Noah Green
HENEFELD & GREEN, P.C.
3017 Bolling Way N.E., Suite 129
Atlanta, GA 30305
*Counsel for Defendant Maryjane Moss*

David C. Will
ROYAL WILL
4799 Sugarloaf Parkway, Building J
Lawrenceville, GA 30044
*Counsel for Defendant Jose Morales*

Annarita L. McGovern
Terry L. Long
Satcher & McGovern
288 South Main Street
Suite 100
Alpharetta, Georgia 30009
*Counsel for Defendant Adkerson*

**BUCKLEY CHRISTOPHER & HENSEL, P.C.**

/s/ Timothy J. Buckley III

_____
TIMOTHY J. BUCKLEY III
Georgia State Bar No. 092913
ERIC J. O'BRIEN
Georgia State Bar No. 383745
Attorneys for District Attorney Adams

2970 Clairmont Road NE
Suite 650
Atlanta, Georgia 30329
(404) 633-9230 (telephone)
(404) 633-9640 (facsimile)
tbuckley@bchlawpc.com
eobrien@bchlawpc.com