# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

Lily Engleman,

               Plaintiff,

                         Case No. 1:21-cv-1992-MLB

v.

Nathan Adkerson, et al.,

               Defendants.

_____/

## <u>OPINION & ORDER</u>

All Defendants in this case move for summary judgment. (Dkts. 50, 53, 55, 57, 59, 61, 63).  For the reasons explained below, the Court grants Defendant Nathan Adkerson's motion in part but grants the other Defendants' motions in their entirety.

## I.  Background[1]

In 2019, Plaintiff worked for the Office of the Georgia Capital Defender as a mitigation specialist and licensed social worker.  (Dkt. 61-1

---

[1] Most of the responses to statements of material facts in this case violate this Court's Standing Order.  The Standing Order provides: "[A] party responding to a statement of material facts shall copy into its response

¶ 1.)[2]  Plaintiff was assigned to help Ricky Dubose, an inmate at Jackson Special Management Unit (a high max facility) awaiting trial for the murder of two prison guards while escaping from another Georgia state prison.  (*Id.* ¶ 3; Dkt. 50-13 ¶ 2.)  Plaintiff regularly met with Dubose in designated meeting rooms at the prison.  (Dkt. 61-1 ¶ 4.)  Those rooms were monitored by video cameras.  (*Id.* ¶ 6; Dkt. 50-10.)

On September 13, 2019, Warden Jose Morales found undated, handwritten notes from an inmate in a trash can.  (Dkt. 61-1 ¶¶ 7, 10;

---

document the numbered statement to which it is responding and provide its response to that statement immediately following."  (Dkt. 10 ¶ r(2).) None of the parties, except Adams, copied into their response documents the numbered statements to which it was responding.  The Court admonishes the other parties for violating the Standing Order.  The rule is pretty clear and should be followed.  In the light of this, citations that reference only one party's statement of material facts refer to statements the Court has confirmed are not factually (or properly) disputed.  Where a statement is factually disputed or where the Court finds it necessary to establish context, the Court cites directly to evidence from the record that supports the Court's factual recitation.  If a party has objected to a fact on the grounds of relevance or materiality but has not objected to the accuracy of the fact, the Court cites directly to the party's statement of facts if it chooses to consider the information.

[2] Unless otherwise noted, all citations refer to the page numbers electronically generated by CM/ECF.

Dkt. 70 ¶¶ 14, 17.)  He thought Dubose had written the notes.  (Dkt. 61-1

¶ 7.)  One of the notes said:

> I need you to call and talk to Jessi on Whats app FrFr and
> explain what the reason is I can[']t get my line and tell her I
> love her and miss her and tell her I had a lawyer visit 2day
> and Morales went in my room again 2day . . .

A second note said:

> I gotta get all those drugs picked up from 'L' and put in
> balloons so she can bring either next week or the following[.]
> We bout 2 go up now and OMG when you get online?  Sigh…
> We will be so str7 [sic] oh she had 4 packs I was like just give
> me one lol and the MF [a]in[']t even search me its all good at
> least I got a pack of Newports . . .

A third note said:

> [Y]ou have to take the water out your toilet and smoke in the
> toilet its only safe!  2morrow we blowin on the yard real free
> world lol did you get the cream?  Love ya bra I[']m bout to send
> you one I put them in my shoe so sum is broke smh[.]  Hit me
> back[.]  7sap[.]

(Dkt. 70 ¶ 16.)  The notes contained no page numbers.  (*See id.*)  Morales

spoke with Adkerson (a Special Agent with the Office of Professional

Standards ("OPS") responsible for investigations inside the Department

of Corrections) and expressed concern because officers had found Dubose

with contraband multiple times.  (Dkt. 50-13 ¶¶ 11, 12.)  In the days prior

to discovery of the note, Dubose had met with members of his defense

team.  He met with Plaintiff (the only member of his team whose name begins with the letter "L") on September 6 and with Vyvia Cabiness-Harris (a fact investigator) on September 12.  (Dkts. 61-1 ¶ 8; Dkt. 70 ¶ 24; Dkt. 70-5 at 179.)    Adkerson watched videos of both meetings.  (Dkt. 70-7 at 18; Dkt. 50-13 ¶ 12.)

The video of Dubose's September 6 meeting with Plaintiff has no audio but shows Plaintiff and Dubose talking across a table.  (*See* Dkt. 50-10.)[3]    During one portion of the one-and-a-half-hour long meeting, Plaintiff and Dubose bent over and looked under the table several times.  (*Id.* at 1:00:08–1:00:47.)  The fifth time they did so, Dubose rolled down his right sock until it covered only the ball of his foot.  (*Id.* at 1:01:06–1:00:13.)  He put his foot on his sandal and slid the sandal and his foot forward.  (*Id.* at 1:01:13–1:01:18.)  He pulled the sandal back and rolled his sock back up.  (*Id.* at 1:01:18–1:01:29.)  He rolled his left sock

---

[3] At summary judgment, "in cases where video evidence is available, the Court views the facts in accordance with that video evidence, so long as 'there are no allegations or indications that video evidence has been doctored, or that the video shows something different [from] what actually happened.'" *Turner v. Phillips*, 547 F. Supp. 3d 1188, 1200 (N.D. Fla. 2021) (quoting *Varnadore v. Merritt*, 778 F. App'x 808, 812 (11th Cir. 2019)).  Neither party contests the video's authenticity here.

down, put his foot on his sandal, moved his foot toward Plaintiff on the floor, brought his foot back, and rolled his sock back up. (*Id.* at 1:01:31–1:02:05.) At various times during this activity, Dubose's body or the table obstructed the camera's view under the table. (*Id.* at 1:00:08–1:02:05.) During this same time, Plaintiff had one or both of her arms in her lap or under the table. (*Id.* at 1:00:06–1:01:23.) As discussed more fully below, the video never showed Plaintiff drop anything on the floor or Dubose pick anything up. (*See* Dkts. 84, 88.)

The video of Dubose's meeting with Harris is not part of the record in this case. But, as explained in more detail below, other evidence establishes that it showed Harris pass Dubose a "package" and him conceal it in his pants. (Dkt. 70-5 at 179.)

As part of the investigation, Morales searched the holding cell in which guards placed Dubose after his September 12 meeting with Harris. (Dkt. 50-13 ¶ 10; Dkt. 50-7 at 6:15–19; Dkt. 70-5 at 179–80.) He found what appeared be a Newport cigarette, a metal clip, a piece of tape, and a piece of latex—all contraband. (Dkt. 50-13 ¶ 10; Dkt. 50-2 at 29:18–23.) It's unclear whether this is the same holding cell in which guards placed Dubose after his September 6 meeting with Plaintiff. Adkerson and

Morales say it was.  (Dkt. 50-13 ¶ 10; Dkt. 61-1 ¶ 9.)  But the cited portions of Morales's testimony only establish that officers searched one of the holding cells "adjacent to the contact visit room"—not necessarily that they searched the holding cell used for Dubose after his visit with Plaintiff.  (Dkt. 50-7 at 6:1–9.)  And, although Morales required guards to search inmates before and after visits, he could not verify whether guards did that after Dubose's September 6 meeting with Plaintiff.[4] (Dkt. 61-1 ¶ 9.)

Following Morales's search of the holding cell, Adkerson e-mailed Tomekia Jordan and Mike Riley (supervisors with the OPS) about his investigation.  (Dkt. 70 ¶ 27; Dkt. 70-5 at 179–80.)  He explained that Morales had found notes that "appeared to have been written by" Dubose and in which Dubose "referred to someone he called 'L' who brought him tobacco and drugs in a balloon."  (Dkt. 70-5 at 179–80.)  He said he had

---

[4] Plaintiff says Dubose was strip searched after his September 6 meeting with Plaintiff.  She points to Morales's previous testimony from Dubose's criminal case in which Morales testified that: (1) he had made it a practice to enforce a strip search policy; and (2) to his knowledge, there had been a strip search after every contact visit since he took over Jackson SMU. (Dkt. 70-7 at 53:13–55:11, 55:14–18.)  But Morales's prior testimony does not contradict his assertion that he *could not verify* whether Dubose was searched as directed after his September 6 meeting.

6

reviewed the video of the September 6 meeting between Dubose and

Plaintiff and that the video showed Plaintiff pass something to Dubose.

Specifically, he wrote:

> Towards the end of the visit the video showed Lily Engleman
> reach behind her back and appear to be holding some blue in
> color object.  You then see her reach under the table and
> appear to drop something.  At that point both Lily Engleman
> and Inmate Ricky Dubose appear to be both looking under the
> table.  At that point Inmate Ricky Dubose takes his right foot
> and appears to pick up something with his foot and then he
> conceals the item in his sock and shoe.

(*Id.*)  He offered the opinion that "[t]he notes appear to corroborate the

video that Lily Engleman brought what appeared to be a balloon [with

contraband] into contact visit with [I]nmate Ricky Dubose and the item

was passed to the inmate[,] and he picked it up and placed it in his sock."

(*Id.*)

In the e-mail, Adkerson also described Dubose's meeting with

Harris.  He explained Dubose had had a contact visit with Harris on

September 12, and that, in a video of the meeting, "it appears that

[Harris] slides [Dubose] a package[,] and he picks it up and places some

item in the crouch [sic] area of his pants.  (*Id.*)  He explained that Dubose

was then placed in the holding cell, that he turned the cameras in the

holding cell so they faced the walls, and that Morales found tobacco

hidden in the holding cell.  (*Id.*)  Finally, Adkerson explained he had spoken with a district attorney and was hoping to surveil Plaintiff's next meeting with Dubose in an "attempt to catch her in the act of delivering the contraband and then place her under arrest for the initial incident." (*Id.*)  After receiving Adkerson's e-mail, Jordan e-mailed William Clayton Nix (Director of OPS), repeating the same information.  (Dkt. 59-1 ¶ 15; Dkt. 59-4 at 1–2.)  Nix viewed the video of the September 6 visit. (Dkt. 59-1 ¶ 19.)

Adkerson met with Jordan, Nix, and Jonathan Adams (District Attorney for Butts County) to discuss the scope of any further investigation.  (Dkt. 50-13 ¶¶ 14, 17.)  Riley, John Richey (Deputy Director of OPS) and Maryjane Moss (another Special Agent with OPS) attended the meeting as well.  (Dkt. 70-8 at 5.)  Nix wanted to confirm Adams would support charges against Plaintiff since Plaintiff worked for the Office of the Georgia Capital Defender.  (Dkt. 50-13 ¶ 16; Dkt. 70-9 at 3:9–10.)  Before playing the video of the September 6 meeting, Adkerson said he thought the video showed Plaintiff passing Dubose contraband.  (Dkt. 50-13 ¶ 15; Dkt. 70-4 at 3:14–18; Dkt. 70-8 at 7:4–14.) Adams recalled that Adkerson also discussed the notes and the items

8

found in the holding cell.  (Dkt. 70-4 at 1:7–14.)  When Adams said he would support charges, Nix authorized Adkerson to continue the investigation.  (Dkt. 50-13 ¶ 16; Dkt. 70-9 at 3:9–15.)

On October 8, Plaintiff met with Dubose a second time.  (Dkt. 50-13 ¶ 18.)  Adkerson and Morales watched the meeting through a live feed and searched Dubose immediately afterwards.  (*Id.*)  They found no contraband.  (*Id.*)

About a week later, Adkerson had a second meeting with Adams, Nix, Jordan, and Moss.  (*Id.* ¶ 20.)  Adams explained he would be "comfortable" charging Plaintiff with one count of providing items to an inmate without prior approval of the warden.  (*Id.*; Dkt. 70-4 at 10:5–21.) Adams felt that they "certainly had . . . probable cause for [Adkerson] to seek a warrant."  (Dkt. 50-4 at 8:9–11; *see also* Dkt. 53-2 ¶ 28.)

On October 23 and 24, Adkerson interviewed Javaris Roundtree, Dubose's cellmate.  (Dkt. 70 ¶ 78.)  On the first day, Roundtree identified several sources of contraband at the prison, including correctional officers and a counselor who would supply contraband to inmates.  (*Id.* ¶ 79.)  Roundtree also said a black female on Dubose's defense team supplied him contraband.  (*Id.* ¶¶ 80–81; Dkt. 70-5 at 145.)  He identified

that person as Harris.   (Dkt. 70 ¶ 81.)   This information supports Adkerson's analysis of the video from Harris's September 12 meeting with Dubose.  (Dkt. 70-5 at 179–80.)  Roundtree never identified Plaintiff as a source of contraband during the first meeting.  (*Id.* at 33:6–9.)

In the second interview, Roundtree said Dubose had a plan to smuggle a gun into the prison for use in an escape attempt.  (Dkt. 70 ¶ 84.)  He said one of Dubose's fellow gang members outside of prison (a woman identified as Diamond Loyd) was helping Dubose with that plan. (*Id.*)  Adkerson also asked about Plaintiff.  (*Id.* ¶ 85.)  Roundtree said he was "positive" "[s]he not doing nothing."   (Dkt. 70-1 at 34:21–34:24.) When Adkerson told him there was a video of her passing Dubose two items "wrapped up in a ball" that Dubose put in his sock, Roundtree responded, "I don't know about that . . . didn't know that . . . that must have been recently though[.]"  (*Id.* at 34:13–34:35.)

On October 25 and 30, Adkerson interviewed Dubose.   (Dkt. 70 ¶ 85.)  Dubose identified correctional officers and a counselor as sources of contraband.  (*Id.* ¶ 88.)  Dubose said he had received "stuff" from his defense team.  (*Id.* ¶ 89.)  When Adkerson asked about Plaintiff and

Harris, he said they had not brought him anything, but his defense team had.  (*Id.*; Dkt. 70-5 at 150.)

On November 4, Adkerson sought an arrest warrant against Plaintiff for giving contraband to an inmate in violation of O.C.G.A. § 42-5-18(a).  (Dkt. 50-12 at 2.)  In an affidavit submitted with the warrant application, Adkerson alleged that, to the best of his knowledge and belief:

> For the said Lily Eugenia Engleman did violate O.C.G.A. § 42-5-18(a) when he/she unlawfully to wit said accused did on the date of September 06, 2019 at between 3:42 PM and 3:39 PM[5] hours she was observed passing Georgia Department of Corrections Inmate Ricky Dubose two small unknown items that Inmate Ricky Dubose was observed picking the items up from the floor and then hiding said items in his socks as to avoid detection by staff.  Said accused did pass these items to inmate Ricky Du[b]ose without the permission or consent of the Warden at the Georgia Diagnostic & Classification Prison Special Management Unit, A Correctional facility located in Butts County Georgia.

(*Id.*)  Adkerson presented his affidavit to a magistrate judge via FaceTime.  (Dkt. 50-13 ¶ 23.)  As discussed below, the parties dispute

---

[5] The Court assumes that "3:39" is a typographical error and that Adkerson meant 3:49 given the preceding time provided and the video itself.  (*See* Dkt. 50-10.)

what was said during this presentation.  The magistrate judge approved the warrant.  (*Id.*; Dkt. 50-12 at 3.)

On November 9, Plaintiff met with Dubose again. (Dkt. 50-13 ¶ 18.) Before this meeting, Nix consulted legal counsel and supervisors about watching the meeting via live video feed (that did not include audio). (Dkt. 59-1 ¶ 34.)  No one suggested that was a problem or would require a warrant.  (*Id.*)  Adkerson and Morales watched this meeting. (Dkt. 50-13 ¶ 18.)  Officers searched Dubose after the visit but found no contraband.  (*Id.*)  Adkerson arrested Plaintiff anyway.  (*Id.*)  The Georgia Capital Defender's Office fired Plaintiff following her arrest and indictment.  (Dkt. 70 ¶ 107.)

During Plaintiff's criminal proceeding, Plaintiff's lawyer proffered to the District Attorney that Plaintiff had looked under the table during the September 6 meeting to admire Dubose's tattoos.  (Dkt. 50-13 ¶ 25.) About a year and a half after Plaintiff was arrested, the District Attorney dismissed all charges.  (Dkt. 70 ¶ 108.)

Plaintiff sued Defendants, claiming—contrary to Adkerson's repeated assertions—the video shows she never passed anything to Dubose during the September 6 meeting.  She alleged the trumped-up

charges cause her to lose her job and prevented her from getting any other job as a licensed social worker. Plaintiff named Adkerson, Moss, and Morales as defendants in this case. (Dkt. 1.) She filed a separate case against Nix, Richey, Jordan, Riley, and Adams for their involvement in the same conduct. (Case No. 22-cv-903, Dkt. 1.) The Court consolidated the later-filed case into this case. (Case No. 22-cv-903, Dkt. 44.) But Plaintiff did not file a consolidated amended complaint so both complaints remain in this single action. The Court refers to the complaint in this case as "Complaint I" and the Complaint in the later-filed case as "Complaint II." In Plaintiff's response to the Defendants' motions for summary judgment, she consents to the dismissal of all her claims against Defendants Moss, Jordan, Richey, and Riley. She explains that, following discovery, the primary actors were the other Defendants here. (Dkt. 69 at 1–2.) Accordingly, the Court **GRANTS** their Motions for Summary Judgment and dismisses all claims against them. (Dkts. 55, 57, 59, 63.)

Remaining before the Court for consideration at summary judgment are Plaintiff's claims under 42 U.S.C. § 1983 against

(1) Adkerson and Adams for malicious prosecution;[6] (2) Adkerson, Morales, and Nix for illegal search; and (3) Nix and Adams for failure to intervene. (Complaint I at 18–24; Complaint II at 21–25.) Defendants move for summary judgment. (Dkts. 50, 53, 59, 63).

## II. Legal Standard

### A. Summary Judgment

Federal Rule of Civil Procedure 56 says that a court "shall grant summary judgment if the movant shows that there is no genuine dispute

---

[6] In both complaints, Plaintiff confusingly styles Count I as a claim for false statements in affidavit, arrest without arguable probable cause, and malicious prosecution. (Complaint I at 18; Complaint II at 21.) It is clear from the arguments and law cited in her responses, however, that she only raises a claim for malicious prosecution in that Count. (*See* Dkts. 68; 69.) So the Court construes Count I that way. To the extent that she also raises a claim for false arrest (by adding "false arrest" in her headings), her claim fails because, as discussed below, she was arrested pursuant to a warrant, and a warrant constitutes legal process. *Joyce v. Adams*, 2007 WL 2781196, at *4 (S.D. Ga. Sept. 20, 2007) ("*Regardless of the validity of the warrant,* plaintiff's allegations support a § 1983 malicious prosecution claim rather than a § 1983 false arrest claim." (emphasis added)). While Plaintiff initially included Defendant Nix in her malicious prosecution claim, she agreed to dismissal of that claim against him in her response to summary judgment because, following discovery, "it is clear that Adkerson misled his colleagues [] into believing that there [was] at least some circumstantial evidence implicating [Plaintiff], while in truth there was not." (Dkt. 69 at 1.) In Complaint II, she also tacks onto Count I a failure-to-intervene claim against Nix and Adams. (Complaint II at 21.) The Court addresses that claim separately from her malicious prosecution claim.

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361 (citing *Anderson*, 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the Court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing there is a genuine dispute for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(e)).  Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* (citation omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. A district court must "resolve all reasonable doubts about the facts in favor of the non-movant[] and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (alteration adopted) (citation omitted).

### B.   Qualified Immunity

Defendants argue that qualified immunity protects them from Plaintiff's claims arising under 42 U.S.C. § 1983. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002). So, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). When properly applied, qualified immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010).  Plaintiff does not dispute that Defendants were engaged in a discretionary duty, so the burden shifts to Plaintiff on summary judgment to show Defendants are not entitled to qualified immunity.  (Dkts. 68, 69); *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2022).

The qualified immunity analysis presents two questions: first, whether the facts, taken in the light most favorable to the party asserting the injury, establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established when the violation occurred.  *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).  Plaintiff must show both.  *Id.*  The Court does not have to analyze these distinct questions sequentially; indeed, "if the law was not clearly established, [the Court] need not decide if the [d]efendants actually violated the [plaintiff's] rights, although [the Court is] permitted to do so."  *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011).

17

### III.   Analysis

### A.      Malicious Prosecution Claim Against Adkerson

Plaintiff attacks the arrest warrant.  She contends Adkerson is liable for malicious prosecution because Adkerson "knowingly and with reckless disregard for the truth made materially false and misleading statements and omissions" in applying for the warrant for her arrest and because the false statements were "material and necessary" to the reviewing judge's finding of probable cause.  (Complaint I ¶¶ 84–85.)

"A malicious prosecution occurs when legal process itself goes wrong." *Goldring v. Henry*, 2021 WL 5274721, at *3 (11th Cir. Nov. 12, 2021) (citing *Manuel v. City of Joliet*, 580 U.S. 357 (2017)).[7]  To state a claim for malicious prosecution under 42 U.S.C. § 1983, a plaintiff must overcome two hurdles: (1) she must prove that she suffered a seizure pursuant to a legal process that violated the Fourth Amendment; and (2) she must satisfy "the elements of the common law tort of malicious

---

[7] The Court recognizes *Goldring* is unpublished and not binding.  The Court cites it and other unpublished cases referenced herein as instructive, nonetheless.  *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342, 1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

prosecution." *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020) (citations omitted).

To demonstrate that a seizure pursuant to an arrest warrant violated the Fourth Amendment, a plaintiff must show that "(1) that the [arrest warrant] justifying [her] seizure was constitutionally infirm and (2) that [her] seizure would not otherwise be justified without legal process." *Williams v. Aguirre*, 965 F.3d 1147, 1162 (11th Cir. 2020).[8] To establish that the arrest warrant was constitutionally infirm, the plaintiff must demonstrate that (1) that the officer who applied for the warrant should have known that his application failed to establish probable cause; or (2) that the officer "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.*

---

[8] Plaintiff misstated the first *Williams* prong, ignoring the required focus on the warrant and instead arguing that "[she] can show constitutional infirmity by establishing [] that the official(s) who obtained warrants against her should have known that there was no probable cause for the crime for which she was charged[.]" (Dkt. 68 at 4, 19–20.) She, in turn, failed to explain how the warrant application itself was facially invalid and, instead, generally contends that Adkerson lacked arguable probable cause to arrest her. *Cf. Kelly v. Curtis*, 21 F.3d 1544, 1548 (11th Cir. 1994); *Garmon v. Lumpkin Cty.*, 878 F.2d 1406, 1408–10 (11th Cir. 1989). She later cited the correct standard but then focuses on whether Adkerson generally had arguable probable cause to arrest her. (Dkt. 68 at 19–20.) At any rate, the Court follows *Williams*.

at 1165 (citations omitted).  A court's analysis of the warrant's validity focuses exclusively on the information the officer actually provided (or failed to provide) to the magistrate judge.  An officer in a case like this cannot rehabilitate an otherwise insufficient probable cause presentation with information the officer knew but did not disclose to the judge who issued the warrant.  *Id.* at 1162 (malicious prosecution cases involving an arrest warrant focused on the warrant itself and "whether the judicial officer who approved the seizure had sufficient information to find probable cause"); *see also Butler v. Smith*, 85 F.4th 1102, 1113–14 (11th Cir. 2023) (considering the information before the magistrate, either in formal affidavits or otherwise, including oral statements).

### 1.  Constitutional Infirmity Due to Obvious Facial Insufficiency

An officer who applies for a warrant knows his or her application fails to establish probable cause when the affidavit is lacking on its face. *See Kelly*, 21 F.3d at 1548, 1555.  This occurs, for example, in the case of a conclusory affidavit that lacks information providing the basis for the affiant's belief that probable cause exists.  *Id.* (affidavit stating plaintiff "did commit the [drug] offense [in violation of state law]" was conclusory and violated the plaintiff's clearly established constitutional right);

20

*Garmon*, 878 F.2d at 1408–10 (finding a sheriff who directed the completion of a warrant affidavit was not entitled to qualified immunity when the warrant stated only that the plaintiff "did . . . commit the offense of false report of a crime").  The Supreme Court has described this standard as requiring "reasonable professional judgment" and has instructed that the question "is whether a reasonably well-trained officer in [the defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley v. Briggs*, 475 U.S. 335, 345–46 (1986).

Adkerson's arrest warrant in this case was short and light on facts. Adkerson merely alleged that, to the best of his knowledge and belief, on September 6, 2019, "[Plaintiff] was observed passing Georgia Department of Corrections Inmate Ricky Dubose two small unknown items that Inmate Ricky Dubose was observed picking the items up from the floor and then hiding said items in his socks as to avoid detection by staff." (Dkt. 50-12 at 2.)  He does not explain where that information came from (whether a video, a witness, or something else), whether his source was credible, or any other details of his investigation.

21

The Court need not consider whether the warrant application alone is deficient on its face because Adkerson testified he also provided the issuing magistrate judge additional information while obtaining the warrant.  He recalled telling the magistrate judge that he had "watched the video" and that "it appeared that [Dubose] pulled at least two items over with his feet and, you know, put right sock on, rolled sock up, appeared to conceal something in his socks."  (Dkt. 70-5 at 39:6–11.) Adkerson said he could not tell "what specifically" Dubose put in his sock because Dubose tried to block the camera with his back but that it "appeared that [Dubose] concealed items in both socks." (*Id.* at 39:13-16.) He again summarized what he told the magistrate judge:

> You know, I can't say what was concealed or what was passed. Described the overall visit to where it appears both [Dubose and Plaintiff] are basically under the table for a set period of time.  I mean, whether a couple of minutes.  Kind of give [the magistrate judge] just a brief rundown of that.  How [Dubose] pulled items over and appeared to conceal them in his socks.

(*Id.* at 39:18–24.)

Adkerson testified he told the magistrate judge about other aspects of his investigation.  He described, for example, his interviews with Roundtree.  (*Id.* at 40:8–11.)  Adkerson explained that Roundtree had said Dubose's "defense team was bringing contraband in."  (*Id.*

at 41:1–42:11.)  Adkerson testified that he told the magistrate judge that Dubose had stated that his defense team was bringing contraband in, but Dubose had not identified a specific team member.  (*Id.* at 42:13–18.) Adkerson testified that he told the magistrate judge about the notes, but he did not show the notes or read the notes to the magistrate judge.  (*Id.* at 43:23–44:12.)  It is unclear whether Adkerson said the notes referred to someone identified as "L" supplying Dubose contraband or that Plaintiff was the only defense team member with a name beginning with "L."  Since Adkerson has not presented evidence that he did, the Court does not assume that fact.  Adkerson testified that he told the magistrate judge about the contraband found in the cell.  (*Id.* at 44:13–22.)

Adkerson testified he did not provide a copy of the video to the magistrate judge because he had "never had to provide a magistrate judge with copies of the video."  (*Id.* at 45:10–16.)  Counsel asked whether he told the magistrate judge that the video is open to interpretation as to whether it shows Plaintiff passing contraband, and Adkerson replied, "I told the judge . . . the video by itself I wouldn't be comfortable moving, but the video with the notes, the evidence, and everything else, I was more comfortable proceeding with this."  (*Id.* at 46:3–10.)  Counsel asked

again whether he explained the video is inconclusive as to whether Plaintiff passed Dubose two small unknown items, and Adkerson said:

> I informed him after watching the video can I say specifically what was dropped or passed? No. But from knowledge, training, and experience in working cases there, it was my interpretation that something was placed on the floor, he pulled it over with his bare feet, taking his shoes and socks off to be able to grip it with his toes, pull it over to him, and then conceal it in two socks.

(*Id.* at 46:11–47:3.) When asked a third time whether he provided this explanation, Adkerson said, "I told him, again, I couldn't identify any specific item other than he pulled what appeared to be two unknown items because they were concealed in each sock." (*Id.* at 47:5–12.)

This adds a lot to the simple affidavit. Plaintiff disputes Adkerson's contention that he provided additional information to the issuing magistrate judge. (Dkt. 68 at 9–11 n.13.) She offers no direct evidence (like an affidavit from the magistrate judge) to contradict Adkerson's sworn testimony but rather insists his claim "lacks credibility." (*Id* at 10.) General attacks upon a witness's testimony, however, are not enough to create a genuine issue of material fact at summary judgment. *Williams*, 965, F.3d at 1165 (citation omitted). Instead, Plaintiff must identify "affirmative evidence" from which a jury could find Adkerson lied

when he said he presented additional information to the magistrate judge. *Id.* at 1166.

In an attempt to do that, Plaintiff focuses on Adkerson's claim that he told the magistrate judge he was not comfortable relying exclusively on the video. She says Adkerson's conduct during the investigation shows he never hesitated in his assertion that the video—by itself—showed Plaintiff pass contraband. As part of this, she points to (1) Adkerson's sworn arrest warrant application and accompanying affidavit in which he averred that Plaintiff was "observed" passing contraband; (2) Adkerson's contemporaneous e-mail to Jordan during the investigation in which he described the video as showing Plaintiff dropping a blue object onto the floor for Dubose to retrieve; (3) the testimony of Adkerson's colleagues that Adkerson described the video as showing Plaintiff passing Dubose contraband; and (4) Adkerson's draft search warrant application for Plaintiff's cellphone, which said Plaintiff was "clearly observed on video passing" contraband" to Dubose. (*Id.* at 9–10; Dkt. 70-5 at 193.)

These are just attacks on Adkerson's credibility—saying he said something inconsistent before. But his testimony is not that different.

Perhaps he never previously said the video was not enough on its own. But Adkerson's testimony about how he described his investigation to the magistrate judge is consistent with how he presented the evidence to his colleagues and in his prior writings, specifically because, on those prior occasions, he mentioned the other evidence he had collected, including the notes, the contraband found in the holding cell, and his interview with Roundtree.  (Dkt. 70-5 at 179–80, 191-92; Dkt. 70 ¶ 42.)  In other words, there is no evidence that, prior to obtaining the warrant, Adkerson focused exclusively on the video.  To the contrary, he repeatedly discussed the video in the context of the other evidence—just as he says he did with the magistrate judge.  Moreover, the arrest warrant explained, "[f]or sufficient cause made known to me in the above affidavit, incorporated by reference herein, and *from other sworn testimony by the Prosecutor therein*, with said affidavit and testimony establishing [p]robable [c]ause for arrest of the accused . . . ."  (Dkt. 50-12 at 3 (emphasis added).)  The actual text of the warrant indicates the magistrate judge relied on evidence beyond the affidavit.  Perhaps this is form language, but Plaintiff has not suggested that.

The Court finds Plaintiff has not created a genuine dispute about whether Adkerson orally presented additional information to the magistrate judge.   Considering all the evidence Adkerson says he presented the magistrate judge beyond his simplistic affidavit, the Court concludes Plaintiff has not presented evidence from which a jury could conclude any reasonable officer would have known the warrant failed to establish probable cause.  *Williams*, 965 F.3d at 1165.

### 2. Constitutional Infirmity Due to Material Misstatements and Omissions

As a result of this determination, Plaintiff must present evidence from which a jury could conclude Adkerson "intentionally or recklessly made misstatements or omissions necessary to support the warrant." *Id.* To avoid summary judgment on a malicious prosecution claim alleging material misstatements, Plaintiff must demonstrate that a genuine dispute of fact exists as to whether Adkerson's statements in the affidavit were false.  *See id.* (noting a genuine dispute of fact over whether the warrant application statement was false before embarking on further analysis).  The accusation cannot be "a mistaken belief" and "general attacks" on credibility and "conclusory allegations and speculation" are sufficient.  *Id.* at 1165–66.  Instead, Plaintiff must "identify affirmative

evidence" from which a jury could find an intentional or reckless disregard for the truth. *Id.* at 1166 (finding that contradictory evidence that "supports an inference that someone is lying" was sufficient to support an inference that the officers' "accusations were intentionally false"). Upon passing that hurdle, Plaintiff must also demonstrate that, "after deleting the misstatement, the affidavit is insufficient to establish probable cause." *Id.* at 1165.

To avoid summary judgment on a malicious prosecution claim alleging material omissions, Plaintiff must put forth evidence that Adkerson (1) knew the information omitted, (2) that he intentionally or recklessly omitted the information, and (3) disclosure of the information would have negated probable cause. *See Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019) ("[A]n affidavit's omissions may lead to an unreasonable and unconstitutional warrant-based arrest if information that the affiant knew about but intentionally or recklessly disregarded negates a finding of probable cause."). "Without direct evidence of intentional or reckless conduct, a plaintiff may raise an inference of recklessness where the facts omitted from the affidavit are clearly critical to a finding of probable cause." *Elmore v. Fulton Cty. Sch. Dist.*, 605 Fed.

28

App'x 906, 910 (11th Cir. 2015) (citing *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)).  To examine the materiality of the omissions, the Court must ask whether probable cause for the warrant would be lost if the omitted statements were included in the affidavit.  *Id.*

Plaintiff alleges both material misstatements and omissions.  So the issue is whether, after deleting inappropriate misstatements and adding relevant omissions, the reconstituted affidavit still supports a finding of probable cause.  If it does not, Plaintiff has proven that element of her malicious prosecution claim.  Despite that, Adkerson is entitled to qualified immunity if even arguable probable cause is present. *Paez*, 915 F.3d at 1288 ("if the affidavits (including the omitted information) would have demonstrated even arguable probable cause—that a reasonable officer <u>could have</u> believed an offense was committed—then the officers are entitled to qualified immunity" and summary judgment is due); *Martelli v. Knight*, 855 Fed. App'x 621, 623-24 (11th Cir. 2021) (to overcome qualified immunity plaintiff must "show that the affidavit (including the omitted information) would not have demonstrated even arguable probable cause") (punctuation and citations omitted).

As explained, the starting point for this analysis is the information Adkerson put in the affidavit or otherwise told the magistrate judge. Regarding the video, Adkerson said in his affidavit that Plaintiff was "observed passing" two objects to Dubose and that he was "observed" putting those items in his socks.  (Dkt. 50-12 at 2.)  As explained above, the Court accepts Adkerson's testimony that he also told the magistrate judge that Plaintiff was observed passing Dubose two unknown objects, reiterating several times that he could not tell what the objects were. (Dkt. 50-12 at 2; Dkt. 70-5 at 39:8–16; Dkt. 70 at 46:19–21.)   Plaintiff says Adkerson's description of the video was categorically untrue because it never showed her pass him anything. (Dkt. 68 at 8.)  The Court agrees. Having reviewed the video several times, the Court cannot see Plaintiff ever pass Dubose anything.   Plaintiff certainly looks under the table (sometimes putting her head and upper body under the table) and has her hands under the table at various times.  Dubose lowers his socks, takes off his sandals, slides his feet under the table, and raises his socks. Dubose's body and the table obstruct the camera's view under the table. But, accepting all that, the video does not show Plaintiff pass anything,

depict any objects on the ground, or show Dubose pick anything up or put anything in his sock.  (Dkt. 50-10 at 1:00:06–1:02:05.)

This issue is now beyond dispute.  In moving for judgment, Plaintiff filed a Statement of Additional Material Facts, asserting that "[o]bjectively, the video does not show any item or items being passed by [Plaintiff] to Dubose or Dubose concealing any item(s) in his socks." (Dkt. 70 ¶ 31.)  Adkerson did not properly respond to that assertion but objected, saying the video did not show what happened under the table. Specifically, he wrote "since a table blocked the view on the video[,] it does not show what occurred under the table and therefore, can not [sic] establish whether objects were passed under the table or that there were no objects passed under the table."  (Dkt. 72 ¶ 31.)  But saying the video cannot rule out the possibility of things being passed outside the view of the camera is not a response to the simple assertion that the video does not—in fact—show Plaintiff engaged in that conduct.   That made Adkerson's response completely unresponsive.  In considering this case, the Court exercised its discretion and ordered Adkerson to respond appropriately to Plaintiff's factual assertion.  (Dkt. 83.)  He did and now admits it.  (Dkts. 84.)

Adkerson's false assertions about the video are both misstatements and omissions.  If intentional or reckless, the reconstituted probable cause presentation would accurately state that the video does not show Plaintiff pass anything to Dubose or him take anything from her.

Second, Plaintiff says Adkerson's description of Roundtree's interview was false. (Dkt. 68 at 12–13.) The Court agrees. While not in the affidavit, Adkerson told the magistrate judge that Roundtree said Dubose's defense team was bringing contraband into the prison. (Dkt. 70-5 at 41:1–42:11).  That was true.  But Adkerson's interview notes reflect that Roundtree said a black female on Dubose's defense team—specifically, Harris—was bringing contraband into the prison. (Dkt. 70 ¶ 80–81; Dkt. 70-5 at 145.)  And when asked about Plaintiff, Roundtree said he was "positive" Plaintiff was "doing nothing." (Dkt. 70-1 at 34:13–34:35.)  Indeed, when Adkerson told him there was a video of Plaintiff passing contraband to Dubose, Roundtree insisted he knew nothing of Plaintiff's involvement.  (*Id.*)  If Adkerson acted recklessly or intentionally in this regard, the reconstituted probable cause presentation must include the fact that Rountree (a fellow inmate)

implicated Harris (a member of the defense team) by name and exculpated Plaintiff.

Third, Plaintiff says Adkerson misstated or omitted information when he told the magistrate judge about the contraband. (Dkt. 68 at 13–15.) The Court agrees again. Adkerson testified that he told the magistrate judge about the contraband found in the cell. (Dkt. 70-5 at 44:13–22.) He also told the magistrate judge that it was found in the holding cell where Dubose had been housed. (*Id.* at 44:23–45:1.) But Adkerson failed to explain that Morales found the contraband one week after Plaintiff's meeting with Dubose. He also failed to tell him that, the day before Morales found the contraband in the cell, (1) Dubose met with Harris, (2) a video of the meeting showed Harris slide something across the table to Dubose and Dubose conceal the item in his pants, (3) Dubose was placed in the holding cell after his meeting with Harris, and (4) Dubose turned the camera in the holding cell towards the wall to obstruct its view. (*Id.* at 179–80.) Pending a determination of recklessness or intentionality, the reconstituted probable cause presentation should include these details tying Harris to the contraband

found in the holding cell and corroborating Roundtree's identification of her as a source of contraband on Dubose's defense team.

Fourth, Plaintiff says Adkerson didn't show or read the notes to the magistrate judge and that he likely misled the magistrate judge given how he described the notes elsewhere.  (Dkt. 68 at 15–17.)  She says the notes, which do not contain page numbers, are undated, identify "Jessi," "L," and "she," but do not clearly identify who is bringing the contraband. (*Id.* at 15–16.)  Adkerson testified that he recalled telling the magistrate judge about the notes, but he did not show the notes or read the notes to him.  (Dkt. 70-5 at 43:23–44:12.)  Elsewhere in Adkerson's deposition, he characterized the note as "indicat[ing] that someone that Dubose referred to as 'L' was supposed to meet and pick the drugs up and tobacco, package it, and bring it in to him."  (Dkt. 50-2 at 26.)  The Court agrees that, based on Adkerson's other representation about the notes, he may have mischaracterized the note as definitively establishing that "L" would bring in contraband.  It is unclear what exactly Adkerson told the magistrate judge about the notes.  So this may not be a misstatement, but even Adkerson does not claim he fully explained the notes.  So, as part of the omission analysis, it is fair to consider what the magistrate

judge could have been told. The notes do not implicate Plaintiff—at least

not to the extent Adkerson's other representations about them suggest.

The notes, for example, do not clearly identify "L" as the smuggler of

contraband. They say:

> I gotta get all those drugs picked up from 'L' and put in
> balloons so she can bring either next week or the
> following . . . We will be so str7 [sic] oh she had 4 packs I was
> like just give me one lol and the MF [a]in[']t even search me
> its all good at least I got a pack of Newports . . . .

(Dkt. 70 ¶ 16.) The note establishes that the drugs would be picked up

from "L," meaning "L" is supplying Dubose (or someone working with him

outside of prison) drugs so they could be packaged into balloons,

presumably for smuggling into the prison. The notes do not necessarily

indicate that "L" is the "she" who would be bringing drugs "either next

week or the following." The "she" also could refer to Jessi, the individual

mentioned in the other note, or some unidentified female. (*See id.*) And

recall that Roundtree identified a women named Loyd, who was outside

prison, a member of Dubose's gang and, and worked with him to smuggle

contraband into the prison. These details should be considered for

inclusion in the reconstituted probable cause presentation if omitted

intentionally or recklessly.

Fifth, Plaintiff says Adkerson misrepresented Dubose's interview. (Dkt. 68 at 17–19.) The Court agrees.  Adkerson testified that he told the magistrate judge that Dubose had stated his defense team was bringing contraband in, but Dubose had not identified a specific team member. (Dkt. 70-5 at 42:13–18.)   So Adkerson omitted that, while Dubose admitted he received contraband from his defense team, he exculpated Plaintiff.   This detail should also be considered for inclusion in the reconstituted  probable  cause  presentation  if  Adkerson  omitted  it intentionally or recklessly.

The next step is to consider whether Plaintiff has presented affirmative evidence that Adkerson made the misstatements and omissions identified above intentionally or in reckless disregard for the truth. *Williams*, 965 F.3d at 1166.  The Court finds she has.

Adkerson's mischaracterization of the video is hard to understand. He says he had a sincerely held belief that Plaintiff passed Dubose contraband, or at worst, a mistaken belief that she did.  (Dkt. 71 at 4–6.) But that understanding is totally at odds with the content of the video. A jury could certainly infer intentionality or recklessness from his distortion of the video.  It is also hard to understand how Adkerson could

have discussed Rountree's interview, explained that he said Dubose was receiving contraband from a member of his defense team, and yet failed to mention either that Roundtree identified Harris as that person or that he specifically exculpated Plaintiff.   The same is true of Adkerson's failure to include the fact that Dubose denied Plaintiff supplied him contraband and his failure to provide complete information about the note or to identify Loyd as possibly being "L."  Adkerson says Plaintiff's asserted meaning of the notes and timing of when the contraband was found is speculative.  (Dkt. 71 at 9–10.)  He adds that Roundtree's and Dubose's interviews played a small part in the overall decision to obtain the warrants and that, at the very least, there appeared to be some impropriety within the defense team.  (*Id.* at 10.)  That may be true.  But at the same time, all Adkerson's mischaracterizations and omissions disfavor Plaintiff.  A jury could find intentionality or recklessness from the nature of these errors, that Adkerson made each mistake against Plaintiff, and that any one of them (if properly disclosed) would have run counter to his overarching misstatement that the video showed Plaintiff passing something to Dubose.  *Elmore*, 605 Fed. App'x at 910.

Having identified these intentional or reckless misstatements and omissions, the Court must determine whether a reconstituted probable cause determination is insufficient to establish at least arguable probable cause that Plaintiff passed contraband to Dubose.

Adkerson says he had arguable probable cause based on the following evidence: (1) the suspicious behavior in the video, (2) the notes, (3) the contraband found in the holding cell, (4) Dubose regularly was found with contraband, (5) Roundtree's and Dubose's statements, (6) Dubose was only permitted visits from his defense team, and (7) Plaintiff was the only defense team member with a name beginning with "L." (Dkt. 50 at 15–18; Dkt. 71 at 11–12.) Adkerson did not testify that he told the magistrate judge officers regularly found Dubose with contraband, that Dubose was only permitted visits from his defense team, or that Plaintiff was the only defense team member with a name beginning with "L." (Dkt. 50-13 ¶ 23.) And "if there isn't undisputed evidence that an inculpatory fact was before the magistrate, then we must assume that it *wasn't*." *Butler*, 85 F.4th at 1113 n.2 (citation omitted) (emphasis in original); *see also Williams*, 965 F.3d at 1162.

Adkerson correctly identified the other evidence that should be considered in assessing arguable probable cause.

The Court starts with the warrant application. It must redline the application to remove the inaccurate statement that Plaintiff was "observed" passing contraband and Dubose was "observed" taking it. The redlined application would read as follows:

> For the said Lily Eugenia Engleman did violate O.C.G.A. § 42-5-18(a) when he/she unlawfully to wit said accused did on the date of September 06, 2019 at between 3:42 PM and 3:[4]9 PM hours she ~~was observed passing Georgia Department of Corrections Inmate Ricky Dubose two small unknown items~~ that ~~Inmate Ricky Dubose was observed picking the items up from the floor and then hiding said items in his socks as to avoid detection by staff. Said accused did pass these items to inmate Ricky Du[b]ose with out the permission or consent of the Warden~~ at the Georgia Diagnostic & Classification Prison Special Management Unit, A Correctional facility located in Butts County Georgia.

This really scraps everything except the alleged crime, Plaintiff's name, and the date of the alleged crime. The reconstituted probable case presentation would establish the following:

- On September 13, 2019, Morales found undated notes, which he believed were in Dubose's handwriting. One of the notes said:

  > I need you to call and talk to Jessi on Whats app FrFr and explain what the reason is I can[']t get my line and tell her I love her and miss her and tell her I had a

> lawyer visit 2day and Morales went in my room again
> 2day . . .

A second note said:

> I gotta get all those drugs picked up from 'L' and put in
> balloons so she can bring either next week or the
> following[.]  We bout 2 go up now and OMG when you
> get online?  Sigh…  We will be so str7 [sic] oh she had 4
> packs I was like just give me one lol and the MF [a]in[']t
> even search me its all good at least I got a pack of
> Newports . . .

- Dubose met with Plaintiff on September 6.

- A video of that meeting shows Plaintiff and Dubose look under the
  table several times and Plaintiff put her hands and arms under the
  table several times.  It also shows Dubose roll down his right sock
  until it covers only the ball of his foot, put his foot on his sandal,
  slide his foot forward, pull his foot back, and roll his sock back up.
  He does the same with his other foot.  These could be interpreted
  as odd or suspicious movements.[9]   In Adkerson's knowledge,

---

[9] The Court understands Plaintiff has provided a clear, logical
explanation: Dubose was showing Plaintiff tattoos on his ankles and feet.
But that fact is not obvious from the video, and the Court's inquiry is
focused on whether a reasonable officer in the same position with the
same information could have believed probable cause existed. *Knight*,
855 Fed. App'x at 623–24.

40

training, and experience, it was his interpretation that Plaintiff passed Dubose something.

- There are times when Dubose's body or the table obstructs the camera's view under the table.  Nevertheless, the video does not show Plaintiff passing any objects or Dubose picking up any objects.

- After the meeting, officers placed Dubose in a holding cell.

- Dubose met with Harris on September 12.  A video of that meeting showed Harris slide Dubose a package and Dubose place the item in his pants.

- After the meeting with Harris, officers placed Dubose in a holding cell.  Dubose turned the camera in the holding cell toward the wall.

- The next day Morales—after finding the notes—searched the holding cell in which guards had placed Dubose after the meeting with Harris (and that might have been the same cell in which guards had placed Dubose after his meeting with Plaintiff) and found a piece of latex (or balloon), a piece of a Newport cigarette, and a paperclip.  This occurred one week after Plaintiff's meeting with Dubose.

- Roundtree (Dubose's cellmate) said Harris (a member of Dubose's defense team) was bringing contraband into the prison.  He denied Plaintiff's involvement.

- Roundtree also identified Loyd as someone outside the prison who worked with Dubose to bring contraband into the prison (or was working with him at the time to get a gun into the prison).

- Dubose stated he had received "stuff" from his defense team and did not positively identify anyone.  He denied that either Plaintiff or Harris had brought him anything.

Georgia law makes it a crime for anyone to provide an inmate anything without the authorization of the warden or superintendent of the prison.  *See* O.C.G.A. § 42-5-18(a).  No reasonable juror could conclude Adkerson's investigation as he described (or should have described) it to the magistrate judge established even arguable probable cause to conclude Plaintiff violated this statute.  Without Adkerson's mischaracterization of the video, almost no evidence suggests Plaintiff provided contraband during the September 6 meeting.  Indeed, any accurate assessment of the video goes a long way to exonerating Plaintiff of any suspicion.  That becomes nearly absolute when considered against

the evidence suggesting Harris was responsible for the contraband found on September 13.  After all, Roundtree identified her as a source of contraband, she is a member of Dubose's defense team, and she was seen passing Dubose contraband the day before Morales found the items in the holding cell.  Only two things point to Plaintiff: she also was a member of the defense team and the handwritten note identified "L" as helping Dubose.  But the Court finds that, in the light of the video and evidence implicating Harris, any reasonable officer in the same position with the same information as Adkerson could not have believed that Plaintiff passed contraband based on this weak evidence.  Plaintiff has established that the reconstituted facts fail to present even arguable probable cause.[10]

---

[10] Adkerson argues that any causal link to him was broken because the magistrate judge and grand jury also found that there was probable cause.  (Dkt. 50 at 14.)  But Plaintiff was seized pursuant to the purportedly invalid warrant before Plaintiff was indicted.  So "the effect of the indictment is a question of damages, which are not determinative of qualified immunity." *Williams*, 965 F.3d at 1168 (citation omitted).

### 3.     Would the Arrest have been Valid Without a Warrant?

If an arrest warrant is invalid, "a seizure is still constitutional if it would be valid without a warrant." *Williams*, 965 F.3d at 1164. "This rule has little use in most suits challenging pretrial detention . . . [because] only a brief period of detention is lawful without some form of legal process" assessing probable cause. *Id.* The Supreme Court has held that a seizure that lasts for longer than 48 hours without legal process is presumptively unconstitutional, with a burden on the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance. *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991). The Eleventh Circuit has thus refused to consider arguments about an officer's probable cause for a warrantless arrest when the plaintiff's seizure was too long to be justified without legal process. *Williams*, 965 F.3d 1147, 1167 (finding one month in jail before a grand jury indictment "far too long" to be justified without legal process); *Goldring*, 2021 WL 5274721, at *6 (finding a five-month seizure "far too long to be justified without legal process"); *see also Sorrells v. Dodd*, 2021 WL 4928416, at *16 (N.D. Ga. Sept. 29, 2021) (finding a

63-day detention too long to be justified without legal process even if the officers had probable cause for a warrantless arrest).

Neither party explains whether Plaintiff was detained for more than 48 hours.  The Court will not sift the docket "like [a] pig[], hunting for truffles" to find this fact.  *See Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (citation omitted).  However, even if timely legal process occurred after Plaintiff was seized, the Court finds that the facts as presented and construed for purposes of summary judgment do not support arguable or actual probable cause for a warrantless arrest.  As discussed at length above, any suspicion that Plaintiff passed contraband is eviscerated when considering the reconstituted facts—even including that Dubose regularly was found with contraband, that Dubose was only permitted visits from his defense team, or that Plaintiff was the only defense team member with a name beginning with "L."  The video simply does not show Plaintiff pass anything, Roundtree identified Harris as a source of contraband on Dubose's defense team, and Adkerson saw Harris pass Dubose contraband the day before Morales found the items in the holding cell.  This intervening act dispels any suspicion that Plaintiff was involved by

45

virtue of her name starting with an "L" or because she worked on Dubose's defense team.

### 4.   Common Law Elements of Malicious Prosecution

To satisfy the elements of a common law tort of malicious prosecution, the plaintiff must prove "that the officials instituted criminal process against [her] with malice and without probable cause . . . that the broader prosecution against [her] terminated in [her] favor . . . and proof of damages." *Laskar*, 972 F.3d at 1284–85 (citations omitted). But "a plaintiff may recover nominal damages even though [she] suffers no compensable injury when she raises a claim of malicious prosecution under the Fourth Amendment." *Id.* at 1285 (citing *Kelly*, 21 F.3d at 1557). In addition, "[i]f a plaintiff establishes that a defendant violated her Fourth Amendment right to be free from seizures pursuant to legal process, she has also established that the defendant instituted criminal process against her with malice and without probable cause." *Goldring*, 2021 WL 5274721, at *4 (alterations omitted) (quoting *Luke v. Gulley*, 975 F.3d 1140, 1143–44 (11th Cir. 2020)) (explaining that there is "significant overlap between a plaintiff's burden to establish that she suffered a seizure pursuant to a process that violated the Fourth

Amendment and her burden to establish the common law elements of malicious prosecution").

As discussed above, Plaintiff has established a violation of her Fourth Amendment right to be free from seizures pursuant to legal process, so she has also established that Adkerson instituted criminal process against her with malice and without probable cause. *Id.* The parties do not dispute—and the Court agrees—that the broader prosecution against Plaintiff terminated in her favor. *Laskar*, 972 F.3d at 1295 ("[T]he favorable-termination element requires only that the criminal proceedings against the plaintiff formally end in a manner not inconsistent with [her] innocence on at least one charge that authorized [her] confinement.").

### 5. Did Adkerson Violate Clearly Established Law?

Adkerson does not make any arguments about whether his actions violated clearly established law. (*See* Dkts. 50; 71.) In any event, it was and is clearly established that intentionally or recklessly omitting material information from a warrant affidavit violates the Fourth Amendment. *See Paez*, 915 F.3d at 1287 (considering it clearly established that a warrant affiant cannot omit known material facts).

Consistent with the Court's analysis above, Adkerson is not entitled to qualified immunity on Plaintiff's malicious prosecution claim.[11]

## B.   Malicious Prosecution Claim Against Adams

Plaintiff "does not allege that Adams intentionally made misstatements or omissions necessary to support the warrant." (Dkt. 69 at 4.)  She says Adams is still responsible for malicious prosecution because "Adams should have known that there was no probable cause or arguable probable cause for the crime for which she was charged." (Dkt. 69 at 4.)

To succeed on this claim, Plaintiff must connect Adams's actions to the alleged constitutional violation—an invalid arrest warrant. *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (explaining that § 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation).  She seeks

---

[11] Adkerson argues that he is entitled to absolute immunity for any alleged false statements made in preparing and presenting the arrest warrant because his actions involved functions intimately associated with the judicial phase of the criminal process.  But the cases he cites expressly rejected an officer's identical argument.  *Jones v. Cannon*, 174 F.3d 1271, 1282 (11th Cir. 1999) ("[P]olice officers do not have absolute immunity for submitting supporting affidavits in their applications for arrest warrants." (citing *Malley*, 475 U.S. at 342–43)).

to do this by focusing on testimony that Adkerson arranged two meetings with Adams (and others) to ensure Adams would support charges against Plaintiff.  (Dkt. 50 13 ¶ 16; Dkt. 70 9 at 3:9–10.)  She says that Adams confirmed he would be "comfortable" pursuing charges against Plaintiff, thus making Adams responsible for Adkerson's subsequent conduct in obtaining the warrant.  (Dkt. 69 at 8.)  She says that, had Adams not approved her arrest, Adkerson would not have obtained the warrant.

The Court thus considers whether—based on the information provided to Adams at the time of his opinion—any reasonable officer should have known Adkerson lacked even arguable probable cause to seek a warrant.  At the first meeting, Adkerson played the video, said it showed Plaintiff passing Dubose contraband, and discussed the notes and items found in the holding cell.  (Dkt. 50-13 ¶ 15; Dkt. 70-4 at 1:7–14, 3:14–18; Dkt. 70-8 at 7:4–14.)  Adams testified that "at the very beginning," the following facts were relayed to him: (1) there was a video of Plaintiff doing something under the table with her client, (2) there was a note that contained information about contraband and that "L" had provided the contraband; (3) there was a jail or cell room inspection that had produced contraband; (4) there was an inmate that would testify that

Dubose had told him that someone on his legal team had brought in contraband. (Dkt. 70-4 at 1:4–18.) He could not recall whether he had "all of that" information before viewing the video. (*Id.* at 1:19–21.) But he had it at some time before Plaintiff's arrest. Adams also confirmed that, before Adkerson played the video, he said that the video would show Dubose passing contraband. (*Id.* at 3:5–24, 7:5–17.) Adams (like Adkerson) initially tried to dodge Plaintiff's assertion that the video does not show her pass Dubose anything but now admits that assertion. (Dkt. 88.)

Adams's admission about the video is bad for him. But Plaintiff concedes that Adkerson failed to disclose key exculpating evidence from Adams. She admits, for example, that Adkerson "kept Adams 'oblivious' as to the ambiguities within the 'L' note"; that Adkerson never told Adams about Harris's possible connection to the contraband found in the holding cell and that it "implicated Harris rather than Ms. Engleman"; and that Adkerson never told Adams that Roundtree had implicated Harris and exculpated Plaintiff. (Dkt. 69 at 13 n.6.) She also recognizes that Adams was unaware of the evidence "that pointed away from [Plaintiff] being the 'L' from the note." (*Id.*) Finally, Plaintiff concedes

Adkerson's pre-meeting description of the video "essentially prim[ed]" Adams into believe it showed illegal activity. (*Id.*) These facts put Adams in a totally different light—one who relied upon an investigator's representation of a video and incomplete presentation of surrounding facts that aimed to implicate Plaintiff while excluding any evidence to the contrary. Even accepting that a careful review of the video would have debunked Adkerson's contention that it showed Plaintiff give Dubose contraband, the stilted evidence Adkerson provided would present at least arguable probable cause to conclude Plaintiff provided contraband outside the view of the camera. Adams is thus entitled to summary judgment on the malicious prosecution claim.

## C.   Illegal Search Claim Against Adkerson, Morales, and Nix

Plaintiff says Adkerson and Morales violated her Fourth Amendment rights to be free from an unreasonable search when they pulled video of the September 6 meeting and live-monitored the October 8 and November 6 meetings without a warrant. (Dkt. 68 at 21; Dkt. 69 at 14.) She adds that Nix violated her Fourth Amendment rights because he was part of the decision to allow Adkerson to continue live monitoring her meetings with Dubose. (Dkt. 69 at 14.) She says she had a

reasonable expectation of privacy in her meetings with Dubose, pointing to (1) attorney-client privilege, (2) a Georgia statute prohibiting the use of a device to record activities of persons incarcerated in jail without her and Dubose's consent, and (3) a Superior Court order in Dubose's capital case mandating confidential visits.  (Dkt. 68 at 21–25; Dkt. 69 at 17–20.) Adkerson, Nix, and Morales say they are protected by qualified immunity.  (Dkt. 50-1 at 22; Dkt. 59-2 at 19; Dkt. 61-2 at 6–8.)  The Court agrees.

"The Fourth Amendment, as applied to the states by way of the Fourteenth Amendment, protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches or seizures.'"  *Gennusa v. Cannova*, 748 F.3d 1103, 1109-10 (11th Cir. 2014) (internal citation omitted) (quoting U.S. Const. amend. IV).  A Fourth Amendment search occurs where the government violates a subjective expectation of privacy that society deems as reasonable.  *Id.* at 1110.  The use of electronic devices to record a private conversation thus may sometimes be considered a "search" within the meaning of the Fourth Amendment.  *Id.*  Individuals who have been arrested or are in custody may not have a reasonable expectation of privacy while they are

in prison if there is an indication law enforcement might monitor their conversations. *See id.* at 1111-12 (collecting cases).

No one monitored the substance of Plaintiff's meeting with Dubose. They just watched her physical movements. She could have had no reasonable expectation of privacy in this regard. Plaintiff acknowledged that, while she met with Dubose, a guard was stationed on the outside of the room (with glass walls on either side) looking through the window or the door three to four feet away. (Dkt. 59-1 ¶ 7.) Although Plaintiff repeatedly emphasizes the importance of the attorney-client privilege, she has identified no legal authority to support the proposition that she could possess a reasonable belief that her movements during her meeting with Dubose were confidential, despite the presence of a guard three to four feet away from them.[12] Summary judgment is thus appropriate on the illegal search claims.

---

[12] Embedded in her illegal search claim, Plaintiff adds that Defendants Adkerson, Nix, and Morales violated her First Amendment right to free speech and her Fourteenth Amendment right to due process. (Complaint I ¶ 105; Complaint II ¶ 131.) Adkerson and Nix say they did not violate these rights. (Dkt. 50-1 at 22; Dkt. 59-2 at 22–25.) Morales moved for summary judgment in full but didn't specifically address these arguments. (*See* Dkt. 61; Dkt. 61-2.) In Plaintiff's responses, she mentions only the Fourth Amendment, and does not otherwise mention

### D.     Failure to Intervene Claim Against Adams and Nix[13]

Plaintiff alleges Adams failed to intervene to stop the constitutional violations in her case, despite having seen the video and (thus) knowing it did not show her pass Dubose anything.  (Complaint II ¶ 124.)  Adams reiterates that he was not personally involved in Adkerson's investigation, that he did not review the warrant application or representations Adkerson made to the magistrate judge, and that he thus has no liability for failing to intervene.  (Dkt. 53-1 at 10–12.)  Adams adds that, even if Adkerson's investigation was allegedly flawed, he was not required to intervene.  (Dkt. 73 at 9.)  He also argues that he is entitled

---

free speech or due process.  (Dkt. 68 at 21–25; Dkt. 69 at 14–20.)  So the Court **GRANTS** summary judgment on any free speech and due process claims against Adkerson, Nix, and Morales.  *Burnett v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004) ("Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party.").

[13] Nix says Plaintiff's failure-to-intervene claim fails for several reasons, but Plaintiff does not address those arguments.  (*See* Dkts. 59-2 at 12–17; 69.)  Plaintiff also waived this claim in her response to Nix's Statement of Material Facts.  (Dkt. 69-2 at 1 ("Plaintiff has dismissed . . . the malicious prosecution claim against Nix, leaving only the illegal [search] claim against Nix.")).  So the Court **GRANTS** summary judgment on any failure-to-intervene claim against Nix.  *See Burnett*, 342 F. Supp. 2d at 1140.

to qualified immunity for claims against him in his individual capacity. (Dkt. 53-1 at 17–21.) Plaintiff devotes no section to her failure-to-intervene claim but simply says Adkerson is not entitled to qualified immunity because it is clearly established that a person cannot be arrested without a warrant if no probable cause exists. (Dkt. 69 at 9–13.) She argues that the evidence creates a dispute of fact as to whether Adams advised Adkerson that there was probable cause to arrest Plaintiff. (*Id.* at 13.) The Court agrees with Adams that he is protected by qualified immunity.

A failure to intervene claim under a theory of supervisory liability requires that the supervisor: "(1) have the ability to prevent or discontinue a known constitutional violation by exercising his or her authority over the subordinate who commits the constitutional violation, and (2) subsequently fails to exercise that authority to stop it." *Keating v. City of Miami*, 598 F.3d 753, 765 (11th Cir. 2010).

Plaintiff's claim for failure to intervene fails for the same reason her malicious prosecution claim against him fails—no evidence suggests Adams was aware of the evidence implicating Harris or exculpating Plaintiff. Put differently, there is no evidence from which a jury could

conclude he knew of a constitutional violation.  Even assuming Plaintiff could bring such a claim against Adams, Plaintiff has pointed to no clearly established law holding that a prosecutor violates the Constitution by failing to intervene in an officer's investigation, let alone under the stilted facts that Adkerson provided Adams.[14]  *Gutierrez*, 526 F.3d at 1329; (*See* Dkt. 69 at 9–13).  Indeed, the Eleventh Circuit has held that prosecutors were entitled to qualified immunity in a case in which the plaintiff claimed that the prosecutor was "aware that others were tampering with evidence and t[ook] no action to stop them."  *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1281 (11th Cir. 2002); *see also Captain Jack's Crab Shack, Inc. v. Cooke*, 2022 WL 4375364, at *10 (11th Cir. Sept. 22, 2022) (affirming the dismissal of a failure-to-intervene claim where plaintiffs alleged the prosecutors did nothing to prevent officers from investigating them, drafting a false affidavit, or conducting

---

[14] To the extent Plaintiff means that Adams failed to intervene during her prosecution, Adams is entitled to absolute immunity for his actions. *Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004) (explaining that "[a] prosecutor is entitled to absolute immunity for all actions he takes while performing his function as an advocate for the government[,]" including initiation and pursuit of criminal prosecution).

a search). Summary judgment is thus appropriate on the failure-to-intervene claim against Adams.

## IV. Conclusion

The Court **GRANTS** summary judgment for Defendants Jonathan Adams, Mike Riley, Tomekia Jordan, William Clayton Nix, John Richey, Jose Morales, and Maryjane Moss. (Dkts. 53, 55, 57, 59, 61, 63). The Court **GRANTS IN PART** and **DENIES IN PART** summary judgment for Nathan Adkerson. (Dkt. 50.) The Court grants summary judgment for Adkerson only on Plaintiff's claim for illegal search. Plaintiff's malicious prosecution claim against Adkerson survives.

**SO ORDERED** this 1st day of March, 2024.



_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE